**No. 22-13315-DD**
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
_____

**CONSUMERS' RESEARCH, CAUSE BASED COMMERCE, INC.,
EDWARD J. BLUM, KERSTEN CONWAY, SUZANNE BETTAC,
ET AL.,**

*Petitioners*,

**v.**

**FEDERAL COMMUNICATIONS COMMISSION, UNITED
STATES OF AMERICA,**

*Respondents.*

Petition for Review of an Order of the
Federal Communications Commission
Agency No. 96-45

**BRIEF OF PETITIONERS**

C. Boyden Gray
R. Trent McCotter
  *Counsel of Record*
Jonathan Berry
Michael Buschbacher
Jared M. Kelson
BOYDEN GRAY & ASSOCIATES
801 17th Street NW., Suite 350
Washington, DC 20006
202-706-5488
mccotter@boydengrayassociates.com
*Counsel for Petitioners*

*Consumers' Research v. FCC, No. 22-13315-DD*

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, Petitioners provide this Certificate of Interested Persons and Corporate Disclosure Statement. To the best of Petitioners' knowledge, the following persons and entities may have an interest in the outcome of this case:

Bayly, Joseph

Benton Institute for Broadband & Society. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Berry, Jonathan

Bettac, Suzanne

Blum, Edward J.

Boyden Gray & Associates

Buschbacher, Michael

Carr, James M.

Cause Based Commerce, Inc.

Center for Media Justice (d/b/a MediaJustice). It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Competitive Carriers Association. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Consumers' Research

Conway, Kersten

Crews, Adam G.

Federal Communications Commission

*Consumers' Research v. FCC, No. 22-13315-DD*

Gibbs, Lynn

Gibbs, Paul

Gray, C. Boyden

HWG LLP

Kelson, Jared M.

Kirby, Kwang Ja

Kirby, Tom

Kull, Robert

Lewis, Jacob M.

McCotter, R. Trent

Murray, Brian W.

National Digital Inclusion Alliance. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

National Telecommunications Cooperative Association (d/b/a NTCA – The Rural Broadband Association). It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Neal, Jason

Roth, Deanna

Roth, Jeremy

Schools, Health & Libraries Broadband Coalition. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Schwartzmann, Andrew Jay

Sinzdak, Gerard J.

*Consumers' Research v. FCC, No. 22-13315-DD*

Stern, Mark B.

Tatel, Jennifer

Thomas, Rhonda

United States of America

USTelecom – The Broadband Association. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Wilkinson, Barker & Knauer LLP

     To the best of Petitioners' knowledge, no other persons, associations of persons, firms, partnerships, or corporations have an interest in the outcome of this case or appeal.

<u>/s/ R. Trent McCotter</u>

R. Trent McCotter

*Counsel of Record for Petitioners*

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Petitioners respectfully request oral argument. This case involves novel and complex issues of constitutional and administrative law. Oral argument would substantially aid the Court in its resolution of the case.

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................ii

TABLE OF CITATIONS .........................................................................iv

STATEMENT OF JURISDICTION.......................................................... 1

INTRODUCTION.................................................................................... 3

STATEMENT OF THE ISSUES.............................................................. 10

STATEMENT OF THE CASE ................................................................ 10

    A.    Statutory and Regulatory Background ................................. 10

        1.    Universal Service Before 1996..................................... 10

        2.    Telecommunications Act of 1996 ................................. 12

        3.    Carriers Pass Section 254 Taxes Through to Consumers.................................................................... 13

        4.    The FCC Re-Delegates Its Powers to a Private Company...................................................................... 15

        5.    USAC Imposes Skyrocketing Rates, Raising Tens of Billions of Dollars...................................................... 18

        6.    Rampant Abuse, Fraud, and Waste in the Universal Service Fund ................................................................ 21

        7.    The Universal Service Fund is a Regressive Tax that Hurts the People it is Supposed to Help...................... 24

    B.    Agency Proceedings................................................................ 26

        1.    Petitioners.................................................................... 26

        2.    Proceedings at the FCC and This Court...................... 28

SUMMARY OF THE ARGUMENT ........................................................29

ARGUMENT ........................................................................................30

    I.     Petitioners Have Standing.....................................................30

    II.    The Universal Service Fund Is an Unconstitutional Delegation of Legislative Power ...........................................32

        A.   Section 254 Violates the Original Understanding of Nondelegation ...........................................................33

        B.   Section 254 Violates the Intelligible-Principle Test....39

    III.   The Nondelegation Violations Here Are Particularly Egregious Because They Involve Congress's Exclusive Power to Levy Taxes ...........................................................49

        A.   History of the Taxing Power ........................................50

        B.   Universal Service Fund Charges Are Taxes Under Supreme Court Precedent...........................................55

        C.   Expert Economic Analysis Confirms that Universal Service Fund Charges Are Taxes ...............................60

        D.   Taxing Delegations Should Be Barred or Subject to Strict Guidelines .........................................................63

    IV.   The Universal Service Fund Violates the Private Nondelegation Doctrine ......................................................64

CONCLUSION ...................................................................................70

CERTIFICATE OF COMPLIANCE....................................................72

CERTIFICATE OF SERVICE............................................................73

iii

## <u>TABLE OF CITATIONS</u>

**Page(s)**

C**ASES**

*A.L.A. Schechter Poultry Corp. v. United States*,
  295 U.S. 495 (1935) ............................................................. 47–49, 65

*Alabama Ass'n of Ins. Agents v. Bd. of Governors of Fed. Rsrv.
  Sys.*, 533 F.2d 224 (5th Cir. 1976) ......................................................... 1

*Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608 (5th Cir. 2000) ............... 36

*Am. Power & Light Co. v. SEC*, 329 U.S. 90 (1946) ............................... 44

*Blanca Tel. Co. v. FCC*, 991 F.3d 1097 (10th Cir. 2021) ........................ 15

*Carter v. Carter Coal Co.*, 298 U.S. 238 (1936)...................................... 65

*Clinton v. City of New York*, 524 U.S. 417 (1998).................................. 31

*Columbia Broad. Sys. v. United States*, 316 U.S. 407 (1942).................. 1

*Competitive Enter. Inst. v. FCC*, 970 F.3d 372 (D.C. Cir. 2020)............. 31

*Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43 (2015).................... 65

*Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.*,
  112 F.3d 1283 (5th Cir. 1997) ............................................................... 1

*Edmo v. Corizon, Inc.*, 949 F.3d 489 (9th Cir. 2020) ............................. 33

*Free Enter. Fund v. PCAOB*, 561 U.S. 477 (2010) ................................. 70

*Fund for Animals v. Kempthorne*, 538 F.3d 124 (2d Cir. 2008) ............. 68

*Georgia Republican Party v. SEC*, 888 F.3d 1198 (11th Cir. 2018) ....... 27

*Gundy v. United States*, 139 S. Ct. 2116 (2019) ....5, 33–34, 36, 38, 48, 54

*Gun Owners of Am., Inc. v. Garland*, 992 F.3d 446 (6th Cir. 2021)......... 8

iv

*Hart v. United States*, 16 Ct. Cl. 459 (1880) ........................................... 53

*In re Incomnet, Inc.*, 463 F.3d 1064
 (9th Cir. 2006) ...................................................... 7, 13, 15–17, 64–66

*In re MCP No. 165*, 20 F.4th 264 (6th Cir. 2021) ..................................... 8

*INS v. Chadha*, 462 U.S. 919 (1983) ....................................................... 53

*J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928) ..... 39, 41

*Legal Env't Assistance Found., Inc. v. EPA*,
 118 F.3d 1467 (11th Cir. 1997) ........................................................... 1

*Lichter v. United States*, 334 U.S. 742 (1948) ....................................... 41

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ..................................... 31

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ............................................ 31

*M'Culloch v. Maryland*, 4 Wheat. 428 (1819) ........................................ 53

*Mistretta v. United States*, 488 U.S. 361 (1989) ............................... 39, 43

*Nat'l Broad. Co. v. United States*, 319 U.S. 190 (1943) .......................... 44

*Nat'l Cable Television Ass'n. v. United States*,
 415 U.S. 336 (1974) ............................................................... 50, 56–57

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ................... 55

*Panama Refin. Co. v. Ryan*, 293 U.S. 388 (1935) ............................. 41, 47

*Paul v. United States*, 140 S. Ct. 342 (2019) .......................................... 34

*PHH Corp. v. CFPB*, 881 F.3d 75 (D.C. Cir. 2018) ............................... 33

*Pittston Co. v. United States*, 368 F.3d 385 (4th Cir. 2004) .................. 69

*Rural Cellular Ass'n*, 685 F.3d 1083 (D.C. Cir. 2012) ........................... 60

*Self v. Bellsouth Mobility, Inc.*, 700 F.3d 453 (11th Cir. 2012) ............ 14

*Sierra Club v. Lynn*, 502 F.2d 43 (5th Cir. 1974) ................................. 66

*Skinner v. Mid-Am. Pipeline Co.*,
    490 U.S. 212 (1989).................................................... 39, 41, 52, 59–63

*State v. Rettig*, 987 F.3d 518 (5th Cir. 2021) ........................................... 1

*Texas v. C.I.R.*, 142 S. Ct. 1308 (2022).................................................. 56

*Texas v. Rettig*, 993 F.3d 408 (5th Cir. 2021) .............................. 8, 33, 68

*Tex. Off. of Pub. Util. Couns. v. FCC*,
    183 F.3d 393 (5th Cir. 1999)........................................... 36, 46, 58–59

*Tex. Off. of Pub. Util. Couns. v. FCC*,
    265 F.3d 313 (5th Cir. 2001).............................................. 4, 36–38, 46

*Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*,
    5 F.4th 666 (6th Cir. 2021) ...................................................... 9, 32, 38

*Trafigura Trading LLC v. United States*,
    29 F.4th 286 (5th Cir. 2022) ........................................................... 55

*United States v. Becton*, 632 F.2d 1294 (5th Cir. 1980)......................... 58

*U.S. ex rel. Shupe v. Cisco Sys., Inc.*, 759 F.3d 379 (5th Cir. 2014) ....... 64

*United States v. Frame*, 885 F.2d 1119 (3d Cir. 1989) .......................... 69

*United States v. Mazurie*, 419 U.S. 544 (1975)...................................... 41

*United States v. U.S. Shoe Corp.*, 523 U.S. 360 (1998) ............. 55, 60–61

*U.S. Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004) ................... 68

*Wayman v. Southard*, 10 Wheat. 1 (1825)............................................. 54

*Weaver v. Fed. Motor Carrier Safety Admin.*,
    744 F.3d 142 (D.C. Cir. 2014) ......................................................... 1

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) .........................................9, 34, 40, 43, 49, 54, 67

*Yakus v. United States,* 321 U.S. 414 (1944) ..........................................41

### U.S. CONSTITUTION

U.S. Const. art. I, § 1................................................................... 34

U.S. Const. art. I, § 7............................................................. 50, 51

U.S. Const. art. I, § 8................................................................... 51

U.S. Const. art. I, § 9................................................................... 52

### PUBLIC LAWS AND U.S. CODE

28 U.S.C. § 2343 ....................................................................... 2

28 U.S.C. § 2344 ....................................................................... 1

47 U.S.C. § 1 .......................................................................... 12

47 U.S.C. § 254 ...............................6, 12–13, 17, 32, 37, 46, 48–49, 56–57

47 U.S.C. § 402 ....................................................................... 1

### REGULATORY MATERIALS

47 C.F.R. §§ 1............................................................................ 1

47 C.F.R. § 54 ............................................1, 13, 15–17, 29, 66–67, 69

*In re Matter of Federal-State Joint Board on Universal Service,*
  12 FCC Rcd. 8776 (1997) .................................................. 14

*In re Federal-State Joint Board on Universal Service*, 17 FCC Rcd.
  3752 (2002) .................................................................. 14

