No. 22-13315-DD

# In the United States Court of Appeals for the Eleventh Circuit

———————————————

CONSUMERS' RESEARCH, et al.,

*Petitioners*,

vs.

FEDERAL COMMUNICATIONS COMMISSION,
UNITED STATES OF AMERICA,

*Respondents.*

———————————————

## BRIEF OF *AMICUS CURIAE* TECHFREEDOM IN SUPPORT OF PETITIONERS

———————————————

On Petition for Review from
the Federal Communications Commission
Agency No. 96-45

———————————————

Corbin K. Barthold
Berin Szóka
James E. Dunstan
TECHFREEDOM
110 Maryland Ave., NE, #205
Washington, DC 20002
(202) 803-2867
cbarthold@techfreedom.org
*Attorneys for Amicus Curiae TechFreedom*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

*Amicus Curiae* TechFreedom certifies under Fed. R. App. P. 26.1 that it has no parent company, it issues no stock, and no publicly held corporation owns a ten-percent or greater interest in it.

TechFreedom states, in accord with Circuit Rule 26.1-1, that it believes the Certificate of Interested Persons in the Brief of Petitioners is complete.

/s/ Corbin K. Barthold

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICUS CURIAE .....................................................1

SUMMARY OF ARGUMENT ............................................................2

ARGUMENT ......................................................................................6

I.    The FCC's Subdelegation Of Authority To USAC Is Unconstitutional ...........................................................................6

    A.    Private Delegation Violates Article I Of The Constitution ...........................................................................6

    B.    Private Delegation Offends The Constitutional Principle Of Representative Democracy ..........................10

    C.    Private Delegation Lends Itself To Politically Unaccountable Governance ..............................................13

II.    USAC Cannot Be Saved By Procedural Requirements Set By The FCC ........................................................................15

CONCLUSION.................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*\*A.L.A. Schechter Poultry Corp. v. United States*,
    295 U.S. 495 (1935) .................................................... 4, 6, 7, 10, 13

*Ass'n of Am. R.R.s v. U.S. Dep't of Transp.*,
    721 F.3d 666 (D.C. Cir. 2013)............................................. 8, 13, 14

*Carter v. Carter Coal Co.*,
    298 U.S. 238 (1936) ........................................................... 7, 8, 9, 13

*City of Springfield v. Ostrander (In re LAN Tamers, Inc.)*,
    329 F.3d 204 (1st Cir. 2003)...........................................................2

*Collins v. Yellen*,
    141 S. Ct. 1761 (2021) ...................................................................15

*Gundy v. United States*,
    139 S. Ct. 2116 (2019) ............................................................. 2, 10

*NARUC v. FCC*,
    737 F.2d 1095 (D.C. Cir. 1984)......................................................14

*Nat'l Horsemen's Ass'n v. Texas*,
    No. 22-10387 (5th Cir., Nov. 18, 2022) .........................................9

*Panama Refining Co. v. Ryan*,
    293 U.S. 388 (1935) .............................................................. 15, 16

*Texas v. Comm'r of Internal Revenue*,
    No. 21-379 (U.S., March 28, 2022)..................................................9

*Texas v. Rettig*,
    993 F.3d 408 (5th Cir. 2021) ..........................................................8

# TABLE OF AUTHORITIES
## (Cont.)

**Page(s)**

*Texas v. Rettig,*
  987 F.3d 518 (5th Cir. 2021) ........................................................ 8

*United States v. Mead Corp.,*
  533 U.S. 218 (2001) .................................................................. 16

*W. Va. v. EPA,*
  No. 20-1530 (U.S., June 30, 2022) .............................................. 10

*Whitman v. Am. Trucking Ass'ns, Inc.,*
  531 U.S. 457 (2000) ........................................................ 15, 16, 17

*Wichita R.R. Light Co. v. Pub. Util. Comm'n,*
  260 U.S. 48 (1922) ................................................................ 15, 16