*In re USF Contribution Methodology*, 27 FCC Rcd. 5357 (2012)........... 14

*Proposed Second Quarter 2000 Universal Service Contribution Factor*, Mar. 7, 2000, https://docs.fcc.gov/public/attachments/ DA-00-517A1.pdf................................................................. 18

*Proposed First Quarter 2021 Universal Service Contribution Factor*, Dec. 14, 2020, https://docs.fcc.gov/public/attachments/ DA-20-1480A1_Rcd.pdf...................................................... 19

*Proposed Second Quarter 2021 Universal Service Contribution Factor*, Mar. 12, 2021, https://docs.fcc.gov/public/attachments/ DA-21-308A1_Rcd.pdf........................................................ 19

*Proposed Third Quarter 2021 Universal Service Contribution Factor*, June 10, 2021, https://docs.fcc.gov/public/attachments/ DA-21-676A1.pdf................................................................. 19

*Proposed Fourth Quarter 2021 Universal Service Contribution Factor*, Sept. 10, 2021, https://docs.fcc.gov/public/attachments/ DA-21-1134A1.pdf............................................................... 19

*Proposed First Quarter 2022 Universal Service Contribution Factor,* Dec. 13, 2021, https://docs.fcc.gov/public/attachments/ DA-21-1550A1.pdf............................................................... 19

*Proposed Second Quarter 2022 Universal Service Contribution Factor,* Mar. 14, 2022, https://docs.fcc.gov/public/attachments/ DA-22-268A1.pdf................................................................. 19

*Proposed Third Quarter 2022 Universal Service Contribution Factor*, June 9, 2022, https://docs.fcc.gov/public/attachments/ DA-22-623A1.pdf................................................................. 19

*Proposed Fourth Quarter 2022 Universal Service Contribution Factor*, Sept. 13, 2022, https://docs.fcc.gov/public/attachments/ DA-22-946A1.pdf........................................................ 1, 19, 28–29

MISCELLANEOUS

Doug Abrahms, *Phone Rates Will Rise for Firms, Some Homes*, WASH. TIMES, December 11, 1997........................................57

An Act Declaring the Rights and Liberties of the Subject, and
    Settling the Succession of the Crown (Bill of Rights), 1689, 1 W.
    & M., Sess. 2 ...................................................................... 51

Barbara A. Cherry & Donald D. Nystrom, *Universal Service
    Contributions: An Unconstitutional Delegation of Taxing
    Power*, 2000 L. REV. MICH. ST. U. DET. C.L. 107 (2000) ........... 6, 40, 57

DEBATES AND PROCEEDINGS IN THE CONGRESS OF THE UNITED
    STATES (Joseph Gales ed., 1834) ........................................ 52

THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE
    ADOPTION OF THE FEDERAL CONSTITUTION (Jonathan Elliot 2d
    ed., 1836) ...................................................................... 36

Christopher C. DeMuth, Sr. & Michael S. Greve, *Agency Finance
    in the Age of Executive Government*, 24 GEO. MASON L. REV. 555
    (2017)................................................................... 54–55, 58

Sam Dillon, *School Internet Program Lacks Oversight, Investigator
    Says*, N.Y. TIMES, June 18, 2004 ........................................ 23

Sam Dillon, *Waste and Fraud Besiege U.S. Program to Link Poor
    Schools to Internet*, N.Y. TIMES, June 17, 2004................................ 24

ENCYCLOPEDIA BRITANNICA (1911) ........................................... 6

FCC, *2022 Budget Estimates to Congress*, May 2021,
    https://docs.fcc.gov/public/attachments/DOC-372853A1.pdf ............. 20

THE FEDERALIST NO. 48 (James Madison) ......................................... 3, 53

THE FEDERALIST NO. 58 (James Madison) ....................................... 51, 54

Robert M. Frieden, *Universal Service: When Technologies
    Converge and Regulatory Models Diverge*, 13 HARV. J.L. &
    TECH. 395 (2000) .............................................................. 11

ix

GAO-11-11, *Improved Management Can Enhance FCC Decision Making for the Universal Service Fund Low-Income Program* (2010), http://www.gao.gov/assets/320/312708.pdf. ........................... 22

GAO-15-335, *FCC Should Evaluate the Efficiency and Effectiveness of the Lifeline Program* (2015), http://www.gao.gov/assets/670/669209.pdf ................................... 22, 26

GAO-17-538, *Additional Action Needed to Address Significant Risks in FCC's Lifeline Program* (2017), https://www.gao.gov/assets/gao-17-538.pdf. ................................ 22–23

GAO-21-24, *FCC Should Enhance Performance Goals and Measures for Its Program to Support Broadband Service in High-Cost Areas* 17 (2020), https://www.gao.gov/assets/gao-21-24.pdf ................................................................................... 25

John Locke, TWO TREATISES ON GOVERNMENT (1690) ........................ 3, 35

Ronald J. Krotoszynski, Jr., *Reconsidering the Nondelegation Doctrine: Universal Service, the Power to Tax, and the Ratification Doctrine*, 80 IND. L.J. 239 (2005) ...................... 10–12, 25

C.S. Lewis, *Poems* (2017) ...................................................... 37

Jennifer L. Mascott, *Who Are "Officers of the United States?"*, 70 STAN. L. REV. 443 (2018) .............................................. 70

*The Lifeline Fund: Money Well Spent?*, Hearing Before the H. Subcomm. on Commc'n and Tech., H. Comm. on Energy and Comm., No. 113-36 (Apr. 25, 2013), https://www.govinfo.gov/content/pkg/CHRG-113hhrg82189/pdf/CHRG-113hhrg82189.pdf ...................................................... 14, 21

Michael W. McConnell, THE PRESIDENT WHO WOULD NOT BE KING (2020) ................................................................ 53

THE COMPLETE WORKS OF M. DE. MONTESQUIEU (1777) ........................ 35

Office of the Inspector General, FCC*, The High Cost Program* (Nov. 26, 2008), http://hraunfoss.fcc.gov/edocs_public/ attachmatch/DOC-286971A1.pdf ........................................................ 21

Letter from Mark Stephens, Managing Director, FCC, to Ron Johnson, Chairman, S. Comm. on Homeland Sec. and Gov'tal Affs. (Aug. 27, 2019), https://www.fcc.gov/sites/default/files/ improper-payments-compliance-report-fy2018.pdf ........................... 23

TechFreedom, *Broadband Subsidies for Some, Broadband Taxes for Everyone* (May 28, 2015), https://techfreedom.org/ broadband-subsidies-for-some-broadband-taxes-for/ ......................... 24

St. George Tucker, BLACKSTONE'S COMMENTARIES (1803) ...................... 35

USAC, *Leadership*, https://www.usac.org/about/leadership/ ................ 15

## STATEMENT OF JURISDICTION

The Federal Communications Commission ("FCC") issued the Proposed Fourth Quarter 2022 Universal Service Contribution Factor on September 13, 2022. *See Proposed Fourth Quarter 2022 Universal Service Contribution Factor*, CC Docket No. 96-45, DA22-946, A.171. It was "deemed approved by the [FCC]" 14 days later on September 27, 2022. 47 C.F.R. § 54.709(a)(3). The Petition was timely filed with this Court on October 4, 2022. *See* 28 U.S.C. § 2344; 47 U.S.C. § 402(a); 47 C.F.R. §§ 1.4, 1.103; *Columbia Broad. Sys. v. United States*, 316 U.S. 407, 416–20 (1942); *Legal Env't Assistance Found., Inc. v. EPA*, 118 F.3d 1467, 1472 (11th Cir. 1997); *Alabama Ass'n of Ins. Agents v. Bd. of Governors of Fed. Rsrv. Sys.*, 533 F.2d 224, 235–36 (5th Cir. 1976) (binding under *Bonner*); *see also Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1287 (5th Cir. 1997) ("[W]hen an agency applies a rule, the limitations period running from the rule's publication will not bar a claimant from challenging the agency's … authority" because "an agency's application of a rule to a party creates a new, [sixty-day] cause of action to challenge … the agency's constitutional or statutory authority."); *State v. Rettig*, 987 F.3d 518, 529 (5th Cir. 2021); *Weaver v.*

*Fed. Motor Carrier Safety Admin.*, 744 F.3d 142, 145 (D.C. Cir. 2014) ("[T]he sort of 'application' that opens a rule to such a challenge is not limited to formal 'enforcement actions.'").

Venue is proper because multiple Petitioners reside in this Circuit. 28 U.S.C. § 2343. *See* Pet. for Review 3.

## <u>INTRODUCTION</u>

> *The power of the legislative being derived from the people by a positive voluntary grant … , which being only to make laws, and not to make legislators, the legislative can have no power to transfer their authority of making laws, and place it in other hands.*[1]

> *The legislative department alone has access to the pockets of the people.*[2]

Section 254 of the Telecommunications Act of 1996 established the Universal Service Fund and delegated its operation to the FCC. As its name indicates, the Universal Service Fund is designed to facilitate broad access to telecommunications services. Petitioners take no position on the wisdom of universal service, but instead object to the method by which Congress has chosen to fund it. Rather than pay for this general welfare program with an appropriation from federal revenues, Congress requires telecommunications carriers to contribute to the Universal Service Fund, with those extra costs passed along to consumers via line-items in their monthly phone bills. The Universal Service Fund then redistributes that money—amounting to nearly $10 billion annually—to

---

[1] John Locke, Two TREATISES OF GOVERNMENT bk. II, ch. XI, § 141, at 381 (1690).

[2] THE FEDERALIST NO. 48 (James Madison).

entities and projects that ostensibly will expand telecommunications services.

Unlike other welfare programs, however, the money here is raised by an agency on which Congress imposed no formula, ceiling, or other meaningful or objective restrictions. To be sure, Congress provided a list of universal service "principles," but they are so amorphous and vague that one circuit court has labeled them "aspirational only," meaning they provide no real limit on the FCC's power to raise money under the guise of "universal service." *Tex. Off. of Pub. Util. Couns. v. FCC* (*"TOPUC II"*), 265 F.3d 313, 321 (5th Cir. 2001). And to top it off, Congress expressly authorized the FCC to *redefine* "universal service" and "universal service principles" as often as it wishes.

Congress's delegation of revenue-raising power, limited only by vague "aspirational" principles, *id.*, violates the original understanding of the nondelegation doctrine. *See* Part II.A, *infra*. The Framers understood "that it would frustrate 'the system of government ordained by the Constitution' if Congress could merely announce *vague aspirations* and then assign others the responsibility of adopting legislation to realize

its goals." *Gundy v. United States*, 139 S. Ct. 2116, 2133 (2019) (Gorsuch, J., joined by Roberts, C.J. and Thomas, J., dissenting) (emphasis added).

Congress's delegation also violates the more modern intelligible-principle test. *See* Part II.B, *infra*. Although the Supreme Court has found that test satisfied by relatively open-ended statutory delegations in the context of variegated technical matters, the Court has found an intelligible principle in delegations of revenue-raising powers only in cases where Congress laid down restrictions like a ceiling on the amount raised, or formulas with objective variables that the Executive can calculate based on fact-finding.

These delegations are all the worse because the FCC has been given the power to raise *taxes*, meaning the collection of money from one group of individuals for the benefit of the general public. *See* Part III, *infra*. The Universal Service Fund's annual collections are nearly 25 times the FCC's annual budget, confirming these charges are taxes, not mere incidental fees or cost recoupments. The taxing power is the most jealously guarded legislative power, as demonstrated by the long history of Parliament wresting that power from the king to prevent a tyrannical self-funding Executive. Indeed, the label of these forced payments as

"contributions" to the Executive, 47 U.S.C. § 254(d), is reminiscent of the abusive history of English "benevolences," where the king demanded payments from subjects under the euphemistic title of "loving contributions." *See* "Benevolence," 3 ENCYCLOPEDIA BRITANNICA 728 (1911), https://en.wikisource.org/wiki/Page%3AEB1911_-_Volume_03. djvu/748.