## Statutes and Regulations

47 U.S.C. § 254(b)(6) ................................................................... 2

47 U.S.C. § 254(h)(1) ................................................................... 2

47 C.F.R. § 54.701 ..................................................................... 16

47 C.F.R. § 54.702(c) ................................................................. 16

47 C.F.R. § 54.702(g) ................................................................. 16

47 C.F.R. § 54.709(a)(3) ........................................................ 10, 16

47 C.F.R. § 54.717 ..................................................................... 16

## Other Authorities

John Adams, *Thoughts on Government* (1776) .................................. 12

# TABLE OF AUTHORITIES
## (Cont.)

**Page(s)**

Amy Coney Barrett, *Suspension and Delegation*, 99
  Cornell L. Rev. 251 (2014)................................................................3

Corbin K. Barthold, *A Path Forward on Nondelegation*,
  WLF Legal Pulse, https://bit.ly/3LEdfSe (Jan. 31, 2022)...............1

Corbin K. Barthold, *No Legislation Without
  Representation*, Law & Liberty, https://bit.ly/3UbiopY
  (April 18, 2022)...................................................................................1

Jim Dunstan, *The Arrival of the Federal Computer
  Commission*?, Regulatory Transparency Project,
  https://bit.ly/3Jm9PCh (Aug. 27, 2021) ...........................................1

FCC, Public Notice, *Streamlined Resolution of Requests
  Related to Actions by the Universal Service
  Administrative Company*, No. DA 22-448 (Apr. 29,
  2022) ......................................................................................... 16, 17

FCC, *In re Report on the Future of the Universal Service
  Fund*, FCC WC Docket No. 21-476 (Aug. 15, 2022) ................. 1, 17

*Federalist* No. 10 (Madison) ........................................................ 12, 13

*Federalist* No. 11 (Hamilton) ............................................................. 10

*Federalist* No. 35 (Hamilton) ............................................................. 12

*Federalist* No. 63 (Madison) .............................................................. 12

A. Michael Froomkin, *Wrong Turn in Cyberspace: Using
  ICANN To Route Around the APA and the
  Constitution,* 50 Duke L.J. 17 (2000) .............................................14

Jack N. Rakove, *Original Meanings: Politics and Ideas in
  the Making of the Constitution* (Vintage 1997)........................ 11, 12

# TABLE OF AUTHORITIES
## (Cont.)

**Page(s)**

Gordon S. Wood, *Power and Liberty: Constitutionalism in the American Revolution* (Oxford Univ. Press 2021)..............12, 13

Gordon S. Wood, *The Radicalism of the American Revolution* (Vintage 1993).......................................................12, 13

## INTEREST OF AMICUS CURIAE*

TechFreedom is a nonprofit, nonpartisan think tank based in Washington, D.C. It is dedicated to promoting technological progress that improves the human condition. It seeks to advance public policy that makes experimentation, entrepreneurship, and investment possible.

TechFreedom frequently offers expert commentary both on the Universal Service Fund, see, e.g., FCC, *In re Report on the Future of the Universal Service Fund* ("*Future of the USF Report*"), FCC WC Docket No. 21-476 (Aug. 15, 2022) (citing TechFreedom's comments three times); Jim Dunstan, *The Arrival of the Federal Computer Commission?*, Regulatory Transparency Project, https://bit.ly/3Jm9PCh (Aug. 27, 2021), and on nondelegation, see, e.g., Corbin K. Barthold, *No Legislation Without Representation*, Law & Liberty, https://bit.ly/3UbiopY (April 18, 2022); Corbin K. Barthold, *A Path Forward on Nondelegation*, WLF Legal Pulse, https://bit.ly/3LEdfSe (Jan. 31, 2022). In this case, those two issues intersect. Indeed, this case demonstrates why each issue is so important to TechFreedom. The Universal Service Fund plays an important role in

---

* No party's counsel authored any part of this brief. No one, apart from TechFreedom and its counsel, contributed money intended to fund the brief's preparation or submission. All parties have consented to the brief's being filed.

ensuring that the benefits of technological innovation are enjoyed widely across the country. But the power to run the Universal Service Fund has been delegated to a federal agency, which has in turn subdelegated that power to a private organization. This double delegation—and, worse, private delegation—has led to lax oversight, runaway budgets, wasteful spending, and outright fraud.