Thus, "[u]nlike the thousands of responsibilities carried out by governmental agencies on behalf of Congress, this delegation is unique because of the unfettered power given to the FCC in defining the scope of universal service, and because Congress delegated the power to levy a tax to pay for the service with no limits, knowing that the end user, the American public, would ultimately be saddled with the burden." Barbara A. Cherry & Donald D. Nystrom, *Universal Service Contributions: An Unconstitutional Delegation of Taxing Power*, 2000 L. REV. MICH. ST. U. DET. C.L. 107, 110 (2000).

Indeed, the Universal Service Fund tax is widely acknowledged as one of the most regressive taxes in America because it hits low-income, elderly, and recent-immigrant customers the hardest.

To make matters worse, the FCC has violated the *private* nondelegation doctrine by re-delegating operation of the Universal Service Fund to the Universal Service Administrative Company ("USAC"), a private entity comprising industry insiders. Each quarter USAC announces its desired budget for the Universal Service Fund, which is ministerially converted into a tax rate on certain telecommunications revenues, and then "deemed approved" by the FCC 14 days later. This entire process happens only days before the new quarter begins, giving the FCC no option but to accept whatever numbers USAC demands. USAC then collects the forced contributions and chooses how to disburse the funds to subsidize the general welfare. *In re Incomnet, Inc.*, 463 F.3d 1064, 1067, 1072 (9th Cir. 2006).

This unaccountable state of affairs has unsurprisingly led to skyrocketing costs, with the contribution rate quintupling since 2002, as well as rampant waste, fraud, and abuse.

From start to finish, every aspect of the Universal Service Fund is designed to be as obscure, unresponsive, and opaque as possible. Congress hides behind the FCC, which hides behind USAC and a passive "deemed approved" process, which then hides behind carriers passing

7

along the levies to customers. "Of all the separation-of-powers concerns identified, perhaps this is the most troubling: the bureaucrats at the agency are unaccountable to the public. If the agency adopts an interpretation contrary to the will of the people, what recourse does the public have? Unlike legislators, agency bureaucrats are not subject to elections and are often further protected from removal by civil-service restrictions." *Gun Owners of Am., Inc. v. Garland*, 992 F.3d 446, 466 (6th Cir.), *reh'g en banc granted, opinion vacated*, 2 F.4th 576 (6th Cir. 2021), *and on reh'g en banc*, 19 F.4th 890 (6th Cir. 2021); *see also Texas v. Rettig*, 993 F.3d 408, 409 (5th Cir. 2021) (Ho, J., joined by Jones, Smith, Elrod, and Duncan, JJ., dissenting from denial of rehearing en banc) ("Congress passes problems to the executive branch and then engages in finger-pointing for any problems that might result. The bureaucracy triumphs— while democracy suffers.") (cleaned up).

This arrangement severely damages separation of powers, which is "the true mettle of the U.S. Constitution, the true long-term guardian of liberty." *In re MCP No. 165*, 20 F.4th 264, 269 (6th Cir. 2021) (Sutton, C.J., joined by Kethledge, Thapar, Bush, Larsen, Nalbandian, Readler, and Murphy, JJ., dissenting from the denial of initial hearing en banc).

If Congress believes these programs are worthy of funding, it should have to endure the public scrutiny and beneficial debate of raising money and proposing an appropriation for them. But "[b]y shifting responsibility to a less accountable branch, Congress protects itself from political censure—and deprives the people of the say the framers intended them to have." *Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*, 5 F.4th 666, 675 (6th Cir. 2021) (Thapar, J., concurring).

If allowed to stand, Congress's off-boarding of general revenue-raising to agencies, and the agencies' subsequent off-boarding to private companies, would only encourage imitation. Billions—even trillions—of dollars could be extracted from the public every year by agencies and private companies under penalty of law. It would be a politician's dream: faux-balanced budgets with faux-low taxes, but with all departments and programs still funded and flush with subsidies.

"Whether the statute delegates legislative power is a question for the courts." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 473 (2001). The Court should grant the Petition and hold that the Universal Service Fund's mechanisms for raising revenue violate the nondelegation

doctrine. This Court should also hold that re-delegation of authority over the Universal Service Fund violates the private nondelegation doctrine.

## STATEMENT OF THE ISSUES

(1)    Whether section 254 of the Telecommunications Act of 1996 is an unconstitutional delegation of legislative or taxing powers to the FCC.

(2)    Whether the FCC's re-delegation of authority to the Universal Service Administrative Company to implement the Universal Service Fund is an unconstitutional delegation to private persons and entities.

## STATEMENT OF THE CASE

### A.    STATUTORY AND REGULATORY BACKGROUND

#### 1.    UNIVERSAL SERVICE BEFORE 1996

"Since the inception of the Federal Radio Commission in 1928, and continuing with the creation of the Federal Communications Commission in 1934, the federal government has pursued a policy of providing 'universal' telephone service to all residents and businesses in the United States." Ronald J. Krotoszynski, Jr., *Reconsidering the Nondelegation Doctrine: Universal Service, the Power to Tax, and the Ratification*

*Doctrine*, 80 IND. L.J. 239, 279 (2005). This meant consumers would have access to roughly the same telecommunication services and pricing regardless of whether they were located in major metropolitan areas where service is easily provided or isolated rural communities where service is difficult to provide.

Universal service was initially a condition of the monopoly status granted to incumbent telephone companies like AT&T. *Id.* at 279–81. AT&T agreed "not [to] discriminate among 'similarly situated' users, which in practice meant that [AT&T] had a limited capacity to price service as a function of demand and marketplace conditions," and was instead "subject to a regulator-managed calculation of carrier costs and a fair rate of return." Robert M. Frieden, *Universal Service: When Technologies Converge and Regulatory Models Diverge*, 13 HARV. J.L. & TECH. 395, 401 (2000). All customers within a given geographic area thus paid the same government-regulated price, regardless of the actual cost of providing them service. Businesses and long-distance callers also paid disproportionately higher rates to subsidize the rates of local residential callers.

11

But AT&T was broken up in 1984, and the Regional Bell Operating Companies that resulted were no longer able to subsidize local services through artificially increased long-distance rates. Krotoszynski, Jr., 80 IND. L.J. at 279.

### 2.    TELECOMMUNICATIONS ACT OF 1996

When Congress passed the Telecommunications Act of 1996 (the "Act"), 47 U.S.C. § 1 *et seq.*, it opened local telephone service markets to competition, and "the last remaining part of the old universal service program, based on a system of pervasive cross-subsidies, fell." Krotoszynski, Jr., 80 IND. L.J. at 282.

Congress responded with 47 U.S.C. § 254, which expressly created a funding system to facilitate universal access. In particular, "[e]very telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the [FCC] to preserve and advance universal service." *Id.* § 254(d). The FCC has established several such "mechanisms," including a High-Cost and Low-Income Program (which includes the Connect America Fund, to mandate provision of broadband internet across the country, and the

Lifeline Program), a Schools and Libraries Program, and a Rural Health Care Program. 47 C.F.R. §§ 54.101, 54.701(c); *see also id.* §§ 54.304, 54.308, 54.404, 54.501, 54.601.

Congress imposed no formula or limitation on how much money the FCC can raise to support these mechanisms. And although the money must be spent on "universal service," that term is generically defined as "an evolving level of telecommunications services that the [FCC] shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services." 47 U.S.C. § 254(c).

### 3. CARRIERS PASS SECTION 254 TAXES THROUGH TO CONSUMERS

The FCC, by regulation, requires carriers to pay a percentage of their interstate and international telecommunications revenues at a rate set every quarter, called a quarterly Contribution Factor. *See* 47 C.F.R. § 54.709(a); *Incomnet*, 463 F.3d at 1066.

Carriers typically "pass this cost through to their subscribers." *Incomnet*, 463 F.3d at 1066, which the FCC's regulations expressly permit, *see, e.g.*, 47 C.F.R. §§ 54.407(c), 54.712(a). The "charge generally appears on phone bills as the 'Universal Service Fund Fee.'" *Incomnet*,

463 F.3d at 1066; *see also Self v. Bellsouth Mobility, Inc.*, 700 F.3d 453, 455–57 (11th Cir. 2012) (providing background of the Act and early litigation over the Universal Service Fund).

The FCC has regularly acknowledged that consumers bear the costs of the Universal Service Program through increased telephone rates. *See In re USF Contribution Methodology*, 27 FCC Rcd. 5357, 5362–63, ¶ 9 (2012); *In re Federal-State Joint Board on Universal Service*, 17 FCC Rcd. 3752, 3792, ¶ 91 (2002); *In re Federal-State Joint Board on Universal Service*, 12 FCC Rcd. 8776, 9199, ¶ 828 (1997); *id.* at 9211–12, ¶ 855; *see also* Expert Report of Dr. George Ford ("Ford Report") at 3–4 n.7, A.238–A.239 n.7.

Members of Congress have also acknowledged that the Universal Service Fund is financed by "virtually every American's money" because "at the end of the day, it is still the same taxpaying people who bear the cost, since 96 percent of the country has phone service and see a fee on their bill." Opening Statement of Chairman Greg Walden*, The Lifeline Fund: Money Well Spent?*, Hearing Before the H. Subcomm. on Commc'n and Tech., H. Comm. on Energy and Comm., No. 113-36, at 2 (Apr. 25,

2013), https://www.govinfo.gov/content/pkg/CHRG-113hhrg82189/pdf/
CHRG-113hhrg82189.pdf.

### 4. THE FCC RE-DELEGATES ITS POWERS TO A PRIVATE COMPANY

The FCC subsequently re-delegated its authority over the Universal Service Fund to USAC, a private non-profit company registered in Delaware. 47 C.F.R. § 54.701(a) ("The Universal Service Administrative Company is appointed the permanent Administrator of the federal universal service support mechanisms ...."); *Incomnet*, 463 F.3d at 1067.

USAC is an "independent subsidiary of the National Exchange Carrier Association, Inc.," 47 C.F.R. § 54.5, which "is a membership organization of telecommunications carriers," *Blanca Tel. Co. v. FCC*, 991 F.3d 1097, 1105 (10th Cir. 2021). USAC has a 19-member Board of Directors comprising individuals from various "interest groups that are interested in and affected by universal service programs" and who are nominated "by their respective interest groups." USAC, *Leadership*, https://www.usac.org/about/leadership/; *see* 47 C.F.R. § 54.703(b). After their nomination, USAC board members are approved by the Chair of the FCC. 47 C.F.R. § 54.703(c)(3).

USAC is charged with establishing the budget for the Universal Service Fund. *Id.* § 54.709(a). Each quarter, USAC's board announces a proposed contribution amount—essentially how much money USAC wants for "universal service" for the next quarter. The FCC's Office of Managing Director then ministerially calculates what percentage of all telecommunication carriers' expected interstate and international end-user revenues would be necessary to reach that target. *Id.*; *see also id.* § 54.706(a) (listing 19 types of taxed services). This number is published as the proposed quarterly Contribution Factor.

A quarterly Contribution Factor is "deemed approved" by the FCC unless it acts within 14 days of publication. *Id.* § 54.709(a)(3). It appears the FCC has never rejected or meaningfully modified USAC's proposed budget—the entire process is automated, as the rate is deemed approved shortly after proposal, only a few days before the start of the next quarter when the new rate takes effect.

USAC takes the contributions it receives from carriers and deposits them into the Universal Service Fund, then chooses how to disburse funds to subsidize the general welfare via provision of service to libraries, schools, rural areas, and high-cost areas. *Incomnet*, 463 F.3d at 1067,

16

1072. USAC generally divides these funds among its High-Cost and Low-Income Program, its Schools and Libraries Program, and its Rural Health Care Program. 47 C.F.R. §§ 54.101, 54.701(c); *see also id.* §§ 54.304, 54.308, 54.404, 54.501, 54.601.