A well-run Universal Service Fund could help close this country's digital divide. As the Founders understood, however, over-delegation, especially in the form of private delegation, is a recipe for bad governance.

## SUMMARY OF ARGUMENT

When it approved the creation of the Universal Service Fund (USF), Congress started with an idea that was sound enough. It wanted to expand its policy of promoting universal access to communications services—a policy that began with telephone service in the early twentieth century—to modern telecommunications. Codified in the Telecommunications Act of 1996, the USF pays for "'advanced telecommunications and information services,' particularly high-speed internet access, for schools (as well as for libraries and rural health care providers)." *City of Springfield v. Ostrander (In re LAN Tamers, Inc.)*, 329 F.3d 204, 206 (1st Cir. 2003) (quoting 47 U.S.C. §§ 254(b)(6), (h)(1)).

Sadly, Congress did a poor job of structuring the USF to fit within constitutional boundaries. Article I, section 1, "vest[s]" "all legislative Powers" in Congress, which may not delegate those powers to another branch of government. *Gundy v. United States*, 139 S. Ct. 2116, 2121 (2019) (plurality opinion). In creating the USF, Congress handed the Federal Communications Commission (FCC) open-ended power to define what services should be "universal," to set the amount of private-sector money (ultimately, consumer money) the government will collect to promote those services, and to determine how the money is spent. As written, the law governing the USF might well fail even the "notoriously lax" intelligible principle test for nondelegation. Amy Coney Barrett, *Suspension and Delegation*, 99 Cornell L. Rev. 251, 318 (2014). If the Supreme Court were to discard that test in favor of a more rigorous one— as a majority of the Court have signaled they intend to do—the constitutionality of Congress's delegation to the FCC would become even more doubtful. The Petitioners raise a strong nondelegation argument (Pet. Brief 32-49) that merits close consideration. The issue, even under the current test, is a close one.

In any event, we know this much for sure: After Congress passed the USF's enabling statute, the FCC botched the USF's implementation. It was bad enough that Congress handed such broad and ill-defined

regulatory power to an independent agency—a government entity not subject to direct control by democratically elected leadership. To make matters worse, though, the agency then passed the power *again*, handing it to a *private* organization, the Universal Service Administration Company (USAC). What's more, it did so without Congress's permission, which means that the USF is not subject to any congressionally established procedural guardrails.

Nondelegation and subdelegation are far from the only problems here. The directors who run USAC are not properly appointed (Pet. Brief 69-70), and the FCC's rubber-stamping of USAC's proposals violates the Administrative Procedure Act (Pet. for Review 5). Although these are important issues—and proper grounds to rule against the FCC—they are downstream of the profound constitutional violation that occurred when the FCC passed the running of the USF into private (and less-than-disinterested) hands.

In this brief, we explain why the FCC's subdelegation of legislative authority to a private entity is unconstitutional. In Section I, we discuss some of the cases—including the Supreme Court's most definitive word on nondelegation, *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)—that establish the invalidity of such "private" delegation. We then explore some of the reasons why private delegation

is so problematic. For one thing, it flouts the Framers' understanding of democratic representation. For another, it is pernicious to accountable governance—a fact that the history of the USF well illustrates.

In Section II, we turn to a more subtle, but still vital, point: that *agency*-set procedural rules cannot cure an unconstitutional private delegation. The amount of regulatory discretion Congress may confer on agencies, consistent with its Article I duty to legislate, depends in part on how many procedural safeguards it places on those agencies' use of such discretion. To count for anything, though, the procedural safeguards must come *from Congress*. For purposes of a nondelegation analysis, procedural requirements concocted by *an agency* count for nothing. The reality is that the FCC has placed few procedural checks on USAC. But *no* amount of procedural protection created by the FCC, and then imposed on USAC (and itself), could rescue the FCC's subdelegation of power to USAC from constitutional invalidity.