As the Ninth Circuit has held, USAC does not act as the FCC's agent. *Incomnet*, 463 F.3d at 1074 (citing 47 C.F.R. § 54.715(c)). The FCC exercises power over the Universal Service Fund only in the most indirect manner and has no ability to control the funds through direct seizure or discretionary spending. *Id.*

Neither the specific recipients nor the specific beneficiaries of the funds are named in the Act, nor did Congress impose any formula or limitation on the rate or how much money can be collected (beyond a requirement that it be "equitable and nondiscriminatory"), nor how to spend it (beyond that it be on "universal service," which the FCC is then expressly permitted to define). *Id.* at 1066; 47 U.S.C. § 254(c), (d).

In short, USAC decides how much to collect, mandates payments under penalty of law, and then "decides if, when, and how it disburses funds on behalf of [Universal Service Fund] beneficiaries." *Incomnet*, 463 F.3d at 1076 (citing 47 C.F.R. §§ 54.701(a), 54.704(a), 54.705, 54.715).

17

## 5. USAC IMPOSES SKYROCKETING RATES, RAISING TENS OF BILLIONS OF DOLLARS

Without congressionally imposed formulas or limits on how much money the FCC or USAC can raise for the Universal Service Fund, the amounts have predictably skyrocketed.

In the second quarter of 2000, USAC's budget imposed a Contribution Factor of 5.7% on all end-user interstate telecommunication revenues, amounting to an expected $1.1 billion in forced contributions for that quarter. *Proposed Second Quarter 2000 Universal Service Contribution Factor*, Mar. 7, 2000, https://docs.fcc.gov/public/attachments/DA-00-517A1.pdf.

The rate steadily climbed, and in 2021 and 2022 it jumped to unprecedented levels. For the first quarter 2021, USAC set the Contribution Factor at 31.8% with $2.4 billion collected; for the second quarter it was 33.4% with $2.5 billion collected; for the third quarter it was 31.8% with $2.3 billion collected. And for the fourth quarter, it was 29.1% with $2.1 billion collected, meaning over $9 billion collected for the entire year. *See Proposed First Quarter 2021 Universal Service Contribution Factor*, Dec. 14, 2020, https://docs.fcc.gov/public/attachments/DA-20-1480A1_Rcd.pdf; *Proposed Second Quarter*

18

*2021 Universal Service Contribution Factor*, Mar. 12, 2021, https://docs.fcc.gov/public/attachments/DA-21-308A1_Rcd.pdf; *Proposed Third Quarter 2021 Universal Service Contribution Factor*, June 10, 2021, https://docs.fcc.gov/public/attachments/DA-21-676A1.pdf; *Proposed Fourth Quarter 2021 Universal Service Contribution Factor*, Sept. 10, 2021, https://docs.fcc.gov/public/attachments/DA-21-1134A1.pdf.

In 2022, the quarterly rates were 25.2%, 23.8%, 33.0%, and 28.9%, respectively. *See Proposed First Quarter 2022 Universal Service Contribution Factor*, Dec. 13, 2021, *available at* https://docs.fcc.gov/public/attachments/DA-21-1550A1.pdf; *Proposed Second Quarter 2022 Universal Service Contribution Factor*, Mar. 14, 2022, *available at* https://docs.fcc.gov/public/attachments/DA-22-268A1.pdf; *Proposed Third Quarter 2022 Universal Service Contribution Factor*, June 9, 2022, *available at* https://docs.fcc.gov/public/attachments/DA-22-623A1.pdf; *Proposed Fourth Quarter 2022 Universal Service Contribution Factor*, Sept. 13, 2022, *available at* https://docs.fcc.gov/public/attachments/DA-22-946A1.pdf.

Thus, since 2000, the Contribution Factor has quintupled:



Quarterly USF Contribution Factor (2000 Q2 to 2022 Q4)

And the scheme now yields nearly $10 billion annually, roughly 25 times the FCC's entire annual budget. *See* FCC, *2022 Budget Estimates to Congress*, May 2021, https://docs.fcc.gov/public/attachments/DOC-372853A1.pdf.



6.    RAMPANT ABUSE, FRAUD, AND WASTE IN THE UNIVERSAL
SERVICE FUND

Given its lack of accountability and limitations, and the fact that USAC is populated with self-described industry insiders, the Universal Service Fund has predictably demonstrated—in the words of then-Senator Claire McCaskill—a "history of extensive waste and abuse." *See* Opening Statement of Chairman Greg Walden, *The Lifeline Fund: Money Well Spent?*, *supra*, at 2 (quoting Sen. McCaskill).

For example, a November 2008 report by the FCC's Inspector General found that 23.3% of payments made from the Universal Service Fund for the High Cost Program from 2007 to 2008 were "erroneous," amounting to nearly $1 billion wasted. Office of the Inspector General, FCC, *The High Cost Program* 2 (Nov. 26, 2008), http://hraunfoss.fcc.gov/edocs_public/attachmatch/DOC-286971A1.pdf.

An October 2010 report by the Government Accountability Office ("GAO") concluded that the Universal Service Fund "lacks key features of effective internal controls," explaining that "the number and scope of USAC's audits have been limited and there is no systematic process in place to review the findings of those audits that are conducted," nor had the FCC or USAC even considered looking for risks like "the possibility

that multiple carriers may claim support for the same telephone line and that households may receive more than one discount, contrary to program rules." GAO-11-11, *Improved Management Can Enhance FCC Decision Making for the Universal Service Fund Low-Income Program* (2010), http://www.gao.gov/assets/320/312708.pdf.

In March 2015, GAO issued another report critical of the Universal Service Fund's Lifeline Program, designed to ensure the availability of telephone voice service for low-income Americans, and recommended improvements to the program to reduce waste and fraud. GAO-15-335, *FCC Should Evaluate the Efficiency and Effectiveness of the Lifeline Program* (2015), http://www.gao.gov/assets/670/669209.pdf.

In May 2017, the GAO issued yet another report, finding that USAC had largely failed to implement the recommendations from the 2015 report and had relied "on over 2,000 Eligible Telecommunication Carriers that are Lifeline providers to implement key program functions, such as verifying subscriber eligibility," an unnecessarily "complex internal control environment [that] is susceptible to risk of fraud, waste, and abuse as companies may have financial incentives to enroll as many customers as possible." GAO-17-538, *Additional Action Needed to*

*Address   Significant   Risks   in   FCC's   Lifeline   Program* (2017), https://www.gao.gov/assets/gao-17-538.pdf.

Nationwide, "GAO was unable to confirm whether about 1.2 million individuals of the 3.5 million it reviewed, or 36 percent, participated in a qualifying benefit program, such as Medicaid, as stated on their Lifeline enrollment application." *Id.* In some states, nearly 80% of actual Lifeline users may be legally ineligible for the service. *Id.* at 42. And the Lifeline Program was estimated to have spent $1.2 million *annually* on users confirmed to have been deceased. *Id.* at 43.

In 2019, the FCC's Managing Director reviewed an Inspector General report and found that USAC was *still* out of compliance in numerous critical aspects, resulting in substantial wasted money. Letter from Mark Stephens, Managing Director, FCC, to Ron Johnson, Chairman, S. Comm. on Homeland Sec. and Gov'tal Affs. (Aug. 27, 2019), https://www.fcc.gov/sites/default/files/improper-payments-compliance-report-fy2018.pdf.

During one oversight hearing, the FCC's Inspector General agreed that "applicants view this program as a big candy jar, free money." Sam Dillon, *School Internet Program Lacks Oversight, Investigator Says*, N.Y.

TIMES, June 18, 2004, at A22; *see also* Sam Dillon, *Waste and Fraud Besiege U.S. Program to Link Poor Schools to Internet*, N.Y. TIMES, June 17, 2004, at A20.

Moreover, the FCC does not open its quarterly Contribution Factor process to a meaningful notice-and-comment process or period, making it even more difficult for the public to exercise any level of influence or oversight.

### 7. THE UNIVERSAL SERVICE FUND IS A REGRESSIVE TAX THAT HURTS THE PEOPLE IT IS SUPPOSED TO HELP

Given its lack of accountability, it is unsurprising that the Universal Service Fund acts as a reverse Robinhood—take from the poor and give to the rich, or, as noted above, the fraudsters. Because the FCC levies a flat tax, customers pay the same percentage regardless of their income or bill amount, making it among the "most regressive taxes in America, so families just above the eligibility threshold will suffer most." TechFreedom, *Broadband Subsidies for Some, Broadband Taxes for Everyone* (May 28, 2015), https://techfreedom.org/broadband-subsidies-for-some-broadband-taxes-for/ (quoting Berin Szoka).

Even in the best light, the Universal Service Fund "arguably hurts as many poor consumers as it benefits. Because the burden of this

funding is concentrated on certain telecommunications services, rather than drawn from general revenues, the base of the 'tax' is relatively narrow, and the markups on the prices of services generating the subsidy are quite high. A single, low-income mother, living in the Bronx, with a cell phone for personal safety, pays 10% or more of her monthly wireless telephone bill to support universal service for wealthy Montana residents living on ranchettes." Krotoszynski, Jr., 80 IND. L.J. at 314 (cleaned up).

A recent GAO report acknowledged the universal wisdom among economists that the universal service charge "functions like a 'regressive tax,' which is a tax that is not sensitive to the income levels of consumers and businesses." GAO-21-24, *FCC Should Enhance Performance Goals and Measures for Its Program to Support Broadband Service in High-Cost Areas* 17 (2020), https://www.gao.gov/assets/gao-21-24.pdf. Additionally, the high-cost program "has focused relatively more on broadband than on voice services in recent years," but "lower income and older Americans may be more likely to rely solely on voice connections than other demographic groups." *Id.* In other words, the Universal Service Fund is not focused on providing the services that low-income

Americans actually use, but instead makes them pay for advanced telecommunications for wealthier Americans.

Indeed, a separate GAO report found that the FCC had not even bothered to evaluate the Universal Service Fund's effectiveness in achieving certain goals. For example, the low-income Lifeline Program may not have played *any* meaningful role in improving the "level of low-income households' subscribing to telephone service over the past 30 years," despite costing billions of dollars ultimately passed along to consumers. GAO-15-335, *supra*.

## B.  AGENCY PROCEEDINGS

### 1.    PETITIONERS

Petitioners comprise several organizations and individuals, all of whom are adversely affected by Universal Service Fund charges.

Petitioner Consumers' Research is an independent educational 501(c)(3) nonprofit organization whose mission is to increase the knowledge and understanding of issues, policies, products, and services of concern to consumers. *See Comments and Objections of Consumers' Research et al.* ("*Petitioners' September Comment*") 25–26, CC Docket No. 96-45 (Sept. 13, 2022), A.200–A.201. Consumers' Research has Verizon

26

phone service in its own name, paid with its own funds. *Id.* The monthly bill contains the Universal Service Charge as a separate line item entitled "Federal Universal Service Fee." *Id.*

Petitioner Cause Based Commerce, Inc., is a reseller of telecommunications services, also known as a mobile virtual network operator. Ex. 1 (Condit Decl.) ¶¶ 3–4.[3] Cause Based Commerce sends 5% of customers' monthly plan price to a cause/charity of the customer's choosing. *Petitioners' September Comment* 26, A.201. Cause Based Commerce pays directly into the Universal Service Fund. Condit Decl. ¶ 4.

The remaining Petitioners are individuals who pay the Universal Service Fund tax in their monthly phone bills. *See Petitioners' September Comment* 26–28, A.201–A.203; Ex. 2 (Blum Decl.) ¶ 3; Ex. 3 (Bayly Decl.) ¶ 3; Ex. 4 (Roth Decl.) ¶ 4.

---

[3] Petitioners' declarations, submitted only to demonstrate standing, are attached to this brief. *See Georgia Republican Party v. SEC*, 888 F.3d 1198, 1201 (11th Cir. 2018) (in a case on petition to an agency, the petitioners may provide "'affidavit[s] or other evidence'" attached to their opening brief to demonstrate standing).