The USF, as structured, is probably unconstitutional. *USAC*, however, is *clearly* unconstitutional, and the Court should say so.

# ARGUMENT

## I. The FCC's Subdelegation Of Authority To USAC Is Unconstitutional

Private delegation violates the Constitution. This is confirmed by every source of authority one might care to consider. The courts have ruled that it is not allowed. The Founders would have been appalled by it. And common sense—and the history of the USF—confirms that it lends itself to political unaccountability and government waste.

### A. Private Delegation Violates Article I Of The Constitution

The most prominent Supreme Court case on nondelegation, *Schechter Poultry*, 295 U.S. 495, also happens to be an important case on private delegation. Seeking to combat the Great Depression, President Franklin Roosevelt signed the National Industrial Recovery Act (NIRA) of 1933. Section 1 of the NIRA set forth Congress's industrial "policy"—a mish-mash of goals that included reducing unemployment, improving labor standards, and "otherwise" rehabilitating industry. Section 3 of the NIRA empowered the President to approve "codes of fair competition" presented to him by trade or industry groups. Although the President could also create such codes himself, *Schechter Poultry* involved a code created by private entities. The chicken dealers of New York drafted a

"Live Poultry Code," which President Roosevelt approved. A slaughterhouse in Brooklyn challenged the code and invoked nondelegation.

Defending the constitutionality of the NIRA, the government tried to paint the private production of codes as a virtue—as a way to generate codes "deemed fair for each industry … by the persons most vitally concerned and most familiar with its problems." 295 U.S. at 537. The Court, however, did not see it that way. On the contrary, the justices treated the strong role played by private parties, in administering the NIRA, as a defect. "[W]ould it be seriously contended," they asked:

> that Congress could delegate its legislative authority to trade or industrial associations or groups so as to empower them to enact the laws they deem to be wise and beneficent for the rehabilitation and expansion of their trade or industries? Could trade or industrial associations or groups be constituted legislative bodies for that purpose because such associations or groups are familiar with the problems of their enterprises? And, could an effort of that sort be made valid by such a preface of generalities as to permissible aims as we find in section 1 [of the NIRA]?

*Id*. "The answer," the Court concluded, "is obvious." *Id*. "Such a delegation of legislative power is unknown to our law and is utterly inconsistent with the constitutional prerogatives and duties of Congress." *Id*.

A year after issuing *Schechter Poultry*, the Court confirmed the unconstitutionality of private delegation in *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936). The case was, in effect, the hypothetical in *Schechter Poultry* brought to life: The statute in question empowered coal industry groups to issue binding wage-and-hour codes. "This," *Carter* declares, "is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business." 298 U.S. at 311. As *Carter* points out, private delegation is worse than intra-government delegation. "[I]n the very nature of things, one person may not be entrusted with the power to regulate the business of another." *Id*. Letting one private party regulate another, *Carter* insists, is "clearly arbitrary" and "an intolerable and unconstitutional interference with personal liberty and private property." *Id*. (citing, among other authorities, *Schechter Poultry*).

As *Carter* shows, "[f]ederal lawmakers cannot delegate regulatory authority to a private entity." *Ass'n of Am. R.R.s v. U.S. Dep't of Transp.*, 721 F.3d 666, 670 (D.C. Cir. 2013), vacated and remanded on other grounds, 575 U.S. 43 (2015). Under *Carter*, in fact, "*even an intelligible principle* cannot rescue a statute empowering private parties to wield regulatory authority." *Id*. at 671 (emphasis added); accord *Nat'l*

*Horsemen's Ass'n v. Texas*, No. 22-10387, slip op. at 21 n.24, 22 (5th Cir., Nov. 18, 2022).