### 2.    PROCEEDINGS AT THE FCC AND THIS COURT

On August 2, 2022, USAC proposed its Fourth Quarter 2022 Universal Service Fund budget, seeking approximately $1.9 billion in total collections over the upcoming quarter. *See* USAC, *Federal Universal Service Support Mechanisms Fund Size Projections for Fourth Quarter 2022* (Aug. 2, 2021), A.1.

On August 5, 2022, a group of Petitioners filed a Comment with the FCC, challenging the legality of the Universal Service Fund. *See Comments and Objections of Consumers' Research et al.*, CC Docket No. 96-45 (Aug. 5, 2022), A.63. In addition to arguing that the Universal Service Fund violates numerous constitutional and statutory requirements, Petitioners included an expert report from Dr. George S. Ford, a former FCC economist who explained why the Universal Service Fund charge is indeed a "tax," not a mere incidental "fee." *See* Ford Report, A.122.

On September 13, 2022, the FCC's Office of Managing Director issued a *Public Notice of Proposed Fourth Quarter 2022 Universal Service Contribution Factor*, with a proposed 28.9% tax rate on all interstate and international telecommunications revenues to raise the $1.9 billion that

USAC demanded. *Proposed Fourth Quarter 2022 Universal Service Contribution Factor*, Public Notice, DA Docket No. 22-946, FCC 96-45 (rel. Sept. 13, 2022), A.171.

Later that same day, Petitioners filed another Comment, raising the same arguments as in their August Comment and again attaching the Ford Report. *See Petitioners' September Comment*, A.176. On September 27, 2022, the 28.9% tax rate was "deemed approved by the Commission" pursuant to regulation. 47 C.F.R. § 54.709(a)(3).

Petitioners timely filed their Petition in this Court just seven days later, on October 4, 2022.[4]

## SUMMARY OF THE ARGUMENT

This Court should grant the Petition and vacate the *Proposed Fourth Quarter 2022 Universal Service Contribution Factor*. The Universal Service Fund's mechanisms for raising revenue are unconstitutional. Congress delegated its legislative power in violation of

---

[4] Various groups of Petitioners have challenged other quarterly contribution factors in the Fifth and Sixth Circuits. *See Consumers' Rsch. v. FCC*, No. 21-3886 (6th Cir.); *Consumers' Rsch. v. FCC*, No. 22-60008 (5th Cir.) (argument set for December 2022); *Consumers' Rsch. v. FCC*, No. 22-60195 (5th Cir.) (stayed pending outcome in No. 22-60008); *Consumers' Rsch. v. FCC*, No. 22-60363 (5th Cir.) (stayed pending outcome in No. 22-60008).

Article I of the Constitution. This delegation is unconstitutional under both an original understanding of nondelegation doctrine and the modern intelligible-principle test. *See* Part II, *infra.* The violation is particularly egregious because it involves Congress's exclusive power to levy taxes. *See* Part III, *infra.*

Operation of the Universal Service Fund is also unconstitutional because the FCC has delegated its authority to USAC, including the revenue-raising functions, violating the private nondelegation doctrine. *See* Part IV, *infra.*

## ARGUMENT

## I.    PETITIONERS HAVE STANDING

Petitioners have standing to bring this action. Most Petitioners pay a separate line-item in their monthly phone bill that is expressly earmarked for the Universal Service Fund, with the precise amount based on the quarterly Contribution Factor determined pursuant to section 254 of the Act. But for the issuance of that Contribution Factor, no Petitioner would have any obligation to pay. They have paid that extra cost in the past (including in Fourth Quarter 2022) and, because they intend to maintain phone service, will continue paying that tax on a

monthly basis. *See Petitioners' September Comment* 26–28, A.201–A.203; Ex. 2 (Blum Decl.) ¶ 3; Ex. 3 (Bayly Decl.) ¶ 3; Ex. 4 (Roth Decl.) ¶ 4.

Increases in monthly "bills" are sufficient to establish standing in a suit against the FCC because those costs "are 'certainly an injury-in-fact,'" and "next month's [] bill is 'certainly impending.'" *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 383 (D.C. Cir. 2020); *see also Clinton v. City of New York*, 524 U.S. 417, 433 (1998) ("Any petitioner who is likely to suffer economic injury as a result of governmental action that changes market conditions satisfies this part of the standing test.") (cleaned up).

Moreover, Petitioner Cause Based Commerce, Inc., is a mobile virtual network operator, which is a regulated entity required to contribute directly to the Universal Service Fund, with the amount likewise based on the Contribution Factor. *See* Ex. 1 (Condit Decl.) ¶¶ 3–4. Where "the plaintiff is himself an object of the action (or forgone action) at issue … there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992).

These injuries are more than sufficient to establish standing and authorize this Court's review. *See Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) ("Only one of the petitioners needs to have standing to permit us to consider the petition for review.").

## II.  THE UNIVERSAL SERVICE FUND IS AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE POWER

The Founders "separated powers within the Federal Government: The legislative power went to Congress; the executive to the president; and the judicial to the courts. That is the equilibrium the Constitution demands. And when one branch impermissibly delegates its powers to another, that balance is broken." *Tiger Lily*, 5 F.4th at 673 (Thapar, J., concurring). The uniquely broad delegation of revenue-raising power here upsets that balance and violates the nondelegation doctrine under any test.

In 47 U.S.C. § 254(d), Congress directed the FCC to raise money from telecommunication carriers to subsidize the Universal Service Fund, but Congress placed no formula or meaningful limitations on the amount the FCC can raise, which is limited only by aspirational principles outlining universal service—which Congress authorized the FCC to redefine anyway.

Congress's delegation to an executive agency of such limitless revenue-raising power violates both the original understanding of the nondelegation doctrine and the more modern intelligible-principle test.

## A.  SECTION 254 VIOLATES THE ORIGINAL UNDERSTANDING OF NONDELEGATION

Lower courts are of course bound by Supreme Court precedent but "should resolve questions about the scope of those precedents in light of and in the direction of the constitutional text and constitutional history." *PHH Corp. v. CFPB*, 881 F.3d 75, 196 (D.C. Cir. 2018) (Kavanaugh, J., joined by Randolph, J., dissenting); *see Rettig*, 993 F.3d at 418 (Ho, J., joined by Jones, Smith, Elrod, and Duncan, JJ., dissenting from denial of rehearing en banc) (same); *Edmo v. Corizon, Inc.*, 949 F.3d 489, 506 (9th Cir. 2020) (Bumatay, J., joined by Callahan, Ikuta, R. Nelson, Bade, and VanDyke, JJ., dissenting from denial of rehearing en banc) (same).

The revenue-raising scheme for the Universal Service Fund violates the original understanding of nondelegation, which prohibited any transfer of Congress's vested legislative powers to another entity. *See Gundy*, 139 S. Ct. at 2135–37 (Gorsuch, J., joined by Roberts, C.J., and Thomas, J., dissenting). Article I of the Constitution begins: "*All legislative Powers herein granted shall be vested in a Congress*"

33

(emphasis added), and the Constitution vests legislative power nowhere else.[5] This meant that Congress must "make[] the policy decisions when regulating private conduct" and only can "authorize another branch to 'fill up the details'" or "make the application of that rule depend on executive fact-finding." *Id.*; *see also Paul v. United States*, 140 S. Ct. 342, 342 (2019) (Kavanaugh, J., statement respecting the denial of certiorari) ("[M]ajor national policy decisions must be made by Congress and the President in the legislative process, not delegated by Congress to the Executive Branch.").

The absolute bar on delegating this power elsewhere was a fundamental principle underlying the separation of powers and on which the Constitution was premised. John Locke called the legislative power "a positive voluntary grant" by the people to the legislature, and that grant was "only to make laws, and not to make legislators," meaning a legislature "can have no power to transfer their authority of making laws,

---

[5] The legislative power is the power to "adopt generally applicable rules of conduct governing future actions by private persons." *Gundy*, 139 S. Ct. at 2133 & nn.17–18 (Gorsuch, J., joined by Roberts, C.J., and Thomas, J., dissenting) (collecting sources); *see also Whitman*, 531 U.S. at 487 (Thomas, J., concurring) ("[T]here are cases in which … the significance of the delegated decision is simply too great for the decision to be called anything other than 'legislative.'").

and place it in other hands."[6] St. George Tucker echoed this sentiment shortly after the Constitution was ratified, explaining that the separation of powers—including nondelegation of the legislative power—"has been uniformly the policy, and constitutes one of the fundamental principles of the American governments."[7] And the Founders were deeply influenced by Montesquieu, who warned that "[w]hen the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no liberty," as those who "enact tyrannical laws" would "execute them in a tyrannical manner."[8]

Consistent with these views, James Madison explained during the Ratification Debates that "[i]f nothing more were required, in exercising a legislative trust, than a general conveyance of authority—without laying down any precise rules by which the authority conveyed should be carried into effect—it would follow that the whole power of legislation might be transferred by the legislature from itself, and proclamations

---

[6] John Locke, TWO TREATISES OF GOVERNMENT bk. II, ch. XI, § 141, at 381 (1690).

[7] 1 St. George Tucker, BLACKSTONE'S COMMENTARIES App. 203 (1803).

[8] 1 THE COMPLETE WORKS OF M. DE MONTESQUIEU bk. 11, ch. VI, at 199 (1777).

might become substitutes for law." 4 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 560 (Jonathan Elliot ed., 2d ed. 1836).

Section 254 undoubtedly authorizes the FCC to "adopt generally applicable rules of conduct governing future actions by private parties," *Gundy*, 139 S. Ct. at 2133 (Gorsuch, J., joined by Roberts, C.J., and Thomas, J., dissenting), and therefore fails the nondelegation test. Rather than make policy choices itself, Congress in section 254 intentionally "'delegate[d] difficult policy choices to the Commission's discretion.'" *TOPUC II*, 265 F.3d at 321 (quoting *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 615 (5th Cir. 2000)); *see also Tex. Off. of Pub. Util. Couns. v. FCC ("TOPUC I")*, 183 F.3d 393, 411 (5th Cir. 1999) (similar). But it is the duty of Congress—not an agency—to make "difficult policy choices." *See Gundy*, 139 S. Ct. at 2135–37 (Gorsuch, J., joined by Roberts, C.J., and Thomas, J., dissenting).

Here, Congress made no effort to guide or restrict the FCC's authority to raise revenue for the Universal Service Fund, either directly via limits or formulas, or indirectly via meaningful definitions of the FCC's scope of power. This failure is evident in the quintupling of the

contribution factor over the last two decades, even though the relevant statutory language has remained unchanged. The nearly $10 billion in annual Universal Service Fund collections now dwarf the less-than $400 million congressionally appropriated budget for the entire FCC—an astounding ratio of roughly 25:1.

Although revenues and spending are ostensibly limited to the subject matter of "universal service," Congress outlined that term using only the most generic "principles"—which the Fifth Circuit has labeled "aspirational only" because they are so amorphous, *TOPUC II*, 265 F.3d at 321—and then allowed the FCC to redefine "universal service" and its "principles" as often as the FCC wishes, including based on "[s]uch other principles as … the Commission determine[s] are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter." 47 U.S.C. § 254(c)(1), (b). It is thus next to impossible to say whether the FCC is being faithful to its statutory mission, as defining that mission is itself part of the FCC's statutory grant of power. *Cf.* C.S. Lewis, "Evolutionary Hymn," in *Poems* 86 (2017) ("Never knowing where we're going, / We can never go astray.").

Deciding how much money to raise is quintessentially a legislative policy choice, not one that can be delegated to an agency using only "aspirational" and vague language. *See, e.g.*, Part III.A, *infra*. The FCC thus does far more than merely "fill up the details"—the FCC creates the entire scheme, defines the terms, raises as much money as it wants, and then spends it, based on nothing more than Congress's vague aspiration to provide telecommunication service broadly.[9]

The FCC's power to fundraise based solely on parameters that are "aspirational only," *TOPUC II*, 265 F.3d at 321, directly violates the Framers' understanding "that it would frustrate 'the system of government ordained by the Constitution' if Congress could merely announce *vague aspirations* and then assign others the responsibility of adopting legislation to realize its goals," *Gundy*, 139 S. Ct. at 2133 (Gorsuch, J., joined by Roberts, C.J. and Thomas, J., dissenting) (emphasis added).