Technically, the FCC has retained for itself the authority to reject a budget proposed by USAC. But that is immaterial, because an agency has no authority "to *re*-delegate [its] power out to a private entity." *Texas v. Rettig*, 993 F.3d 408, 415 (5th Cir. 2021) (Ho, J., joined by Jones, Smith, Elrod, and Duncan, JJ., dissenting from denial of rehearing en banc).

Granted, *Texas v. Rettig*, 987 F.3d 518, 530 (5th Cir. 2021), suggests otherwise. Even if *Rettig* were correct, but see *Texas v. Comm'r of Internal Revenue*, No. 21-379 (U.S., March 28, 2022) (statement of Alito, J., joined by Thomas and Gorsuch, JJ., respecting denial of certiorari), it is very different from this case. *Rettig* involved a privately set actuarial standard that remained in place for only four years. See Brief of U.S., No. 21-379 at 6, 10 (U.S., Nov. 8, 2021) (confirming that the case involved an actuarial standard, issued in 2015, that governed a tax Congress repealed in 2019). In this case, by contrast, there is a pattern of agency abdication. The FCC has a long track record of serving simply as a conduit through which USAC's decisions flow. The FCC appears never to have rejected a USAC budget. For that matter, the FCC need not even review and approve USAC's work: A quarterly budget submitted by USAC—more precisely, a quarterly demand by USAC for money from

- 9 -

consumers—is "*deemed* approved" by the FCC after fourteen days of inaction. 47 C.F.R. § 54.709(a)(3) (emphasis added).

In the way it *actually* operates, USAC is no different from a trade association "constituted [a] legislative bod[y]" because of its "familiar[ity] with the problems of [its] enterprise." *Schechter Poultry*, 295 U.S at 537. (Indeed, USAC is run by people with strong ties to industry trade groups. See Pet. Br. 15.) USAC's ratemaking and spending power is thus a *de facto* private delegation—"delegation in its most obnoxious form." *Carter*, 298 U.S. at 311. As it operates in practice, USAC is "utterly inconsistent with the constitutional prerogatives and duties of Congress." *Schechter Poultry*, 295 U.S. at 537.

## B.  Private Delegation Offends The Constitutional Principle Of Representative Democracy

What makes private delegation so "utterly inconsistent" with Congress's role under the Constitution? *Schechter Poultry*, 295 U.S. at 537. Undoubtedly, the short answer is: the Constitution itself. "[T]he framers believed that a republic—a thing of the people—would be more likely to enact just laws than a regime administered by a ruling class of largely unaccountable 'ministers.'" *W. Va. v. EPA*, No. 20-1530 (U.S., June 30, 2022) (Gorsuch, J., concurring) (slip. op. at 3) (citing *Federalist* No. 11 (Hamilton)); see also *Gundy*, 139 S. Ct. at 2131 (Gorsuch, J.,

dissenting). If Congress cannot pass lawmaking power to other government bodies, it stands to reason that government bodies cannot pass lawmaking power to private groups.

A slightly longer explanation is that the Framers made laws difficult to pass in order to promote liberty, encourage deliberation, protect minorities, guard against faction, and ensure accountability (this last goal being one to which we will return). See *Gundy*, 139 S. Ct. at 2134 (Gorsuch, J., dissenting). Letting Congress delegate its lawmaking power would frustrate these aims. *Id.* at 2134-35. And, once again, what is true of delegation to other government branches is true as well of subdelegation to private parties.

Yet private delegation is also *worse* than intra-government delegation in a key way. Both an executive agency and a private regulator might, at least in theory, be structured so as to promote caution, deliberation, care for minority interests, and accountability. But when lawmaking power is delegated to a private party, any semblance of *representative* governance is lost.

"If one maxim reflected" the American colonists' "ideas of representation," it was "the belief that a representative assembly 'should be in miniature an exact portrait of the people at large. It should think, feel, reason and act like them.'" Jack N. Rakove, *Original Meanings:*

*Politics and Ideas in the Making of the Constitution* 203 (Vintage 1997) (quoting John Adams, *Thoughts on Government* (1776)). The colonists demanded far higher "standards of representation" than "the minuscule electorate of Georgian Britain and the oligarchic Parliament it supported could claim." *Id.* at 214. Indeed, the revolutionary movement arose from the colonists' rejection of "the British idea … of being virtually represented"—an idea that "struck Americans then, and us today, as absurd." Gordon S. Wood, *Power and Liberty: Constitutionalism in the American Revolution* 14 (Oxford Univ. Press 2021).