And although some argue that "modern society is too complex to be run by legislators—better to leave it to the agency bureaucrats," the

---

[9] As discussed below, many of these steps are actually undertaken by USAC, a private company. *See* Part IV, *infra*.

"original meaning, history, and structure of our Constitution" confirms that "these arguments should not carry any weight," *Tiger Lily,* 5 F.4th at 674 (Thapar, J., concurring), especially in the quintessentially legislative context of raising revenue.

Accordingly, under the original understanding of nondelegation, the Universal Service Fund's mechanisms for raising revenue are unconstitutional.

### B.    SECTION 254 VIOLATES THE INTELLIGIBLE-PRINCIPLE TEST

The FCC's unfettered power to raise revenue under section 254 also runs afoul of the more-lenient modern interpretation of the nondelegation doctrine, which broadly permits an agency to undertake legislative action if Congress provided an "intelligible principle." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928). Under that test, Congress still must "clearly delineate[]" the "boundaries of th[e] delegated authority." *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 214 (1989).

What suffices as an intelligible principle will vary based on "'the extent and character'" of the power sought to be delegated, *Mistretta v. United States*, 488 U.S. 361, 372 (1989), and "the degree of agency

discretion that is acceptable varies according to the scope of the power congressionally conferred," *Whitman*, 531 U.S. at 475.

### 1. Congress Imposed No Objective Limits on the FCC's Revenue-Raising Power.

The "power congressionally conferred" on the FCC here, *id.*, is uniquely broad. Congress provided no meaningful formulas or limits on how much money the FCC can raise. "Unlike the thousands of responsibilities carried out by governmental agencies on behalf of Congress, this delegation is unique because of the unfettered power given to the FCC in defining the scope of universal service, and because Congress delegated the power to levy a tax to pay for the service with no limits, knowing that the end user, the American public, would ultimately be saddled with the burden." Cherry & Nystrom, 2000 L. REV. MICH. ST. U. DET. C.L. at 110.

The Supreme Court's nondelegation cases involving revenue-raising statutes demonstrate what suffices as an intelligible principle in this context. In *Hampton*, for example, the Supreme Court upheld a statute authorizing the Executive to calculate and collect customs duties because Congress had laid out a precise formula for objectively calculating such revenues based on the difference in cost between foreign

production and domestic production, and Congress expressly barred the Executive from setting tariffs that varied by more than 50% from the figures Congress had established. 276 U.S. at 404–05. The Executive then undertook objective fact-finding to calculate those values.

Similarly, in *Skinner*, the Court upheld the Secretary of Transportation's authority to impose charges on certain oil revenues, noting the statute contained a ceiling and objective variables. The "Secretary has no discretion whatsoever to expand the budget … because the ceiling on aggregate fees that may be collected in any fiscal year is set at 105 percent of the aggregate appropriations made by Congress for that fiscal year," and the tax had to bear a "reasonable relationship" to purely objective measurements like "volume-miles, miles, or revenues." 490 U.S. at 214. The Court tied those limits to its holding: "We have no doubt that these multiple restrictions Congress has placed on the Secretary's discretion to assess pipeline safety user fees satisfy the constitutional requirements of the nondelegation doctrine as we have previously articulated them." *Id.*[10]

---

[10] Other cases likewise set meaningful restrictions. For example, *Yakus v. United States* approved the wartime conferral of agency power to fix

(*footnote continued on next page*)

But unlike the statutes in *Hampton* and *Skinner*, section 254 contains no discrete formula or objective ceiling that restricts the Executive's ability to raise revenues for the Universal Service Fund.

By contrast, in cases where the statutory provision at issue regulates complex and variegated technical matters, the Court has held that the "infinitely variable conditions [that] constitute the essence of the program" allow for more statutory "flexibility" to satisfy the intelligible-principle test. *Lichter v. United States*, 334 U.S. 742, 785 (1948). In *Whitman*, for example, the Court upheld a statute that authorized the Environmental Protection Agency to set "ambient air quality standards the attainment and maintenance of which in the judgment of the

---

the prices of commodities at a level that "'will be generally fair and equitable and will effectuate the purposes of th[e] Act.'" 321 U.S. 414, 420 (1944). But the statute required that "due consideration" "shall" be given to "the prices prevailing between October 1 and October 15, 1941," and that wages and salaries shall be "stabilize[d]" "'so far as practicable'" at the "levels which existed on September 15, 1942." *Id.* at 421. Moreover, the wartime aspect of *Yakus* would render it a poor analogue to general revenue-raising statutes. *See Panama Refin. Co. v. Ryan*, 293 U.S. 388, 422 (1935) (noting that wartime delegations typically "afford no adequate basis" for a nondelegation challenge because they usually involve "an authority which was cognate to the conduct by [the President] of the foreign relations of the government"); *United States v. Mazurie*, 419 U.S. 544, 556–57 (1975) ("Those limitations are, however, less stringent in cases where the entity exercising the delegated authority itself possesses independent authority over the subject matter.").

Administrator, based on the criteria documents of § 108 [of the Clean Air Act] and allowing an adequate margin of safety, are requisite to protect the public health." 531 U.S. at 471 (cleaned up). The Court noted that discretion "inheres in" such a complicated scientific determination, such that Congress was not required to say "how much of the regulated harm is too much." *Id.* at 475 (cleaned up).[11]

Moreover, *Whitman* avoided nondelegation concerns by narrowly interpreting the relevant statute, *see id.* at 473, following the Court's practice of "giving narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional," *Mistretta*, 488 U.S. at 373 n.7. But no such narrowing construction is available to save the Universal Service Fund's amorphous grant of power to the FCC.

Similarly, in *American Power & Light Co. v. SEC*, the Court approved of a statute authorizing the Securities and Exchange Commission to modify the structure of complex holding companies to ensure they are not "unduly or unnecessarily complicate[d]" and do not

---

[11] *Whitman* did not examine the correctness of the "intelligible principle" test because "none of the parties … examined the text of the Constitution or asked [the Court] to reconsider [its] precedents on cessions of legislative power." 531 U.S. at 487 (Thomas, J., concurring).

43

"unfairly or inequitably distribute voting power among security holders," because other portions of the relevant statutes gave meaning to those restrictions, and, in any event, "[n]ecessity" would prevent Congress from "apprais[ing] before-hand the myriad situations" in which these "complex" businesses could structure themselves. 329 U.S. 90, 104–05 (1946). And in *National Broadcasting Co. v. United States*, the Court approved statutes allowing the FCC to regulate "chain broadcasting" (i.e., where a program is simultaneously broadcast by multiple connected stations) in the "public interest, convenience, or necessity." 319 U.S. 190, 194 n.1, 216 (1943). The Court held that this language "'is as concrete as the complicated factors for judgment in such a field of delegated authority permit,'" especially given that the field of radio wave regulations was then "both new and dynamic." *Id.* at 216, 219.

In determining whether the Universal Service Fund provides an intelligible principle, the proper analogues are the revenue-raising statutes in *Hampton* and *Skinner*, not the open-ended complex, technical determinations delegated in *Whitman*, *American Power*, or *National Broadcasting*. Here, Congress failed to impose any of the express, objective restrictions that would provide an intelligible principle in the

context of a statute that, in essence, delegates a general grant of revenue-raising power to the Executive.

### 2. Congress's Policy Statements Impose No Meaningful Limitations on the FCC's Revenue Power.

Nor does the Act provide meaningful *implied* limitations on the FCC's power to raise revenues. To be sure, the FCC theoretically is "limited" in the sense that it can raise money only for "universal service," but that definition is so standardless and broad—indeed, "universal"—that it serves as no limit at all. The "principles" provided in the statute are often little more than tautologies:

- "Quality service should be available at just, reasonable, and affordable rates";

- "Access to advanced telecommunications and information services should be provided in all regions of the Nation";

- "Consumers in all regions of the Nation … should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas";

and, of course,

- "Such other principles as the Joint Board and the Commission determine are necessary and appropriate for the protection of

45

> the public interest, convenience, and necessity and are consistent with [the Act]."

47 U.S.C. § 254(b).

The Fifth Circuit has previously held that "the lofty and expansive language of § 254(b) hardly constitute[s] a series of specific statutory commands," and therefore is "aspirational only." *TOPUC II*, 265 F.3d at 321 (cleaned up). Indeed, most of these principles are prefaced with "should," not "shall" or "must." *See TOPUC I*, 183 F.3d at 418 ("Generally speaking, courts have read 'shall' as a more direct statutory command than words such as 'should' or 'may.'"). This confirms that Congress did not place any meaningful limits on the FCC's revenue-raising power for universal service.

Section 254(b)'s vague list is similar to the policy statement in the statute that *Panama Refining* invalidated as an unconstitutional delegation. That statute—which elsewhere authorized the President to prohibit transportation of certain petroleum products—stated that the purpose of the statutory regime was

> to eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of production (except as may be temporarily required), to increase the

46

> consumption of industrial and agricultural products by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources.

293 U.S. at 417. The Court held that these statements provided no meaningful "policy *of limitation*" on the President's decision whether to outlaw transportation of oil, even though the language certainly announced "policies" in the general sense, and even though the President was limited to the specific subject matter of certain petroleum products. *Id.* at 418 (emphasis added). The Court further held that even if this policy statement could be construed to provide "a statement of prerequisites" for the President's exercise of discretion, the President was still "free to select as he chooses from the many and various objects generally described." *Id.* at 431–32.

This same statement of "policy" was likewise found insufficient in *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 534–35 (1935), which involved the delegation to the President of the power to publicly adopt private codes of conduct that "impose no equitable restrictions on admission," "are not designed to promote monopolies or to

47

eliminate or oppress small enterprises," and "will tend to effectuate the policy" statement listed above from *Panama Refining*. *Id.* at 522–23.

In short, even when Congress imposes subject-matter and generic "policy" limitations, the statute is still invalid where the Executive "may roam at will" "in that wide field of legislative possibilities." *Id.* at 538. The FCC has that power—a "delegation running riot," *id.* at 553 (Cardozo, J., concurring)—when it comes to raising and spending revenues for universal service.

### 3. The FCC's Broad Powers to Define Universal Service Confirm the Lack of Meaningful Restrictions.

Even if the "vague aspirations" in section 254 did amount to an intelligible principle, *Gundy*, 139 S. Ct. at 2133, the statute still violates the Constitution because Congress gives the FCC broad powers to constantly redefine and expand the scope of "universal service." *First*, the FCC can define and add new "principles" of providing universal service as "necessary and appropriate for the protection of the public interest, convenience, and necessity and … consistent with [the Act]." 47 U.S.C. § 254(b)(7). *Second*, the FCC can define "universal service" as often as it chooses, based on a similar list of vague considerations, including

whether a service is "consistent with the public interest, convenience, and necessity." *Id.* § 254(a), (c)(1)(D).

These powers provide a multi-layer delegation, where the FCC uses a vague, open-ended amendment process to define "universal service" and further expand the already-vague and "aspirational" universal service "principles," which then putatively authorize taxes in undefined amounts. *See Schechter Poultry*, 295 U.S. at 538–39 (criticizing statute whose breadth could be expanded by the President's power to "add[] to or tak[e] from what is proposed, as 'in his discretion' he thinks necessary 'to effectuate the policy' declared by the act"). An improper delegation of power from Congress to an executive agency cannot survive merely on the hope that the agency will restrain itself within the nearly limitless power granted by Congress. *See Whitman*, 531 U.S. at 473.

For these reasons, the Universal Service Fund's revenue-raising mechanisms violate the nondelegation doctrine.