Some, to be sure, questioned the practicality, or the wisdom, of overly direct representation. "The idea of an actual representation of all classes of the people, by persons of each class," Hamilton complained, "is altogether visionary." *Federalist* No. 35. Madison, for his part, worried that the people could not control their passions. He remarked the Athenian mob's capacity to decree "to the same citizens the hemlock on one day and statues on the next." *Federalist* No. 63. In *Federalist* No. 10, Madison suggested that wise representatives should seek to "discern the true interest of their country," even when that "true interest" diverges from the views "pronounced by the people themselves."

It is arguably in the "populist Anti-Federalist calls for the most explicit form of representation possible, and not in Madison's *Federalist*

No. 10," that "the real origins of American pluralism and American interest-group politics" are to be found. Gordon S. Wood, *The Radicalism of the American Revolution* 259 (Vintage 1993). Transforming itself into a "society that was more egalitarian, more middling, and more dominated by the interests of ordinary people than any that had ever existed before," America "experienced an unprecedented *democratic* revolution." *Id.* at 348 (emphasis added). Lincoln did not extol government of all of the people, by a few of the people, for the rest of the people.

But even those who favored a more "filtered" representation would never have tolerated private delegation. Private persons are not "proper guardians of the public weal," *Federalist* No. 10; if anything, they are "advocates and parties to the causes which they determine," *id*. The notion that the public is "virtually represented," when lawmaking power is placed in private hands, is "absurd." Wood, *Power and Liberty*, *supra*, at 14. "Such a delegation of legislative power is unknown to our law." *Schechter Poultry*, 295 U.S. at 537.

### C.    Private Delegation Lends Itself To Politically Unaccountable Governance

Does private delegation violate more than just Article I? It has been argued that "the doctrine of forbidding delegation of public power to private groups is, in fact, rooted in a prohibition against self-interested

regulation that sounds more in the Due Process Clause than in the separation of powers." *Ass'n of Am. R.R.s*, 721 F.3d at 671 n.3 (quoting A. Michael Froomkin, *Wrong Turn in Cyberspace: Using ICANN To Route Around the APA and the Constitution,* 50 Duke L.J. 17, 153 (2000)); see also *Carter*, 298 U.S. at 311 (declaring a private delegation of lawmaking power "a denial of rights safeguarded by the due process clause of the Fifth Amendment").

The impulse to see private lawmaking as a due process problem is yet another sign that private delegation is an unusually egregious constitutional offense. We have seen that it is qualitatively worse than intra-government delegation (flouting, as it does, core principles of representative government). But it is also worse in degree, in that it takes the problem of unaccountability created by intra-government delegation and increases it. While delegation to the Executive Branch harms "principles of political accountability," such "harm is doubled … in the context of a transfer of authority … to private individuals." *NARUC v. FCC*, 737 F.2d 1095, 1143 n.41 (D.C. Cir. 1984).

Look no further than the USF, as run by USAC. As the Petitioners illustrate (at 18-20), it is a case study in unaccountable governance. What started as a 5.7% tax on end-user interstate telecommunications revenue, netting around $1.1 billion in quarterly "contributions," in 2000,

ballooned to a 33.4% tax rate, and around $2.5 billion in quarterly "contributions," by mid-2021. (Making matters worse, this fee is a highly regressive flat tax paid, by all but the poorest Americans, as a line item on monthly phone bills.) No one is minding the till—a fact made all the clearer by the "history of extensive waste and abuse" that has occurred on USAC's watch (or lack thereof). Pet. Brief. 21-24.