### III.  THE NONDELEGATION VIOLATIONS HERE ARE PARTICULARLY EGREGIOUS BECAUSE THEY INVOLVE CONGRESS'S EXCLUSIVE POWER TO LEVY TAXES

For the reasons above, the Universal Service Fund's mechanisms for raising revenues are unconstitutional regardless of whether they are

considered taxes. But as demonstrated next, those charges are indeed taxes, which makes Congress's delegation of such limitless power all the more egregious.

"Taxation is a legislative function, and Congress … is the sole organ for levying taxes." *Nat'l Cable Television Ass'n, Inc.* (*"NCTA"*) *v. United States*, 415 U.S. 336, 340 (1974). More than any other power, the taxing power is uniquely legislative and nondelegable, meaning that putative delegations of this power should be subject to especially searching review. Indeed, the Constitution's Origination Clause, which requires the House of Representatives to originate all bills for raising revenue, prohibits the House even from delegating certain taxing power to the Senate—rendering it unthinkable that such power could be delegated to an executive agency or private entity. U.S. Const. art. I, § 7, cl. 1. The notion of a perpetually self-funding Executive is contrary to core constitutional limitations.

## A.    HISTORY OF THE TAXING POWER

The power to tax was not always the province of legislative bodies. English kings often sought to avoid Parliament's claims on taxing authority by means of a "royal prerogative," and they typically referred

to their collections not as taxes but as compulsory loans and even "benevolences." It took the English Civil War and the Glorious Revolution of 1688 to conclusively establish that the representative legislature—and the representative legislature *alone*—had the authority to levy taxes on the people. *See* An Act Declaring the Rights and Liberties of the Subject, and Settling the Succession of the Crown (Bill of Rights), 1689, 1 W. & M., Sess. 2, c. 2, § 4.

This principle—neatly summarized by the American colonists (who had no voice in Parliament) as "no taxation without representation"—played a decisive role not only in the Revolution, but also in the framing of the Constitution. As Madison observed in The Federalist No. 58, it was only by taking plenary control over "the supplies requisite for the support of government" that "an infant and humble representation of the people" in Parliament had been able to triumph over the "overgrown prerogatives" of the British monarchy. THE FEDERALIST NO. 58 (James Madison).

Article I of the Constitution closely followed the English formula, providing that "[a]ll legislative Powers herein granted"—including the power "to lay and collect Taxes, Duties, Imposes, and Excises"—"shall be

51

vested in a Congress of the United States." U.S. Const. art. I, § 8, cl. 1. Recognizing the need for controls on taxation, and for political accountability regarding its use, the Constitution went even further with the Origination Clause, which requires that "[a]ll bills for raising Revenue shall originate in the House of Representatives," *id.* art 1., § 7, cl. 1, the body of government most responsive and accountable to the popular will of the people.

According to Madison, the "principal reason" for the Origination Clause was that House members are "chosen by the People," "best acquainted with their interests," and subject to "more frequent[]" elections. 1 DEBATES AND PROCEEDINGS IN THE CONGRESS OF THE UNITED STATES 361 (Joseph Gales ed., 1834); *see Skinner*, 490 U.S. at 214 ("[T]he Origination Clause … embod[ies] the Framers' concern that persons elected directly by the people have initial responsibility over taxation").

The Constitution also limits the power to spend. Article I commands that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Thus, "the erstwhile prerogative powers to tax, borrow, and spend were denied to the executive and instead vested in Congress. Congress thus not only

controls how much revenue to raise and how, but what to spend it on, and under what conditions." Michael W. McConnell, THE PRESIDENT WHO WOULD NOT BE KING 103 (2020); *see also Hart v. United States*, 16 Ct. Cl. 459, 484 (1880), *aff'd*, 118 U.S. 62 (1886) ("[A]bsolute control of the moneys of the United States is in Congress.").

The benefits of this arrangement are significant. As Chief Justice Marshall observed, an "unlimited power to tax" is "a power to destroy." *M'Culloch v. Maryland*, 4 Wheat. 428, 432 (1819). The need for representative accountability is therefore at its highest when it comes to taxing and spending, which is why the framers ensured that "the legislative department alone has access to the pockets of the people." THE FEDERALIST NO. 48 (James Madison). And accessing the pockets of the people is hard by design. To legislate a tax, Congress must act through "Laws of the United States," in accordance with a "finely wrought" constitutional procedure. *INS v. Chadha*, 462 U.S. 919, 951 (1983).

"[B]y directing that legislating be done only by elected representatives in a public process, the Constitution sought to ensure that the lines of accountability would be clear: The sovereign people would know, without ambiguity, whom to hold accountable for the laws

they would have to follow." *Gundy*, 139 S. Ct. at 2134 (Gorsuch, J., joined by Roberts, C.J., and Thomas, J., dissenting). Giving Congress the power of the purse also ensures that Congress serves as an effective check on the Executive. As Madison put it, control over the purse strings is "the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people." THE FEDERALIST NO. 58 (James Madison).

Thus, as the Supreme Court has long held, Congress may not "delegate ... powers which are strictly and exclusively legislative." *Wayman v. Southard*, 10 Wheat. 1, 42–43 (1825). And both text and history show that no powers are more strictly and exclusively legislative than the Article I power to lay and collect taxes. Article I's "text permits no delegation of those powers." *Whitman*, 531 U.S. at 472.

In recent years, "the general assumption that Congress will jealously guard the powers of the purse as its ultimate means of checking and balancing the executive has become open to serious doubt." Christopher C. DeMuth, Sr. & Michael S. Greve, *Agency Finance in the Age of Executive Government*, 24 GEO. MASON L. REV. 555, 566 (2017). "Congress has increasingly empowered agencies to calculate and impose

outright taxes—charges unrelated to any service provided—and to exercise wide discretion in how the revenues are spent." *Id.* at 563. The delegation at issue in this case is a stark example of this recent trend towards an unaccountable, self-funding Executive.

### B. UNIVERSAL SERVICE FUND CHARGES ARE TAXES UNDER SUPREME COURT PRECEDENT

The Universal Service Fund charges are taxes. "Congress cannot change whether an exaction is a tax or a penalty for constitutional purposes simply by describing it as one or the other." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012).

Despite euphemistically being labeled as "contributions" or "mechanisms" in section 254, the charges imposed are widely recognized as taxes because "some of the administrative costs at issue inure[] to the benefit of the public." *Skinner*, 490 U.S. at 214.

By contrast, a "fee" is "a charge designed as compensation for Government-supplied services, facilities, or benefits." *United States v. U.S. Shoe Corp.*, 523 U.S. 360, 363 (1998); *see also Trafigura Trading LLC v. United States*, 29 F.4th 286, 292–93 (5th Cir. 2022) (opinion of Ho, J.) (a fee "is a charge for a specific service provided to, and used by, the payor," or stated another way, a fee is "a value-for-value transaction, in

which a feepayer pays the fee to receive a service or benefit in return, and is thus better off as a result of the transaction").

The very title of the program—"Universal Service"—provides direct textual proof that the funds are designed to benefit the public writ-large. The FCC's ability to define and implement "universal service" based on considerations of "public interest, convenience, and necessity," among other broad social goals, 47 U.S.C. § 254(b), (c), reaffirms that the charges are not in exchange for benefits, but rather to further general societal interests. The Supreme Court has been explicit that such consideration "carries an agency far from its customary orbit and puts it in search of revenue in the manner of an Appropriations Committee of the House." *NCTA*, 415 U.S. at 341.

The entire premise of the Universal Service Fund is to redistribute funds and benefits away from payors, whether viewed as consumers or telecommunication companies. Congress directed that funds could be used to provide telecommunication services to the general public, including extensive groups of individuals regardless of whether or how much they paid into the Universal Service Fund. These include "[c]onsumers in all regions of the Nation, including low-income

consumers and those in rural, insular, and high cost areas," "any public or nonprofit health care provider that serves persons who reside in rural areas," and "elementary schools, secondary schools, and libraries for educational purposes." 47 U.S.C. §§ 254(b)(3), (h)(1).

The general purpose is also reflected by the sheer dollar values involved. The Universal Service Fund charges nearly $10 billion a year—certainly nothing like the "incident[al]" fees that the Supreme Court has authorized executive agencies to collect from applicants to recoup costs. *NCTA*, 415 U.S. at 340–41.

Upon implementation, section 254 was widely recognized as a tax. Then-Senator John McCain, Chairman of the U.S. Senate Commerce Committee, said, "Of course, it's a tax. It walks like a duck. It talks like a duck." Doug Abrahms, *Phone Rates Will Rise for Firms, Some Homes*, WASH. TIMES, Dec. 11, 1997. Industry insiders, think tanks, and journalists all agreed. *See* Cherry & Nystrom, 2000 L. REV. MICH. ST. U. DET. C.L. at 109 & nn.9–11 (collecting sources).

Scholars have likewise concluded that the "contribution is a tax in all but name. It has no relation to any benefit conferred by the FCC; instead, it is based on the agency's self-determined funding needs for its

subsidy schemes." DeMuth, Sr. & Greve, 24 GEO. MASON L. REV. at 566. Given all this, there can be no doubt that these charges are "taxes."

To be sure, in *TOPUC I*, the Fifth Circuit stated that the Universal Service Fund scheme imposes a "fee" rather than a "tax," 183 F.3d at 427 & n.52, but that statement is unpersuasive for multiple reasons.

*First*, *TOPUC I* is an out-of-circuit opinion not binding on this Court. In fact, *TOPUC I* expressly acknowledged its cursory statement was dicta, *id.*, which therefore would not bind even the Fifth Circuit itself, *United States v. Becton*, 632 F.2d 1294, 1296 n.3 (5th Cir. 1980).

*Second*, *TOPUC I* held that a Taxing Clause challenge (as Petitioners bring here) would be subject to a "separate line[] of analysis" from an Origination Clause challenge (which *TOPUC I* rejected), and thus the Court's rejection of the Origination Clause claim does not even address a Taxing Clause challenge. 183 F.3d at 427 & n.51 (noting the different inquiries between the two).

*Third*, *TOPUC I* seems to have identified the incorrect test for distinguishing a fee from a tax. The Court held that the Universal Service charge "qualifies as a fee because it is a payment in support of a service (managing and regulating the public telecommunications network) that

58

confers special benefits on the payees." *Id.* at 427 n.52. But the Supreme Court has held that a payment is a tax—and *not* a fee—where "some of the administrative costs at issue inure[] to the benefit of the public." *Skinner*, 490 U.S. at 214. In other words, the inquiry is not whether the payor receives a benefit, but whether the general public benefits, or at least is the primary beneficiary. There is no doubt that the benefits of Universal Service Fund charges, at the very least, inure primarily to members of the public and by parties who do not even pay the charges.

*Fourth*, even if the charges could possibly be considered fees in 1999 when *TOPUC I* was decided, the rates and purposes of the charges have expanded so substantially since that time that they no longer can be called anything but a tax. *See TOPUC I*, 183 F.3d at 443 n.95 (noting that requiring funding for a dramatically expanded interpretation of universal service "could constitute an improperly delegated tax"); *see* Part A.5, *supra* (detailing the skyrocketing rates). As Dr. Ford explains, what initially starts as a fee "may change over time when a government

agency lacks clear legislative guidance, oversight, or constraint" and thereby turn into a tax. Ford Report at 5, A.240.[12]

For these reasons, the Universal Service Fund charges are "taxes" under binding caselaw.

### C. Expert Economic Analysis Confirms that Universal Service Fund Charges Are Taxes

As noted above, precedent asks whether the payment generally inures to the benefit of the public. *See Skinner*, 490 U.S. at 214; *U.S. Shoe Corp.*, 523 U.S. at 363. Economic analysis confirms that the Universal Service Fund charges fit within that definition and thus are taxes.

Dr. Ford, a former FCC economist with a Ph.D. in Economics and decades of experience in the telecommunications industry, explains that most of the money spent by the Universal Service Fund is used for "a galaxy of policy concerns with no obvious connection to carrier liabilities."