This is not an instance where the answer to the "constitutional issue" rests simply on "musings" about "political theory." *Collins v. Yellen*, 141 S. Ct. 1761, 1800 (2021) (Kagan, J., concurring in part and concurring in the judgment). USAC is the Founders' fear of unaccountable government come to life.

## II.   USAC Cannot Be Saved By Procedural Requirements Set By The FCC

"The degree of agency discretion that is acceptable varies according to *the scope of the power* congressionally *conferred*." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 475 (2000) (emphasis added). Likewise, it varies according to *how much process* is congressionally *required*. A statute that requires an agency to undertake more process before acting, in other words, may confer more overall power to act. Congress can avoid making "a pure delegation of legislative power" by "enjoin[ing] upon [the agency] a certain course of procedure and certain

rules of decision in the performance of its function." *Panama Refining Co. v. Ryan*, 293 U.S. 388, 432 (1935) (quoting *Wichita R.R. Light Co. v. Pub. Util. Comm'n*, 260 U.S. 48, 59 (1922)).

When an agency wields broad regulatory power, in short, it should do so subject to "formal administrative procedure," which tends "to foster the fairness and deliberation that should underlie" an "administrative action" with "the effect of law." *United States v. Mead Corp.*, 533 U.S. 218, 230 (2001). Crucially, though, the procedures must be set by Congress itself. "[A]n agency can[not] cure an unlawful delegation of legislative power by adopting in its discretion a limiting construction of the statute." *Whitman*, 531 U.S. at 472.

The FCC has imposed various procedural rules and limits on USAC. Among other things, USAC must maintain subcommittees to oversee the USF's various programs, 47 C.F.R. § 54.701; it must submit "the basis for [its] projections" to the FCC, *id.* § 54.709(a)(3), file "an annual report" with the FCC and Congress, *id.* § 54.702(g), and undergo audits, *id.* § 54.717; and it must avoid "mak[ing] policy, interpret[ting] unclear provisions of [the law], or interpret[ting] the intent of Congress," *id.* § 54.702(c). These are flimsy guardrails for an entity that wields such broad power. (Not that either USAC or the FCC are particularly disciplined about following them to begin with. See, e.g., FCC, Public

Notice, *Streamlined Resolution of Requests Related to Actions by the Universal Service Administrative Company*, No. DA 22-448 (Apr. 29, 2022) (FCC order summarily resolving dozens of challenges to USAC policy determinations).) But in any event, procedural requirements set by the FCC, however rigorous, cannot render USAC valid under Article I. Only Congress can repair an improper delegation. *Whitman*, 531 U.S. at 472-73.

Defending its private delegation of power, the FCC maintains that it "closely supervise[s]," and "retain[s] final decision-making authority" over, USAC. *Future of the USF Report*, *supra*, at ¶116. In making those claims, however, the agency cites only regulations that it *itself* has created. *Id*. Whatever process *the FCC* might use to constrain USAC *does not count* in an analysis of whether USAC is constitutional. For constitutional purposes, any such process is equivalent to no process at all. As far as Article I is concerned, the current setup is no different than one in which the FCC instructed USAC to draw its proposed contribution factors from a hat.

## CONCLUSION

The petition should be granted.


November 29, 2022

Respectfully submitted,

Corbin K. Barthold
Berin Szóka
James E. Dunstan
TECHFREEDOM
110 Maryland Ave., NE, #205
Washington, DC 20002
(202) 803-2867
cbarthold@techfreedom.org
*Attorneys for Amicus Curiae*
*TechFreedom*

CERTIFICATE OF COMPLIANCE

I certify:

This brief complies with the type-volume limits of Fed R. App. P. 29(a)(5) because it contains 3,603 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced serif typeface, in 14-point font, using Microsoft Office 365.

/s/ Corbin K. Barthold

CERTIFICATE OF SERVICE

I hereby certify that on November 29, 2022, I electronically filed the foregoing brief with the Clerk of the United States Court of Appeals for the Eleventh Circuit through the Court's CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Corbin K. Barthold