---

[12] The D.C. Circuit in *Rural Cellular Association v. FCC* likewise stated that the Universal Service Fund scheme imposes a fee, not a tax, but it suffers from the same flaws as *TOPUC I*'s dicta, and also was wrong to conclude that payors receive a "network effect" benefit (i.e., the theoretical ability to charge more because more customers are on a specific network). 685 F.3d 1083, 1090–91 (D.C. Cir. 2012). The Ford Report demonstrated that network effects are essentially non-existent for telecommunication services. Ford Report at 6–7, A.241–A.242. The FCC has not rebutted the Ford Report.

Ford Report at 8–9, A.243–A.244. Substantial sums of money go to projects "to support digital learning in schools and robust connectivity for all libraries" and "to improve the quality of health care available to patients in rural communities." *Id.* at 9, A.244. "These are broad social goals that benefit the public, not the telecommunications providers that support the program by paying levies." *Id.* This is a hallmark of a tax under caselaw. *See Skinner*, 490 U.S. at 214; *U.S. Shoe Corp.*, 523 U.S. at 363.

Moreover, far from receiving benefits in exchange for payments to the Universal Service Fund, many carriers are actually *harmed* in exchange, because the charges increase the price of phone service and thereby encourage people to switch to communication services that do not have to pay into the Universal Service Fund. Ford Report at 8, A.243. This can never be true of a fee—i.e., that the payor incurs a separate harm in exchange.

To be sure, some carriers are paid subsidies from the Universal Service Fund, but there is no positive relationship between their contributions and the subsidies. The "companies that contribute large sums to the program receive few benefits, and companies that contribute

little to the fund receive large benefits." *Id.* (collecting data). Again, this is a classic characteristic of a tax. *Id.* at 5, A.240.

Dr. Ford also demonstrates that the Universal Service Fund does not provide carriers with "network effects" benefits (i.e., where a network is putatively more valuable because more customers are on it). *Id.* at 6–7, A.241–A.242. "[N]etwork effects are likely to be small if not zero" because networks today are almost always interconnected, meaning that a carrier's ability to offer a large network is not a valuable characteristic. *Id.* "Academic research suggests that the [Universal Service Fund] Programs have done little, if anything, to increase the adoption of telecommunications services beyond" what would have happened anyway. *Id.* at 7, A.242.

The Universal Service Fund charges are a tax from the perspective of consumers, as well. Almost every consumer pays into the Universal Service Fund (collected by their carriers), yet only a fraction receive *any* benefit in exchange, and most of the money inures to the benefit of the general public. *Skinner*, 490 U.S. at 214.

Dr. Ford's unrebutted report confirms that the Universal Service Fund satisfies the legal definition of a "tax."

### D.   Taxing Delegations Should Be Barred or Subject to Strict Guidelines

The Universal Service Fund charge is therefore a tax imposed in violation of the Constitution's strict assignment of that power to Congress. To be sure, the Supreme Court in *Skinner* rejected "the application of a different and stricter nondelegation doctrine in cases where Congress delegates discretionary authority to the Executive under its taxing power." 490 U.S. at 214. But given the unique importance and history surrounding the taxing power and the dangers of a self-funding Executive, *see* Part III.A, *supra*, the Court should have concluded that apparent delegations of the taxing power must be reviewed closely and "if delegable at all, must be delegated with much stricter guidelines than is required for other congressional delegations," *Skinner*, 490 U.S. at 220. Accordingly, Petitioners preserve their argument that *Skinner* should be overruled or narrowed.[13]

---

[13] In any event, as demonstrated in Part II, *supra*, the Universal Service Fund's revenue-raising mechanisms fail *Skinner* regardless of whether the charges are considered taxes, because there is no intelligible principle in section 254.

## IV. THE UNIVERSAL SERVICE FUND VIOLATES THE PRIVATE NONDELEGATION DOCTRINE

The FCC has unconstitutionally re-delegated its authority over the Universal Service Fund to USAC, which is "a private corporation owned by an industry trade group." *U.S. ex rel. Shupe v. Cisco Sys., Inc.*, 759 F.3d 379, 387 (5th Cir. 2014). USAC decides how much money to raise each year in pursuit of "universal service" and how to spend it, with no meaningful oversight by the FCC. *See Incomnet*, 463 F.3d at 1066–67. As the Ninth Circuit has held, "some entity must have dominion over the [Universal Service Fund]; we hold that USAC is this entity." *Id.* at 1076. Delegating this power—regardless of whether the charges are considered taxes—violates the private nondelegation doctrine.

"To ensure the Government remains accountable to the public, it cannot delegate regulatory authority to a private entity." *Texas v. C.I.R.*, 142 S. Ct. 1308, 1309 (2022) (statement of Alito, J., joined by Thomas and Gorsuch, JJ., respecting the denial of certiorari) (cleaned up). But that is exactly what has happened here—"[w]hat [i]s essentially a legislative determination" is now "made not by Congress or even by the Executive Branch but by a private group." *Id.*

64

Delegation to "private persons" is "legislative delegation in its most obnoxious form," because "it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936). In such cases, "there is not even a fig leaf of constitutional justification." *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 62 (2015) (Alito, J., concurring). "Private entities are not vested with 'legislative Powers.' Nor are they vested with the 'executive Power,' which belongs to the President." *Id.* (citations omitted).

The FCC's re-delegation of such enormous powers to USAC is without precedent. This private company has the power of a full-fledged sovereign—it can decide how much money to raise, force the collection of that money under penalty of law, and then decide precisely how to spend the money. USAC even "holds legal title to the funds in the [Universal Service Fund] accounts." *Incomnet*, 463 F.3d at 1073. The FCC, meanwhile, has essentially no power over this process, as the Ninth Circuit has held. *Id.* at 1074. Again, this "is delegation running riot." *Schechter Poultry*, 295 U.S. at 553 (Cardozo, J., concurring).

The FCC cannot claim that USAC is merely some advisor. USAC is the "permanent Administrator" of the Universal Service Fund and its support mechanisms. 47 C.F.R. §§ 54.5, 54.701. As the Ninth Circuit has recognized, USAC is not the agent or conduit of the FCC. *Incomnet*, 463 F.3d at 1074 (citing 47 C.F.R. § 54.715(c)). The FCC exercises power over that money only in the most indirect manner, ostensibly by overseeing USAC (not that the FCC ever actually does this). *Id.* The FCC has no ability to control the money in the Universal Service Fund through direct seizure or discretionary spending. *Id.* USAC devises the figures that the FCC ministerially uses to calculate the quarterly Contribution Factor charged to carriers, and it does not appear that the FCC has ever rejected or meaningfully modified USAC's proposals. 47 C.F.R. § 54.709(a).

As this Court has held, an agency may not "reflexively rubber stamp[]" action prepared by a private entity, but instead must "independently perform its reviewing, analytical and judgmental function and participate actively and significantly in the preparation and drafting process." *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974) (binding under *Bonner*). But the FCC is not even a rubber stamp here, as it simply "deems approved" each Quarterly Contribution Factor—a

uniquely passive process confirming that USAC, not the FCC, is in the driver's seat.

Nor can the FCC's latent authority (apparently never meaningfully exercised) to reject USAC's quarterly proposals somehow cure the illegality of delegating such power to a private entity. Even assuming an agency's self-imposed restrictions could possibly save an otherwise improper private delegation, *but see Whitman*, 531 U.S. at 473, it remains practically and logistically impossible for the FCC to reject USAC's quarterly proposals. Under current regulations, the FCC's Office of Managing Director must ministerially use USAC's figures to calculate the quarterly Contribution Factor, and then there are only 14 days between issuance of that proposal and when that rate is "deemed approved" unless the FCC steps in. 47 C.F.R. § 54.709(a)(3). Critically, this passive-acceptance process happens on the eve of the quarter for which the rate must take effect. For example, the Contribution Factor in this case was "deemed approved" on September 27, 2022, for the quarter beginning October 1, 2022. There is not enough time for the FCC to review USAC's materials and undertake and complete formal agency action during that narrow window before the new quarter begins.

Accordingly, because of the regulatory process it has established, the FCC has no option but to accept USAC's quarterly numbers.

For all practical purposes, USAC operates the Universal Service Fund from beginning to end without even the possibility of supervision, confirming that USAC has been delegated "decision-making authority." *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 566 (D.C. Cir. 2004).

Given USAC's expansive power over the Universal Service Fund and its programs, along with actual and practical limitations on any involvement by the FCC, the only way to effectuate oversight would be to revoke (or amend) the regulation delegating authority to USAC. But "[i]f all it reserves for itself is 'the extreme remedy of totally terminating the [delegation agreement],' an agency abdicates its 'final reviewing authority.'" *Fund for Animals v. Kempthorne*, 538 F.3d 124, 133 (2d Cir. 2008) (citation omitted). Stated another way, it is of course true that "any agency can always claw back its delegated power by issuing a new rule. But that would render the [private] nondelegation doctrine a dead letter" because an agency can always "claw back" the power it delegated to a private entity. *Rettig*, 993 F.3d at 416–17 (Ho, J., joined by Jones, Smith, Elrod, and Duncan, JJ., dissenting from denial of rehearing en banc).

68

USAC's authority over the entire Universal Service Fund is therefore a far cry from cases where courts have allowed agencies to "employ private entities for ministerial or advisory roles," as distinguished from the prohibited act of giving private entities "governmental power over others," like USAC undoubtedly possesses here. *Pittston Co. v. United States*, 368 F.3d 385, 395 (4th Cir. 2004) (citing *United States v. Frame*, 885 F.2d 1119, 1129 (3d Cir. 1989)). More, the passive-acceptance mechanism by which USAC proposals are "deemed approved," as well as the sheer dollar values involved in USAC's collection efforts, rebut any claim of an "advisory" or "ministerial" role.

The FCC may argue that USAC is some type of quasi-governmental entity such that there are no private nondelegation concerns. That position would be inconsistent with how USAC is established and how it operates. USAC is a private company registered in Delaware, an independent subsidiary of another private company, the National Exchange Carrier Association, Inc., 47 C.F.R. § 54.5, and run by self-described representatives of industry "interest groups." Moreover, USAC's board members are nominated by those interest groups and appointed by the FCC Chair. *Id.* § 54.703(c)(3). This fails to comply with

the Constitution's Appointments Clause, which does not authorize appointment of "Officers" by a single member of a multi-member commission—providing another indication that USAC is indeed private, not governmental. *See Free Enter. Fund v. PCAOB*, 561 U.S. 477, 511–12 (2010) (only the "full Commission" is a "Head[] of Department" under Article II); *see also* Jennifer L. Mascott, *Who Are "Officers of the United States?"*, 70 STAN. L. REV. 443, 454 (2018).

Delegation of such powers to a private company violates the private nondelegation doctrine, contrary to Article I of the U.S. Constitution.

## CONCLUSION

This Court should grant the Petition.

November 22, 2022                    Respectfully submitted,

                                     /s/ R. Trent McCotter
                                     C. Boyden Gray
                                     R. Trent McCotter
                                       *Counsel of Record*
                                     Jonathan Berry
                                     Michael Buschbacher
                                     Jared M. Kelson
                                     BOYDEN GRAY & ASSOCIATES
                                     801 17th Street NW, Suite 350
                                     Washington, DC 20006
                                     202-706-5488
                                     mccotter@boydengrayassociates.com
                                     *Counsel for Petitioners*

71

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7) because it contains 12,854 words, excluding the portions exempted by Rule 32(f). This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure Rule 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook and 14-point font.

Dated: November 22, 2022                     /s/ R. Trent McCotter
                                             R. Trent McCotter
                                             Boyden Gray & Associates
                                             801 17th St NW, #350
                                             Washington, DC 20006
                                             (202) 706-5488

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2022, I electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system, which will serve all parties automatically.

Dated: November 22, 2022                    /s/ R. Trent McCotter
                                            R. Trent McCotter
                                            Boyden Gray & Associates
                                            801 17th St NW, #350
                                            Washington, DC 20006
                                            (202) 706-5488