# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

CONSUMERS' RESEARCH, CAUSE BASED COMMERCE, INC., EDWARD J. BLUM, KERSTEN CONWAY, SUZANNE BETTAC, ET AL.,

*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION AND THE UNITED STATES OF AMERICA,

*Respondents.*

On Petition for Review of an Action of the Federal Communications Commission

## BRIEF FOR RESPONDENTS

Brian M. Boynton
  *Principal Deputy Assistant*
    *Attorney General*

Sarah E. Harrington
  *Deputy Assistant*
    *Attorney General*

Mark B. Stern
Gerard J. Sinzdak
  *Attorneys*

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, APPELLATE STAFF
950 Pennsylvania Ave. NW
Washington, DC 20530

P. Michele Ellison
  *General Counsel*

Jacob M. Lewis
  *Deputy General Counsel*

James M. Carr
Adam G. Crews
  *Counsel*

FEDERAL COMMUNICATIONS
  COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

## CERTIFICATE OF INTERESTED PERSONS
## AND COPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-2(b), Respondents certify that to the best of their knowledge the Certificates of Interested Persons and Corporate Disclosure Statements contained in Petitioners' brief and in the briefs of *amici* TechFreedom and Competitive Enterprise Institute, et al., are correct and complete.

/s/ *Adam G. Crews*

Adam G. Crews
Federal Communications Commission
Washington, DC 20554
(202) 418-1740

*Counsel for Respondent*

## STATEMENT REGARDING ORAL ARGUMENT

Respondents respectfully request oral argument because Petitioners challenge the constitutional validity of a federal statute and agency regulations that provide the basis for the Federal Communications Commission's universal service program.

**TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS AND COPORATE DISCLOSURE STATEMENT ............................................................. i

STATEMENT REGARDING ORAL ARGUMENT ....................................... ii

TABLE OF CONTENTS ................................................................. iii

TABLE OF CITATIONS ................................................................... v

JURISDICTION ............................................................................. 1

INTRODUCTION ............................................................................ 2

STATEMENT OF THE ISSUES ...................................................... 4

STATUTES AND REGULATIONS ................................................... 5

COUNTERSTATEMENT .................................................................. 5

    A.   The FCC's Universal Service Mandate ................................. 5

        1.   The Communications Act of 1934 ................................. 5

        2.   Section 254's Revised Universal Service Regime .......... 6

    B.   The FCC's Implementation of Section 254 .......................... 10

        1.   Universal Service Support Mechanisms ...................... 10

        2.   Universal Service Contribution Rules ......................... 15

    C.   The Fourth Quarter 2022 Contribution Factor ................... 17

SUMMARY OF ARGUMENT .......................................................... 20

STANDARD OF REVIEW ............................................................... 25

ARGUMENT ................................................................................. 26

I.   THE COURT LACKS JURISDICTION UNDER THE HOBBS ACT. ............. 26

    A.   Petitioners Attempt An End-Run Around The 60-Day Time Limit For Pre-Enforcement Challenges. ..................... 26

    B.   Petitioners Forewent Procedurally Proper Options To Obtain Judicial Review. ....................................................... 29

II.   SECTION 254 DOES NOT DELEGATE LEGISLATIVE POWER TO THE FCC. ................................................................................. 31

A. Section 254 Supplies Intelligible Principles That Guide And Limit The Commission's Implementation. ................... 31

    1. Section 254(b)'s General Universal Service Principles .......................................................................... 33

    2. Section 254(c)'s Eligibility Limiting Principles ........... 41

    3. Section 254(d)'s Equitable and Nondiscriminatory Contribution Principles ................................................. 44

    4. Section 254(e)'s Sufficiency Principles ........................ 46

    5. Section 254(h)'s Schools, Libraries, and Health Care Principles ............................................................... 49

B. Petitioners' Efforts To Avoid The Controlling Intelligible Principle Standard Are Unavailing. ................. 52

    1. Section 254 Survives Under Ample Supreme Court Precedent. ........................................................... 52

    2. Petitioners' Proposed Stricter Test for Taxes Is Beside the Point and Incompatible with Precedent. ...................................................................... 54

III. THE FCC DOES NOT IMPERMISSIBLY DELEGATE GOVERNMENT POWER TO USAC. ..................................................................... 56

A. USAC Largely Provides Accounting And Billing Support To The FCC. ......................................................... 57

B. Any Delegation To USAC Is Permissible Because The FCC Provides Supervision And Retains Final Decision-making Authority. ................................................ 61

CONCLUSION ...................................................................... 66

CERTIFICATE OF COMPLIANCE ................................. 68

CERTIFICATE OF FILING AND SERVICE ............................. 69

# TABLE OF CITATIONS

**Cases:**

*A.L.A. Schechter Poultry Corp. v. United States,*
  295 U.S. 495 (1935)......................................................36, 44

*Abramski v. United States,*
  573 U.S. 169 (2014)............................................................33

*Alenco Commc'ns, Inc. v. FCC,*
  201 F.3d 608 (5th Cir. 2000)...........................................37, 47

*Allnet Commc'n Serv., Inc. v. Nat'l Exch. Carrier Ass'n,*
  965 F.2d 1118 (D.C. Cir. 1992) .........................................11

*Am. Power & Light Co. v. SEC,*
  329 U.S. 90 (1946)......................................................32, 42, 52

*Am. Road & Transp. Builders Ass'n v. EPA,*
  588 F.3d 1109 (D.C. Cir. 2009) ..........................................29

*AT&T Corp. v. Iowa Utils. Bd.,*
  525 U.S. 366 (1999)...........................................................5, 6

*AT&T, Inc. v. FCC,*
  886 F.3d 1236 (D.C. Cir. 2018) .....................................10, 43

*Auto Cargo, Inc. v. Miami Dade Cnty.,*
  237 F.3d 1289 (11th Cir. 2001)...........................................55

*Boerschig v. Trans-Pecos Pipeline, LLC,*
  872 F.3d 701 (5th Cir. 2017)...............................................61

*Bonner v. City of Prichard, Ala.,*
  661 F.2d 1206 (11th Cir. 1981) (en banc)..........................26

*Bosse v. Oklahoma,*
  137 S. Ct. 1 (2016)..............................................................24

*\* Denotes authority on which Respondents primarily rely.*

# TABLE OF CITATIONS
## (continued)

**Page(s)**

*California v. Texas,*
141 S. Ct. 2104 (2021)................................................................30

*Chem-Haulers, Inc. v. United States,*
536 F.2d 610 (5th Cir. 1976).....................................................26

*Citizens' Util. Ratepayer Bd. v. State Corp. Comm'n,*
264 Kan. 363, 956 P.2d 685 (Kan. 1998) ...........................56

*Comsat Corp. v. FCC,*
250 F.3d 931 (5th Cir. 2001).....................................................46

*Denney v. City of Albany,*
247 F.3d 1172 (11th Cir. 2001).................................................62

*FCC v. Pottsville Broad. Co.,*
309 U.S. 134 (1940)....................................................................40

*Fed. Radio Comm'n v. Nelson Bros. Co.,*
289 U.S. 266 (1933)..............................................................40, 45

*Funds for Animals v. Kempthorne,*
538 F.3d 124 (2d Cir. 2008) ...............................................59, 61

\* *Gundy v. United States,*
139 S. Ct. 2116 (2019)....................... 22, 24, 31, 32, 33, 52, 54

*Hillcrest Prop., LLP v. Pasco Cnty.,*
915 F.3d 1292 (11th Cir. 2019)................................................44

*In re FCC 11-161,*
753 F.3d 1015 (10th Cir. 2014)..........................................10, 48

*In re Incomnet, Inc.,*
463 F.3d 1064 (9th Cir. 2006)...................................................65

*inContact, Inc. v. FCC,*
495 F. App'x 95 (D.C. Cir. 2013)..............................................30

## TABLE OF CITATIONS
### (continued)

Page(s)

*J.W. Hampton, Jr., & Co. v. United States*,
276 U.S. 394 (1928).................................................................22

*La. Forestry Ass'n Inc. v. Sec'y of U.S. Dep't of Labor*,
745 F.3d 653 (3d Cir. 2014) ...............................59, 60, 61

*Lewis v. Casey*,
518 U.S. 343 (1996).................................................................30

*Loving v. United States*,
517 U.S. 748 (1996).................................................................31

*M'Culloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819)............................................53

*Mais v. Gulf Coast Coll. Bureau, Inc.*,
768 F.3d 1110 (11th Cir. 2014)...................................26, 28

*Mistretta v. United States*,
488 U.S. 361 (1989).......................................................31, 40

*N.Y. Cent. Secs. Corp. v. United States*,
287 U.S. 12 (1932).................................................................39

*NAACP v. FPC*,
425 U.S. 662 (1976).................................................................40

*Nack v. Walburg*,
715 F.3d 680 (8th Cir. 2013)................................................28

*Nat'l Ass'n of Reversionary Prop. Owners v. STB*,
158 F.3d 135 (D.C. Cir. 1998) ............................................28

*Nat'l Ass'n of State Util. Consumer Advocs. v. FCC*,
457 F.3d 1238 (11th Cir. 2006)...........................................25

*Nat'l Cable Television Ass'n v. United States*,
415 U.S. 336 (1974).................................................................55

# TABLE OF CITATIONS
## (continued)

Page(s)

*Nat'l Lifeline Ass'n v. FCC*,
  983 F.3d 498 (D.C. Cir. 2020) .......................................... 12

*Nat'l Truck Equip. Ass'n v. NHTSA*,
  711 F.3d 662 (6th Cir. 2013) ............................................ 59

\* *NBC v. United States*,
  319 U.S. 190 (1943) .................................................. 32, 39, 40

*Owens v. Republic of Sudan*,
  531 F.3d 884 (D.C. Cir. 2008) ......................................... 33

*Panama Refin. Co. v. Ryan*,
  293 U.S. 388 (1935) .................................................. 36, 39, 44

*PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*,
  139 S. Ct. 2051 (2019) ................................................. 26

*Pittston Co. v. United States*,
  368 F.3d 385 (4th Cir. 2004) ......................................... 60, 64

*Qwest Commc'ns Int'l, Inc. v. FCC*,
  398 F.3d 1222 (10th Cir. 2005) ...................................... 23, 35, 36

\* *Qwest Corp. v. FCC*,
  258 F.3d 1191 (10th Cir. 2001) .................................... 6, 23, 35, 36

\* *Rural Cellular Ass'n v. FCC*,
  685 F.3d 1083 (D.C. Cir. 2012) ..................... 16, 23, 24, 37, 55, 56, 60

*Rural Cellular Ass'n v. FCC*,
  588 F.3d 1095 (D.C. Cir. 2009) ...................................... 38, 47

*Rural Tel. Coal. v. FCC*,
  838 F.2d 1307 (D.C. Cir. 1988) ...................................... 34, 55

*Schumacher v. Johanns*,
  272 Neb. 346, 722 N.W.2d 37 (Neb. 2006) ......................... 55

# TABLE OF CITATIONS
## (continued)

Page(s)

\* *Skinner v. Mid-America Pipeline Co.*,
490 U.S. 212 (1989)......................................................................25, 56

\* *State v. Rettig*,
987 F.3d 518 (5th Cir. 2021).................................................59, 61, 62

\* *Sunshine Anthracite Coal Co. v. Adkins*,
310 U.S. 381 (1940)........................................................25, 61, 62

\* *Texas Off. of Pub. Util. Couns. v. FCC*,
183 F.3d 393 (5th Cir. 1999).......6, 7, 10, 23, 24, 27, 33, 35, 36, 43, 44, 45, 46, 47, 48, 49, 55

*Texas Off. of Pub. Util. Couns. v. FCC*,
265 F.3d 313 (5th Cir. 2001)........................................................6, 43

*Texas v. Biden*,
142 S. Ct. 2528 (2022).......................................................................28

*Texas v. Biden*,
20 F.4th 928 (5th Cir. 2021) ............................................................28

*Thomson Multimedia Inc. v. United States*,
340 F.3d 1355 (Fed. Cir. 2003) ......................................................55

*Touby v. United States*,
500 U.S. 160 (1991)....................................................................42, 45

*Trafigura Trading LLC v. United States*,
29 F.4th 286 (5th Cir. 2022) ...........................................................55

*Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC*,
996 F.3d 1161 (11th Cir. 2021)..................................................24, 56

*U.S. Telecom Ass'n v. FCC*,
359 F.3d 554 (D.C. Cir. 2004) ....................................................59, 60

# TABLE OF CITATIONS
## (continued)

**Page(s)**

*United States v. Ambert,*
561 F.3d 1202 (11th Cir. 2009) ........................................... 22

*United States v. Arthrex, Inc.,*
141 S. Ct. 1970 (2021) ........................................................ 62

\* *United States v. Brown,*
364 F.3d 1266 (11th Cir. 2004) ...................... 25, 32, 33, 36, 37, 40, 53

*United States v. Cole,*
823 Fed. App'x. 911 (11th Cir. 2020) ................................. 53

*United States v. Frame,*
885 F.2d 1119 (3d Cir. 1989) ............................................. 64

*United States v. Grimaud,*
220 U.S. 506 (1911) ...................................................... 24, 54

*United States v. Thomas,*
242 F.3d 1028 (11th Cir. 2001) ...................................... 52, 53

*United States v. U.S. Shoe Corp.,*
523 U.S. 360 (1998) ........................................................... 55

*Van Buren v. United States,*
141 S. Ct. 1648 (2021) ....................................................... 37

*Voicestream GSM I Operating Co. v. La. Pub. Serv. Comm'n,*
943 So.2d 349 (La. 2006) ................................................... 55

*Vt. Pub. Serv. Bd. v. FCC,*
661 F.3d 54 (D.C. Cir. 2011) ............................................. 10

*Wayman v. Southard,*
23 U.S. (10 Wheat.) 1 (1825) ............................................. 53

*Whitman v. Am. Trucking Assocs.,*
531 U.S. 457 (2001) ...................................................... 32, 36

(x)

                                                                     **Page(s)**

*Yakus v. United States,*
    321 U.S. 414 (1944).....................................................45, 53

**Constitutional Provisions:**

U.S. Const., art. I, § 1..................................................31

**Statutes:**

5 U.S.C. § 553(e) .........................................................29

28 U.S.C. § 2342(1) ....................................................2, 26

\* 28 U.S.C. § 2344 ...................................2, 4, 21, 26, 27

31 U.S.C. § 1341 ..........................................................66

47 U.S.C. § 151 ...................................................2, 5, 33, 37

47 U.S.C. § 153(53) .....................................................41

\* 47 U.S.C. § 254 ...........................................................1

47 U.S.C. § 254(a)(1)..................................................10

47 U.S.C. § 254(a)(2)..............................................10, 41

47 U.S.C. § 254(b)................................................8, 34, 37

47 U.S.C. § 254(b)(1)......................................9, 22, 34, 37, 51

47 U.S.C. § 254(b)(2)..................................................9, 34

47 U.S.C. § 254(b)(3)..................................9, 22, 34, 38

47 U.S.C. § 254(b)(4)..............................9, 22, 34, 38, 51

47 U.S.C. § 254(b)(5)....................2, 7, 9, 22, 34, 38, 51

47 U.S.C. § 254(b)(6)..................................................9, 35

## TABLE OF CITATIONS
### (continued)

Page(s)

47 U.S.C. § 254(b)(7)...............................................................10, 38, 39

47 U.S.C. § 254(c)(1) ...............................7, 8, 23, 41, 42, 43, 51

47 U.S.C. § 254(c)(3) ....................................................................8, 43

47 U.S.C. § 254(d)...................3, 7, 9, 23, 35, 44, 45, 46, 51, 59

47 U.S.C. § 254(e) ......................................7, 9, 23, 35, 46, 51

47 U.S.C. § 254(h) ............................................................................8

47 U.S.C. § 254(h)(1)(A) ..........................................35, 49, 51

47 U.S.C. § 254(h)(1)(B) ....................................35, 49, 50, 51

47 U.S.C. § 254(h)(2) .................................................................50

47 U.S.C. § 254(h)(2)(A) ...............................................50, 51

47 U.S.C. § 254(i)...........................................................9, 35, 37

47 U.S.C. § 254(j)................................................................................34

47 U.S.C. § 402(a) ............................................................................2

47 U.S.C. § 410(c) .........................................................................10

Act of Feb. 1, 1905,
    33 Stat. 628 ..........................................................................54

Communications Act of 1934,
    Pub. L. 73-416, 48 Stat. 1064 ...........................................2

Consolidated Appropriations Act, 2022,
    Pub. L. No. 117-103, 136 Stat. 49......................................66

Hobbs Administrative Orders Review Act of 1950,
    64 Stat. 1129 .........................................................................3

Telecommunications Act of 1996,
Pub. L. 104-104, 110 Stat. 56 ............................................................2

Universal Service Antideficiency Temporary Suspension Act,
2004, Pub. L. No. 108-494, 118 Stat. 3998 ........................................66

**Administrative Materials:**

*Alpaugh Unified Sch. Dist.,*
22 FCC Rcd 6035 (2007) ..................................................................57

*Changes to the Board of Directors of the National Exchange*
*Carrier Association, Inc.,*
12 FCC Rcd 18400 (1997) ..........................................................12, 15

*Changes to the Board of Directors of the National Exchange*
*Carrier Association, Inc.,*
13 FCC Rcd 25058 (1998) ................................................................12

*Connect America Fund,*
26 FCC Rcd 17663 (2011) ..........................................................10, 63

*Federal-State Joint Board on Universal Service,*
12 FCC Rcd 8776 (1997) ............................................................10, 11

*First Quarter 1998 Universal Service Contribution Factors Revised*
*and Approved,*
12 FCC Rcd 21881 (CCB 1997)........................................................63

*Future of the Universal Service Fund,*
FCC 22-67, 2022 WL 3500217 (rel. Aug. 15, 2022).......... 17, 20, 28, 48

*Revised Second Quarter 2003 Universal Service Contribution*
*Factor,*
18 FCC Rcd 5097 (WCB 2003)........................................................63

*Streamlined Resolution of Requests Related to Actions by the
Universal Service Administrative Company,*
DA 22-1008, 2022 WL 5241209 (WCB rel. Sept. 30, 2022)................57

*Universal Service Contribution Methodology,*
32 FCC Rcd 4094 (WCB 2017)............................................................29

*Universal Service Contribution Methodology,*
34 FCC Rcd 4143 (2019) ....................................................................63

*Universal Service Contribution Methodology (Dorial Telecom, LLC
Request for Review),*
26 FCC Rcd 3799 (WCB 2011)............................................................29

*Wireline Competition Bureau Provides Guidance to the Universal
Service Administrative Company Regarding the High-Cost
Service Mechanism Budget,*
32 FCC Rcd 9243 (WCB 2017)............................................................64

**Regulations:**

47 C.F.R. § 1.401(a) ............................................................................29

47 C.F.R. § 54.101 ..............................................................................11

47 C.F.R. § 54.303(a)(1)............................................................ 13, 58, 60

47 C.F.R. § 54.502(a) ..........................................................................11

47 C.F.R. § 54.507(a) ....................................................................58, 60

47 C.F.R. § 54.619(a) ....................................................................58, 60

47 C.F.R. § 54.702(a) ..........................................................................25

47 C.F.R. § 54.702(b) ................................................................ 13, 25, 57

47 C.F.R. § 54.702(c)................................................................. 13, 25, 57

# TABLE OF CITATIONS
## (continued)

Page(s)

47 C.F.R. § 54.702(e) ................................................................. 12

47 C.F.R. § 54.703 ..................................................................... 12

47 C.F.R. § 54.706(a) ................................................................ 15

47 C.F.R. § 54.706(c) ................................................................ 46

47 C.F.R. § 54.709 ....................................................................... 1

47 C.F.R. § 54.709(a) ................................................................ 58

47 C.F.R. § 54.709(a)(2) ..................................................... 16, 59

* 47 C.F.R. § 54.709(a)(3) ........................ 1, 15, 16, 19, 25, 28, 58, 60, 61

47 C.F.R. § 54.709(b) ................................................................ 60

47 C.F.R. § 54.711(a) ........................................................... 16, 60

47 C.F.R. § 54.712(a) ................................................................ 17

47 C.F.R. § 54.717 .................................................................... 14

47 C.F.R. § 54.717(k) ................................................................ 15

47 C.F.R. § 54.719 .................................................................... 25

47 C.F.R. § 54.719(a) ................................................................ 29

* 47 C.F.R. § 54.719(b) ..................................................... 29, 57, 61

47 C.F.R. § 54.722 .................................................................... 29

47 C.F.R. § 54.901(a) ................................................................ 14

47 C.F.R. § 54.1304(b) .............................................................. 13

**TABLE OF CITATIONS**
**(continued)**

Page(s)

**Legislative Materials:**

H.R. Rep. No. 103-560 (1994) ................................................................. 11

**Other Materials:**

Memorandum of Understanding Between the FCC and USAC,
Dec. 19, 2018 ................................................................................. 13, 66

Pet. for Review, *Consumers' Research v. FCC*,
No. 21-3886 (6th Cir. filed Sept. 30, 2021) ........................................ 18

Pet. for Review, *Consumers' Research v. FCC*,
No. 22-60008 (5th Cir. argued Dec. 5, 2022) ..................................... 18

Pet. for Review, *Consumers' Research v. FCC*,
No. 22-60195 (5th Cir. filed April 6, 2022) ........................................ 18

Pet. for Review, *Consumers' Research v. FCC*,
No. 22-60363 (5th Cir. filed June 28, 2022) ...................................... 18

Statement of Patricia A. Dalton, GAO, Before the Senate
Committee on Commerce, Science, and Transportation,
April 11, 2005, GAO-05-546T ........................................................... 66

No. 21-13315-DD

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

CONSUMERS' RESEARCH, CAUSE BASED COMMERCE, INC., EDWARD J.
BLUM, KERSTEN CONWAY, SUZANNE BETTAC, ROBERT KULL, KWANG JA
KIRBY, TOM KIRBY, JOSEPH BAYLY, JEREMY ROTH, DEANNA ROTH,
LYNN GIBBS, PAUL GIBBS, AND RHONDA THOMAS,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION
AND THE UNITED STATES OF AMERICA,

*Respondents*.

---

On Petition for Review of an Action of the
Federal Communications Commission

---

## BRIEF FOR RESPONDENTS

---

## JURISDICTION

The FCC approved the universal service contribution factor for the

fourth quarter of 2022 under 47 U.S.C. § 254 and 47 C.F.R. § 54.709. The

factor was deemed approved by the Commission on September 27, 2022.

*See* 47 C.F.R. § 54.709(a)(3); A.171. Petitioners sought judicial review on

October 4, 2022, under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1). The

Court lacks jurisdiction because Petitioners raise an untimely collateral attack on Commission rules. *See* 28 U.S.C. § 2344; Part I, *infra*.

## INTRODUCTION

Ensuring universal availability of telecommunications services at reasonable rates is a long-established federal policy. Since 1934, Congress has charged the Federal Communications Commission "to make available, so far as possible, to all the people of the United States … a rapid, efficient, Nation-wide, and world-wide wire and radio communication service … at reasonable charges." *See* Communications Act of 1934, Pub. L. 73-416, tit. I, § 1, 48 Stat. 1064 (codified at 47 U.S.C. § 151).

For the past quarter-century, the FCC has pursued that policy under authority conferred by the Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat. 56. Consistent with Congress's instruction to create "specific" and "predictable" mechanisms that "preserve and advance universal service," 47 U.S.C. § 254(b)(5), the FCC administers programs that make telecommunications service available to low-income consumers and residents of high-cost rural and insular areas and that support the deployment of rural health services and Internet access for schools and libraries across the nation.

Congress chose to fund these programs by requiring certain telecommunications carriers to "contribute, on an equitable and nondiscriminatory basis," to the Commission's universal service mechanisms. *Id.* § 254(d). Pursuant to that directive, the FCC collects fees from providers of interstate telecommunications and distributes the collected funds to the targeted populations that each program serves.

Petitioners—an advocacy organization, a telephone service provider, and several telephone service subscribers—challenge that entire regulatory regime. They argue that Section 254 of the Communications Act unconstitutionally delegates legislative and taxing power to the FCC and that the FCC improperly subdelegated its regulatory authority to a private entity—the Universal Service Administrative Company (USAC)—that administers the universal service program as the FCC's agent. These challenges are meritless.

To begin, this Court lacks jurisdiction under the Hobbs Administrative Orders Review Act, 64 Stat. 1129 (1950) (codified at 28 U.S.C. §§ 2341–52), on which Petitioners rely. Petitioners injected their broad constitutional challenges to the universal service program into an unrelated proceeding concerned solely with calculating a quarterly contribution factor for universal service support. That was procedurally

improper. The FCC's rules implementing Section 254 (on which countless parties have reasonably relied) were adopted decades ago, and the time for a pre-enforcement challenge has long expired. *See* 28 U.S.C. § 2344.

Even if this case were properly before the Court, longstanding precedent forecloses Petitioners' claims. Section 254's delegation of authority to the FCC easily satisfies the Supreme Court's controlling intelligible principle standard; indeed, *numerous* intelligible principles guide and limit the FCC's discretion in implementing the statute. Moreover, the FCC's reliance on USAC (a private entity) for assistance in administering the universal service program is entirely permissible: USAC is subordinate to the Commission and performs only accounting, billing, distribution, and associated tasks, while the Commission makes all universal service policy decisions.

## STATEMENT OF THE ISSUES

1. Whether Petitioners can raise an untimely collateral attack on FCC rules by submitting uninvited comments in an unrelated Commission proceeding.

2.  Whether 47 U.S.C. § 254's detailed instructions to the FCC lack an intelligible principle to guide the Commission's pursuit of universal service.

3.  Whether a private entity improperly uses regulatory power when it provides accounting, billing, and related services to an agency, subject to that agency's oversight and final decision-making authority.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reprinted in an addendum bound with this brief.

## COUNTERSTATEMENT

### A.    The FCC's Universal Service Mandate

#### 1.    The Communications Act of 1934

Since its creation in 1934, the FCC has been tasked to "make available, so far as possible, to all the people of the United States, … a rapid, efficient, Nation-wide, and world-wide wire and radio communication service … at reasonable charges."  47 U.S.C. § 151.

For over a half-century, the FCC fulfilled this "universal service" objective through ratemaking.  Until the 1990s, states typically "granted an exclusive franchise" to one local telephone carrier "in each local service area," *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371 (1999), which

gave these carriers "monopolies … in their respective regions." *Texas Off. of Pub. Util. Couns. v. FCC*, 265 F.3d 313, 317 (5th Cir. 2001) (*TOPUC II*). This allowed the FCC to pursue universal service through "implicit" subsidies. For example, long-distance rates subsidized the cost of local service, *see Qwest Corp. v. FCC*, 258 F.3d 1191, 1196 (10th Cir. 2001) (*Qwest I*), and carriers could be required to charge "'above-cost' rates to low-cost, profitable urban customers" so that "'below-cost' rates" were available "to expensive, unprofitable rural customers." *Texas Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 406 (5th Cir. 1999) (*TOPUC I*).

## 2. Section 254's Revised Universal Service Regime

Telecommunications regulation changed dramatically in the 1990s. In the Telecommunications Act of 1996, Congress "ended the longstanding regime of state-sanctioned monopolies." *AT&T*, 525 U.S. at 371. With the introduction of competition, "a carrier that trie[d] to subsidize below-cost rates to rural customers with above-cost rates to urban customers" would be "vulnerable to a competitor that offers at-cost rates to urban customers." *TOPUC I*, 183 F.3d at 406. Congress therefore "recognized that the universal service system of implicit subsidies would have to be re-examined." *Id.*

To address the need for a new approach to universal service, Congress added a new provision—codified at 47 U.S.C. § 254—requiring "explicit" support for universal service. 47 U.S.C. § 254(e). Congress "directed the FCC to replace" the existing "patchwork" of subsidies with "'specific, predictable and sufficient … mechanisms to preserve and advance universal service.'" *TOPUC I*, 183 F.3d at 406 (quoting 47 U.S.C. § 254(b)(5)). And to pay for these explicit support mechanisms, Congress directed that "[e]very telecommunications carrier that provides interstate telecommunications services" should "contribute" to these mechanisms "on an equitable and nondiscriminatory basis." 47 U.S.C. § 254(d).

Rather than freeze in place support only for services that dominated in 1996, Congress defined "[u]niversal service" as "an evolving level of telecommunications services" that must "tak[e] into account advances in telecommunications and information technologies and services." *Id.* § 254(c)(1). So, when specifying "the services that are supported by Federal universal service support mechanisms," Congress required the Commission to consider:

(1) the services' role in "education, public health, or public safety";

(2) the extent to which "market choices by customers" have led to subscriptions "by a substantial majority of residential customers";

(3) the extent of the services' deployment in networks; and

(4) the broader "public interest, convenience, and necessity."

*Id.* § 254(c)(1)(A)-(D).[1] Section 254 thus equips the Commission to adjust the universal service program's scope as telecommunications technologies, national needs, and consumer choices evolve.

When the Commission establishes policies for "the preservation and advancement of universal service," *id.* § 254(b), Section 254 requires the agency to consider several "universal service principles" reflecting Congress's goals and priorities:

(1) Quality services should be available at just, reasonable, and affordable rates.

(2) Access to advanced telecommunications and information services should be provided in all regions of the Nation.

(3) Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services, including interexchange services and advanced telecommunications services, that are reasonably comparable to those services provided in urban areas and that are available at

---

[1]      Congress also authorized the FCC to designate "additional services" to support "schools, libraries, and health care providers" under a separate grant of authority.  47 U.S.C. §§ 254(c)(3), 254(h).

rates that are reasonably comparable to rates charged for similar services in urban areas.

(4) All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.

(5) There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.

(6) Elementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services.

*Id.* § 254(b)(1)-(6). To emphasize the importance of these policies, Section 254 repeats a number of the principles as *directives* in later provisions.[2] Finally, Congress also empowered the Commission to base universal service policies on "other principles" that a "[Federal-State] Joint Board [on Universal Service] and the Commission determine are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with" the Communications Act. *Id.* § 254(b)(7).[3]

---

[2] *See* 47 U.S.C. § 254(d) (requiring "equitable and nondiscriminatory" contributions); *id.* § 254(e) (universal service support "should be explicit and sufficient to achieve the purposes of this section"); *id.* § 254(i) (the Commission "should ensure that universal service is available at rates that are just, reasonable, and affordable").

[3] The Joint Board is composed of three FCC Commissioners (one of whom chairs the Board), four State Utility Commissioners, and a

## B. The FCC's Implementation of Section 254

### 1. Universal Service Support Mechanisms

To implement Section 254, Congress directed the FCC to revise its rules based on the Join Board's recommendations. *See id.* § 254(a)(1)-(2). After reviewing those recommendations and public comments, the Commission created four universal service programs to provide affordable service to (1) remote areas where the cost of providing service is high, 47 C.F.R. §§ 54.302-54.321, 54.801-54.1515; (2) low-income consumers who qualify for the FCC's Lifeline program, *id.* §§ 54.400-54.423; (3) schools and libraries, *id.* §§ 54.500-54.523; and (4) rural health care providers, *id.* §§ 54.600-54.633. *See Vt. Pub. Serv. Bd. v. FCC*, 661 F.3d 54, 56–57 (D.C. Cir. 2011).

---

consumer advocate representative. *See* 47 U.S.C. §§ 254(a)(1), 410(c). The FCC has added two principles on the Joint Board's recommendation under Section 254(b)(7): (1) the "principle of 'competitive neutrality' among providers and technologies, requiring that specific universal [service] support mechanisms 'neither unfairly advantage nor disadvantage one provider [or technology] over another.'" *AT&T, Inc. v. FCC*, 886 F.3d 1236, 1243 (D.C. Cir. 2018) (quoting *Federal-State Joint Board on Universal Service*, 12 FCC Rcd 8776, 8801 ¶47 (1997) (*Universal Service Order*), *aff'd in part and rev'd in part, TOPUC I*, 183 F.3d 393); and (2) the principle of "support for advanced services." *Connect America Fund*, 26 FCC Rcd 17663, 17679 ¶45 (2011), *pets. for review denied, In re FCC 11-161*, 753 F.3d 1015 (10th Cir. 2014).

The FCC also designated the telecommunications services that qualify for universal service support. *See Universal Service Order*, 12 FCC Rcd at 8809–22 ¶¶61–82. In general, the only services eligible for support are voice telephony services that include certain specified features. 47 C.F.R. § 54.101(a)-(b). Two additional services provided to schools and libraries—Internet access and the installation and maintenance of internal connections—are also eligible for support. *Universal Service Order*, 12 FCC Rcd at 9008–23 ¶¶436–463; 47 C.F.R. § 54.502(a)(1)-(2).

In 1997, the FCC designated the National Exchange Carrier Association (NECA) as the temporary administrator of the new universal service support mechanisms.[4] *Universal Service Order*, 12 FCC Rcd at 9216-17 ¶866. Later that year, the FCC directed NECA "to create an independently functioning, not-for-profit subsidiary"—the Universal Service Administrative Company (USAC)—to "administer temporarily"

---

[4] NECA, "a nonprofit, non-stock membership corporation," was "formed pursuant to FCC orders." *Allnet Commc'n Serv., Inc. v. Nat'l Exch. Carrier Ass'n*, 965 F.2d 1118, 1119 (D.C. Cir. 1992). Before the Telecommunications Act of 1996, NECA administered several FCC programs designed to "keep local [telephone] rates affordable," including a "Universal Service Fund" and "two Lifeline Assistance Programs." H.R. Rep. No. 103-560, at 33 (1994).

the high cost and low income support mechanisms, "as well as perform billing and collection functions" for all four universal service support mechanisms. *Changes to the Board of Directors of the National Exchange Carrier Association, Inc.*, 12 FCC Rcd 18400, 18415 ¶25 (1997) (*Contribution Order*). The Commission later made USAC the permanent administrator of the universal service support mechanisms effective January 1, 1999.[5] *Changes to the Board of Directors of the National Exchange Carrier Association, Inc.*, 13 FCC Rcd 25058, 25059–61, 25069–70 ¶¶2, 5, 20 (1998) (*USAC Order*).

USAC's role is "exclusively administrative," *id.* at 25067 ¶16, and "relatively narrow," *Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498, 503 (D.C. Cir. 2020). USAC acts "as the Commission's agent." *See* Memorandum of Understanding Between the FCC and USAC, Dec. 19, 2018, at 2,

---

[5]     USAC remains an independent, not-for-profit corporation. *See* https://www.usac.org/about/. Its board of directors includes representatives of private industry, recipients of universal service funding, consumer groups, and USAC's Chief Executive Officer, 47 C.F.R. § 54.703(b), most of whom are appointed for three-year terms by the FCC Chair from nominations submitted by groups represented on the board. *Id.* § 54.703(c)-(d). USAC's and NECA's boards are "separate"; NECA's board is "prohibited from participating in" USAC's functions; and USAC's books must be "separate" from NECA's. *Id.* §§ 54.703(a), 54.702(e).

§ III.B (FCC-USAC MOU).[6]  It is responsible "for billing contributors, collecting contributions to the universal service support mechanisms, and disbursing universal service support funds."  47 C.F.R. § 54.702(b).  USAC "may not make policy, interpret unclear provisions of the statute or rules, or interpret the intent of Congress"; if "the Act or the Commission's rules are unclear, or do not address a particular situation," USAC must "seek guidance from the Commission."  *Id.* § 54.702(c).[7]  Thus, the FCC is ultimately "responsible for the overall management, oversight, and administration" of the universal service program, "including all … policy decisions."  FCC-USAC MOU, at 2, § III.A.  And those decisions are often reflected in detailed regulations that govern USAC.  For example, the FCC's rules for high-cost support provide precise formulas that USAC must use.  *See, e.g.*, 47 C.F.R. § 54.303(a)(1) (total eligible annual operating expenses); *id.* § 54.1304(b) (safety net additive support); *id.* § 54.901(a) (Connect America Fund Broadband Loop Support).

---

[6]      https://www.fcc.gov/sites/default/files/usac-mou.pdf.

[7]      *See also* FCC-USAC MOU, at 17, § IV.J (describing procedures for USAC to seek guidance from Commission staff).

Beyond these prescriptive rules, the FCC actively oversees USAC's administration of the universal service program. Any party aggrieved by a USAC decision may request de novo review by the Commission if USAC declines to reconsider the decision. *See id.* §§ 54.719-54.725. In addition, the Commission periodically directs USAC to take specific actions to ensure the proper operation of the universal service support mechanisms (such as, for example, improving cybersecurity, reducing fraud, and making adjustments in response to audits).[8]

The FCC also requires USAC to "obtain and pay for an annual audit conducted by an independent auditor" to determine whether USAC "is properly administering the universal service support mechanisms to prevent fraud, waste, and abuse." *Id.* § 54.717. The FCC's Office of Managing Director approves the audit's requirements, reviews its preliminary findings, and makes recommendations to the auditor. *See id.* § 54.717(b)-(g). "Based on the final audit report," the Office of Managing Director "may take any action necessary to ensure that the universal service support mechanisms operate in a manner consistent with" the Commission's rules and "the public interest." *Id.* § 54.717(k).

---

[8]    These directives are available at https://www.fcc.gov/universal-service-fund-general-management-and-oversight.

## 2. Universal Service Contribution Rules

To implement Section 254(d), which governs carrier contributions, FCC rules require all "telecommunications carriers providing interstate telecommunications services" and "[c]ertain other providers of interstate telecommunications" to "contribute to the universal service support mechanisms." *Id.* § 54.706(a).

In 1997, the Commission adopted a rule for calculating the amount of each carrier's quarterly universal service contribution. *See Contribution Order*, 12 FCC Rcd at 18424-28 ¶¶42–50. At least 60 calendar days before each fiscal quarter, USAC must submit to the FCC "its projections of demand" and "administrative expenses" for the universal service support mechanisms for the upcoming quarter "and the basis for those projections." 47 C.F.R. § 54.709(a)(3). And at least 30 days before the quarter, USAC must submit to the agency's Office of Managing Director "the total contribution base," i.e., the projected collected interstate and international end-user telecommunications revenues for all carriers. *Id.* The contribution base is calculated from projected revenues that carriers are required to report to USAC. *Id.*; *see id.* § 54.711(a).

After receiving USAC's submissions, the FCC announces USAC's projections and proposes a "contribution factor" for the next quarter "in a public notice … available on the Commission's website." *Id.* § 54.709(a)(3). The "contribution factor" is "based on the ratio of total projected quarterly expenses of the universal service support mechanisms to the total projected collected end-user interstate and international telecommunications revenues, net of projected contributions." *Id.* § 54.709(a)(2).

The Commission "reserves the right" to revise USAC's projections and set them "at amounts that the Commission determines will serve the public interest" at any time "within the fourteen-day period following release of the Commission's public notice." *Id.* § 54.709(a)(3). "If the Commission takes no action" within that 14-day period, USAC's projections and the proposed contribution factor are "deemed approved by the Commission." *Id.*

Once the contribution factor has been approved by the Commission, USAC then applies it to each carrier's contribution base "to calculate the amount of individual contributions." *Id.* § 54.709(a)(3); *see Rural Cellular Ass'n v. FCC*, 685 F.3d 1083, 1086 (D.C. Cir. 2012) (*Rural Cellular II*). The Commission's rules permit—but do not require—

carriers to recover their federal universal service contribution costs "through interstate telecommunications-related charges to end users," 47 C.F.R. § 54.712(a), and around eighteen percent of contributors decline that opportunity. *See Future of the Universal Service Fund*, FCC 22-67, 2022 WL 3500217, at *33 ¶90 (rel. Aug. 15, 2022). If a carrier "chooses to recover its federal universal service contribution costs through a line item" on customers' bills, "the amount of the federal universal service line-item charge may not exceed the interstate telecommunications portion of [each] customer's bill times the relevant contribution factor." 47 C.F.R. § 54.712(a).

## C. The Fourth Quarter 2022 Contribution Factor

1. This case is just one in Petitioners' ongoing, multi-jurisdiction effort to obtain a ruling that Section 254 and its implementing regulations violate the nondelegation doctrine. Beginning with the fourth quarter of 2021, Petitioners have asked the Commission each quarter not to collect universal service contributions because (in Petitioners' view) the universal service fund is unconstitutional as designed and implemented. Upon the subsequent approval of each

quarterly contribution factor, Petitioners have filed materially similar petitions for review in federal court.[9]

2. The Commission's adoption of the fourth quarter 2022 contribution factor followed this now-familiar path. On August 2, 2022, USAC submitted to the FCC its projections of demand and administrative expenses for the universal service support mechanisms for the fourth quarter of 2022. *See* A.1-A.62. Three days later, several Petitioners filed extensive comments and objections reiterating their constitutional arguments. *See* A.63-A.162. Then, on September 1, 2022, USAC provided the FCC with the projected contribution base for the quarter. *See* A.163-A.170.

In a public notice released on September 13, 2022, the FCC's Office of Managing Director proposed a contribution factor of 28.9 percent for the fourth quarter of 2022. *See* A.171-A.175. That proposed contribution factor was based on USAC's cost and revenue projections, which were set

---

[9]     Three cases are in the Fifth Circuit; one has been argued, and two are stayed pending that decision. *See Consumers' Research v. FCC*, No. 22-60008 (5th Cir. argued Dec. 5, 2022); *Consumers' Research v. FCC*, No. 22-60195 (5th Cir. filed April 6, 2022); *Consumers' Research v. FCC*, No. 22-60363 (5th Cir. filed June 28, 2022). Briefing is underway in another case in the Sixth Circuit. *See Consumers' Research v. FCC*, No. 21-3886 (6th Cir. filed Sept. 30, 2021).

forth in the public notice. *See* A.171-A.172. In accordance with the Commission's rules, 47 C.F.R. § 54.709(a)(3), the public notice stated that if the Commission took "no action" within 14 days, USAC's projections and the proposed contribution factor "shall be deemed approved by the Commission." A.174. The public notice did not call for comments.

Nevertheless, several Petitioners filed extensive comments and objections in response to the public notice, again raising constitutional objections to the universal service program. *See* A.176-A.275. Petitioners made no specific objections to USAC's projections, nor did they question the agency's calculation of the contribution factor based on those projections. Instead, they argued that the Commission should set the contribution factor at zero and suspend collection of universal service contributions because (according to Petitioners) Section 254 unconstitutionally delegates Congress's legislative and taxing power to the FCC, which improperly re-delegated this power to USAC. *See, e.g.*, A.177.

The Commission took no action within 14 days of the public notice's release. Accordingly, the proposed contribution factor was "deemed approved by the Commission" and became effective on September 27, 2022. *See* 47 C.F.R. § 54.709(a)(3).

3. Although the Commission did not respond directly to Petitioners in this proceeding, the Commission recently submitted a report to Congress on the future of the universal service fund that considered and rejected Petitioners' constitutional arguments. *See Future of the Universal Service Fund*, 2022 WL 3500217, at *40–42 ¶¶112–118.

## SUMMARY OF ARGUMENT

For more than two decades, the FCC has exercised its authority under Section 254 of the Communications Act to carry out the longstanding federal policy to give every American access to affordable telecommunications service. Countless consumers—including low-income families and those in high-cost areas, as well as schools, libraries, and health care providers—have relied on the program to support communications services that are critical to modern life.

Petitioners chiefly complain that Section 254, which contains comprehensive guidelines for the Commission, nevertheless unconstitutionally delegates legislative power to the agency. They also claim that USAC (the program's administrator) unlawfully exercises government power, even though USAC has no policymaking authority, performs routine accounting and billing functions, and is subject to

rigorous FCC oversight.  These claims are not properly before the Court, but they fail regardless.

I.    At the outset, Petitioners cannot invoke the Hobbs Act to challenge Section 254 and its implementing regulations in this proceeding.  Petitioners injected a broad-based constitutional challenge to the universal service program into a proceeding that was concerned solely with calculating a quarterly contribution factor.  But Petitioners have no quarrel with the factor's calculation; their challenge to the program's constitutionality was far outside the scope of the proceeding.

To challenge Section 254 as unconstitutional, or to challenge USAC's role in assisting the FCC, Petitioners could have (1) filed a petition for rulemaking to repeal the FCC's contribution factor rules or (2) challenged an invoice from USAC and then appealed, if necessary, to the agency.  But they did not do either of those things.  Instead, they filed what amounts to a pre-enforcement petition for review of the FCC's rules implementing the universal service program. That challenge is decades out of time.  *See* 28 U.S.C. § 2344.

II.  Petitioners' nondelegation claim fails on the merits regardless.

A.  Section 254 is constitutional if Congress provided "an intelligible principle to which" the Commission "is directed to conform."  *J.W.*

*Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928). This "intelligible principle" standard has governed for nearly a century, and the vast majority of congressional delegations have been affirmed as constitutional under it. *See Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (plurality opinion); *id.* at 2130–31 (Alito, J., concurring); *United States v. Ambert*, 561 F.3d 1202, 1213 (11th Cir. 2009).

Section 254 easily satisfies the intelligible principle standard because its provisions guide and limit the FCC's implementation of the universal service program in multiple ways. Section 254(b) authorizes the FCC to "preserve[] and advance[] universal service" by accounting for a number of specified principles, including that rates be "just, reasonable, and affordable," 47 U.S.C § 254(b)(1), that rural and urban services and rates be "reasonably comparable," *id.* § 254(b)(3), that contributions be "equitable and nondiscriminatory," *id.* § 254(b)(4), and that support mechanisms be "specific, predictable and sufficient," *id.* § 254(b)(5).

Likewise, Section 254(c) directs the Commission to consider particular factors when defining the services eligible for universal service support, including whether: the services are essential to education and public health and safety, have been subscribed to by a substantial

majority of residential customers, and are being deployed by carriers.  *Id.* § 254(c)(1)(A)-(C).

Section 254(d) constrains the FCC's assessment of universal service fees by expressly requiring that contributions be made only "on an equitable and nondiscriminatory basis."  *Id.* § 254(d).  Section 254(e) likewise mandates that universal service support be "explicit and sufficient to achieve" the statute's purpose.  *Id.* § 254(e).  And Section 254(h) provides detailed instructions about establishing and funding universal service support mechanisms for rural health care providers and schools and libraries nationwide.  *Id.* § 254(h)(1)-(4).

All of these provisions intelligibly confine the FCC's discretion to increase the size and scope of its universal service program and the amount of fees it collects to finance the program.  Indeed, the D.C. Circuit has already observed that "section 254 . . . clearly provides an intelligible principle to guide the Commission's efforts."  *Rural Cellular II*, 685 F.3d at 1091.  And other courts have reversed and remanded FCC decisions on the basis of these meaningful statutory limits.  *See Qwest Commc'ns Int'l, Inc. v. FCC*, 398 F.3d 1222, 1235–37 (10th Cir. 2005) (*Qwest II*); *Qwest I*, 258 F.3d at 1201–03; *TOPUC I*, 183 F.3d at 434–35.

B. Petitioners urge the Court (at 33–39) to apply a different constitutional test based on the "original understanding" of nondelegation. But the intelligible principle standard remains the test under controlling Supreme Court decisions. *See Gundy*, 139 S. Ct. at 2123 (plurality opinion) (discussing cases); *id.* at 2130–31 (Alito, J., concurring). "The Supreme Court, and only the Supreme Court, has the prerogative of overruling its own decisions." *Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC*, 996 F.3d 1161, 1168 (11th Cir. 2021) (citing *Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) (per curiam)). Even so, cases pre-dating the modern intelligible principle standard independently confirm Section 254's lawfulness. *See, e.g.*, *United States v. Grimaud*, 220 U.S. 506, 521–22 (1911).

Petitioners also argue (at 49–63) that the Court should apply a stricter standard than the intelligible principle test because Section 254 delegates "taxing power" to the FCC. But universal service contributions are fees, not taxes, because they benefit the telecommunications carriers that pay them by supporting an expanded network. *See TOPUC I*, 183 F.3d at 427 n.52; *Rural Cellular II*, 685 F.3d at 1091. In any event, the Supreme Court has held that delegations of taxing power are "subject to no constitutional scrutiny greater than that … applied to other"

delegations.  *Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212, 223 (1989).

III.  Petitioners' private nondelegation challenge likewise fails.  For one, USAC does not exercise regulatory power; it has no policymaking authority, *see* 47 C.F.R. § 54.702(c), and it is subject to extensive FCC oversight.  *See, e.g.*, *id.* § 54.719.  USAC simply performs the billing, collection, disbursement, and related functions that are necessary to implement the program.  *See id.* § 54.702(a), (b).  Even as to the calculation of the contribution factor, USAC merely gathers facts; the agency's Office of Managing Director calculates the proposed factor, and the Commission retains final decision-making authority.  *See id.* § 54.709(a)(3).  That reservation of final agency authority is sufficient to defeat a private nondelegation claim even if USAC used regulatory power.  *See Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940).

## STANDARD OF REVIEW

Subject matter jurisdiction and constitutional challenges are reviewed de novo.  *See Nat'l Ass'n of State Util. Consumer Advocs. v. FCC*, 457 F.3d 1238, 1246 (11th Cir. 2006) (jurisdiction); *United States v. Brown*, 364 F.3d 1266, 1268 (11th Cir. 2004) (constitutional challenges).

# ARGUMENT

## I. THE COURT LACKS JURISDICTION UNDER THE HOBBS ACT.

### A. Petitioners Attempt An End-Run Around The 60-Day Time Limit For Pre-Enforcement Challenges.

Petitioners brought this case under the Hobbs Act, 28 U.S.C. § 2342(1), which generally allows pre-enforcement judicial review of an agency rule if a petition is filed "within 60 days" of the rule's publication. *Id.* § 2344. That jurisdictional deadline "force[s] parties who want to challenge agency orders via facial, pre-enforcement challenges to do so promptly," thereby ensuring the swift resolution of any "uncertainty" surrounding the lawfulness of agency rules. *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051, 2059 (2019) (Kavanaugh, J., concurring); *see Chem-Haulers, Inc. v. United States*, 536 F.2d 610, 613 (5th Cir. 1976) (stating that Section 2344 is jurisdictional; binding under *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc)).

Consistent with that policy, this Court has held that a "Hobbs Act jurisdictional analysis looks to the 'practical effect' of a proceeding." *Mais v. Gulf Coast Coll. Bureau, Inc.*, 768 F.3d 1110, 1120 (11th Cir. 2014). The practical effect of this lawsuit is to attack Section 254's

implementing rules across the board, not to challenge a single quarterly contribution factor's application. Indeed, the contribution factor's mere announcement did not harm any Petitioner; the factor's *application* does not occur until USAC actually issues a bill. Because this is therefore a pre-enforcement challenge, the Hobbs Act's initial 60-day jurisdictional deadline applies, and the challenge is well out of time.

The Commission devised USAC's role and enacted the contribution factor rules in 1997 and 1998, and those rules were last amended in 2011. In each of these proceedings, parties had opportunities to challenge the universal service regime as facially unconstitutional at the agency and to file petitions for judicial review if the Commission disagreed. *See* 28 U.S.C. § 2344; 47 U.S.C. § 402(a). None did, even when other challenges were timely filed. *See, e.g.*, *TOPUC I*, 183 F.3d at 405 (addressing a "consolidated challenge," including constitutional claims, to Section 254's implementation). To permit a facial challenge here "would permit an end-run around the administrative review mandated by the Hobbs Act."[10]

---

[10] That end-run threatens to throw into disarray longstanding telecommunications support upon which millions of American consumers—including low-income families, schools, libraries, and rural Americans—have reasonably relied for decades. *See Future of the*

*Mais*, 768 F.3d at 1121 (quoting *Nack v. Walburg*, 715 F.3d 680, 686 (8th Cir. 2013)).

The sole purpose of the proceeding to approve the fourth quarter 2022 contribution factor was to provide the Commission with the opportunity "to set projections of demand and administrative expenses at amounts that the Commission determines will serve the public interest." 47 C.F.R. § 54.709(a)(3). Although Petitioners purport to challenge the resulting contribution factor, they identify no calculation error, lack of evidence, or procedural defect. Their uninvited comments had no bearing on either the projected demand or contribution base—Petitioners instead objected to the entire universal service system's validity. As other courts have recognized, "an unsolicited comment" unrelated to the matter at hand is usually insufficient to create a new avenue to judicial review. *Cf. Nat'l Ass'n of Reversionary Prop. Owners v. STB*, 158 F.3d 135, 146 (D.C. Cir. 1998); *see also, e.g.*, *Texas v. Biden*, 20 F.4th 928, 953 (5th Cir. 2021), *rev'd on other grounds*, 142 S. Ct. 2528 (2022).

---

*Universal Serv. Fund*, 2022 WL 3500217, at *34 ¶92 (stating that, in recent years, support has been steady at around $8 billion annually).

## B. Petitioners Forewent Procedurally Proper Options To Obtain Judicial Review.

If Petitioners wanted judicial review of their broad constitutional objections, they had several permissible options to assert their constitutional claims. For one, they could have "petition[ed] for the … repeal" of the challenged universal service rules, 5 U.S.C. § 553(e); 47 C.F.R. § 1.401(a), which—if denied—would have created a new opportunity for judicial review. *See, e.g.*, *Am. Road & Transp. Builders Ass'n v. EPA*, 588 F.3d 1109, 1112 (D.C. Cir. 2009).

For another, Petitioner Cause Based Commerce (the only Petitioner that pays directly into the fund) might have objected to the invoice from USAC and then sought relief from the FCC. *See* 47 C.F.R. §§ 54.719(a)-(b), 54.722; *Universal Service Contribution Methodology (Dorial Telecom, LLC Request for Review)*, 26 FCC Rcd 3799 (WCB 2011) (reviewing an invoice objection). Under USAC's "pay-and-dispute" policy—which the FCC "has consistently upheld"—Cause Based Commerce could pay its invoice to avoid late fees while pursuing an administrative appeal within USAC and then at the FCC. *See, e.g.*, *Universal Service Contribution Methodology*, 32 FCC Rcd 4094, 4098–99 ¶16 (WCB 2017). From there, Cause Based Commerce could have sought judicial review. *See, e.g.*,

*inContact, Inc. v. FCC*, 495 F. App'x 95, 95 (D.C. Cir. 2013) (reviewing Commission action on an objection to a USAC invoice). This pay-and-dispute process would not prejudice Cause Based Commerce; indeed, it avers that it paid in full the contribution that it challenges here. *See* Pet'r Br. Ex. 1, ¶4.[11]

Although a "formal" enforcement action is not always necessary to reset the clock for judicial review (Pet'r Br. 1–2), it does not follow that Petitioners can obtain judicial review by creating a process of their own liking. Approval of a contribution factor is an instruction *to USAC*—not to private parties—for how to compute invoices. Private parties are not affected by the rules' application until the invoice issues, at which point administrative remedies are available. The Court should not reward Petitioners' disregard for proper procedures and for Congress's

---

[11] No Petitioner seeks a remedy that would return money already paid, so there is also a mismatch between their injuries (payment of the fourth quarter 2022 contribution) and the relief sought (invalidation of the program) that likely defeats Article III standing. *Cf. Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("The remedy must of course be limited to the inadequacy that produced the injury … that the plaintiff has established."); *California v. Texas*, 141 S. Ct. 2104, 2116 (2021) ("[A] declaration that the statutory provision they attack is unconstitutional … is the very kind of relief that cannot alone supply jurisdiction otherwise absent.").

comprehensive judicial review framework by entertaining this petition on the merits.

## II. SECTION 254 DOES NOT DELEGATE LEGISLATIVE POWER TO THE FCC.

### A. Section 254 Supplies Intelligible Principles That Guide And Limit The Commission's Implementation.

The Constitution vests "[a]ll legislative Powers herein granted … in a Congress of the United States." U.S. CONST., art. I, § 1. "Accompanying that assignment of power to Congress is a bar on its further delegation." *Gundy*, 139 S. Ct. at 2123 (plurality opinion). But although "Congress may not delegate the power to make laws," it may delegate "the authority to make policies and rules that implement its statutes." *Loving v. United States*, 517 U.S. 748, 771 (1996). As a practical matter, "in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta v. United States*, 488 U.S. 361, 372 (1989).

Given these considerations, the Supreme Court has long recognized that Congress "may confer substantial discretion on executive agencies to implement and enforce the laws." *Gundy*, 139 S. Ct. at 2123 (plurality opinion). The Court has "held, time and again, that a statutory

delegation is constitutional as long as Congress lays down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform." *Id.* (cleaned up); *see also id.* at 2131 (Alito, J., concurring) (upholding a statute with "a discernable standard"); *accord, e.g.*, *Brown*, 364 F.3d at 1270–74 (upholding a delegation under the settled intelligible principle standard).

The Court's intelligible principle standard is "not demanding." *Gundy*, 139 S. Ct. at 2129 (plurality opinion). Congress need only make clear "the general policy" for the agency to pursue and the "boundaries" of the delegated authority. *Id.* (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)). The Supreme Court has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment to be left to those executing or applying the law." *Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 474–75 (2001). Indeed, the Court has "over and over upheld even very broad delegations," including—and especially apt here—a delegation that the FCC merely "regulate in the 'public interest.'" *Gundy*, 139 S. Ct. at 2129 (plurality opinion) (quoting *NBC v. United States*, 319 U.S. 190, 216 (1943)). This Court has followed suit, emphasizing that only Congress's complete failure "to establish *any* standards for the delegated legislative conduct"

creates a nondelegation problem. *Brown*, 364 F.3d at 1273 (emphasis in original).

So, resolving a nondelegation challenge is mostly about statutory construction: the Court must "figure out what task" Section 254 delegates "and what instructions it provides." *Gundy*, 139 S. Ct. at 2123 (plurality opinion). That requires using all the ordinary "tools of divining meaning," which include "the statutory context, structure, history, and purpose" as well as "common sense." *Abramski v. United States*, 573 U.S. 169, 179 (2014) (cleaned up); *accord, e.g.*, *Owens v. Republic of Sudan*, 531 F.3d 884, 890 (D.C. Cir. 2008). By its plain terms, and in the broader context of its history and purpose, Section 254 more than satisfies the intelligible principle standard.

### 1. Section 254(b)'s General Universal Service Principles

a. When Congress enacted Section 254 in 1996, it was not writing on a blank slate. For decades, the FCC had pursued universal service policies designed "to make available … a rapid, efficient, Nation-wide … wire and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151; *see TOPUC I*, 183 F.3d at 405–06. The FCC's authority to implement these programs had been upheld, *see*

*Rural Tel. Coal. v. FCC*, 838 F.2d 1307, 1315 (D.C. Cir. 1988) (upholding a high cost fund), and Section 254 expressly blessed the FCC's pre-existing Lifeline program for low-income consumers. *See* 47 U.S.C. § 254(j) ("Nothing in this section shall affect the collection, distribution, or administration of the Lifeline Assistance Program" previously established.).

These historical initiatives informed Congress's adoption of 47 U.S.C. § 254(b), which requires the FCC to "base policies for the preservation and advancement of universal service on" six specified "principles":

> (1) the availability of "[q]uality services" at "affordable rates," *id.* § 254(b)(1);
>
> (2) nationwide "[a]ccess to advanced telecommunications and information services," *id.* § 254(b)(2);
>
> (3) providing low-income and rural consumers with access to telecommunications and information services "at rates that are reasonably comparable to rates charged for similar services in urban areas," *id.* § 254(b)(3);
>
> (4) ensuring that all telecommunications carriers "make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service," *id.* § 254(b)(4);
>
> (5) the creation of "specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service," *id.* § 254(b)(5); and

(6) "access to advanced telecommunications services" for "schools and classrooms, health care providers, and libraries" in accordance with Section 254(h), *id*. § 254(b)(6).

Although Petitioners seek (at 46) to dismiss these principles as simply "aspirational," the Tenth Circuit has found the Section 254(b) principles sufficiently specific to enable judicial review of the FCC's actions. *See Qwest II,* 398 F.3d at 1235–37; *Qwest I,* 258 F.3d at 1201–03. That is unsurprising, given that several of the principles are re-codified elsewhere in Section 254 as directives.[12] *Cf. TOPUC I*, 183 F.3d at 434–35 (applying Section 254(d), which reinforces Section 254(b)(4)).

Under these cases, Section 254(b) imposes "a mandatory duty on the FCC" to take the principles into account in preserving and advancing universal service. *Qwest I*, 258 F.3d at 1200. Although the statute "allows the FCC a considerable amount of discretion" to "balance" these "competing" principles, "that discretion is not absolute." *TOPUC I*, 183 F.3d at 434. Thus, while the FCC may "balance the principles against one another when they conflict," it "may not depart from them altogether

---

[12]     *See* 47 U.S.C. § 254(d) ("equitable and nondiscriminatory" contri-butions); *id*. § 254(e) (universal service support must be "sufficient to achieve the purposes" of Section 254); *id*. § 254(i) (rates should be "just, reasonable, and affordable"); *id*. § 254(h)(1)(A)-(B) (specific standards for services provided to rural health care providers, schools, and libraries).

to achieve some other goal." *Qwest I*, 258 F.3d at 1200; *see also Qwest II*, 398 F.3d at 1234. And it is "impermissible" for the Commission to "ignore all but one principle enumerated in Section 254(b)" when assessing whether universal service support is "sufficient." *Qwest II*, 398 F.3d at 1234 (cleaned up).

b. Section 254(b) alone makes this statute far different from those held unconstitutional in the Supreme Court's *Panama Refining* and *Schechter Poultry* decisions. *Contra* Pet'r Br. 46–48. The statute in *Panama Refining* "provided literally no guidance," *Whitman*, 531 U.S. at 474, and the one in *Schechter Poultry* "failed to establish *any* standards," *Brown*, 364 F.3d at 1273 (emphasis in original). Section 254(b) gives the FCC broad but intelligibly constrained authority.

This case is far more like this Court's decision in *Brown*. Applying the "intelligible principle" standard, this Court upheld a delegation to the Secretary of the Interior to define criminal conduct so long as the Secretary deemed the rules "necessary and proper for the use and management" of national parks. *Id.* The Court concluded that *Panama Refining* and *Schechter Poultry* were "readily distinguishable" because their defining feature was a total absence of standards. *See id.* But Congress's general policy to "promote … national parks," the Court held,

provided sufficient constraint. *See id.* at 1271–72, 1274. Under *Brown*'s rationale, Congress's directive to the Commission to establish "policies for the preservation and advancement of universal service," 47 U.S.C. § 254(b); *see also id.* § 151, would suffice on its own to uphold the FCC's universal service program. *Accord Rural Cellular II*, 685 F.3d at 1091 ("section 254 of the Act clearly provides an intelligible principle to guide the Commission's efforts, viz., 'to preserve and advance universal service'"). Section 254(b)'s additional principles are thus "extra icing on a cake already frosted." *Van Buren v. United States*, 141 S. Ct. 1648, 1661 (2021).

Of particular note, Section 254(b) cabins the FCC's discretion to assess universal service fees. In deciding the appropriate level of universal service funding, the agency must account for the affordability of telephone service. 47 U.S.C. § 254(b)(1); *see also id.* § 254(i). "Because universal service is funded … by all telecommunications providers—and thus indirectly by [their] customers—excess subsidization in some cases may detract from universal service by causing rates unnecessarily to rise, thereby pricing some consumers out of the market." *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 620 (5th Cir. 2000). Thus, borrowing the D.C. Circuit's common sense explanation, "it is hard to imagine how the

Commission could achieve the overall goal" of "preservation and advancement of universal service" if the agency allowed universal service fees to grow "so large" that telecommunications services became "less 'affordable,' in contravention of [Section] 254(b)(1)." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1103 (D.C. Cir. 2009) (*Rural Cellular I*).

And Section 254(b)'s constraints do not end there. Congress instructed the Commission to pursue policies that give "low-income consumers and those in rural, insular and high-cost areas" access to reasonably comparable services at reasonably comparable rates to those in "urban areas." 47 U.S.C. § 254(b)(3). Congress specified that contributions should be "equitable and nondiscriminatory." *Id.* § 254(b)(4). And support mechanisms should be "specific, predictable, and sufficient," *id.* § 254(b)(5), which supplies another meaningful limit. *See infra* Part II.A.4 (discussing Section 254(e)'s complementary sufficiency directive).

c. Petitioners contest (at 48) the force of these restrictions because Section 254(b)(7) allows the agency to adopt other principles as "necessary and appropriate for the protection of the public interest, convenience, and necessity." 47 U.S.C. § 254(b)(7). This concern is unfounded.

Section 254(b)(7) expressly incorporates limits on agency authority. One is procedural; any "other principles" must be approved by the Commission *and* the Federal-State Joint Board on Universal Service. *Id*. Another is substantive: additional principles must be "consistent with" the Communications Act, including the goal of promoting universal service. *Id*. So, Section 254(b)(7) is not a backdoor for unfettered agency discretion.

Even without those limitations, however, Section 254(b)(7) would still intelligibly constrain the Commission. The Supreme Court held in *NBC v. United States*, 319 U.S. at 216, that a "public interest" standard provides a sufficiently intelligible limiting principle for delegations to the FCC. *See id*. (upholding FCC broadcasting regulations under the agency's power to grant licenses in line with the "public interest, convenience, or necessity"); *accord N.Y. Cent. Secs. Corp. v. United States*, 287 U.S. 12, 24–25 (1932) (rejecting nondelegation challenge to Interstate Commerce Commission's authority to approve railroad acquisition in the "public interest"). Indeed, the Supreme Court in *Panama Refining* cited this public interest standard as an example of a permissible and definite constraint on agency power. *Panama Refin. Co. v. Ryan*, 293 U.S. 388, 428 (1935) (citing *Fed. Radio Comm'n v. Nelson*

*Bros. Co.*, 289 U.S. 266, 279 (1933)). As the Court would later explain, the public interest standard does not "confer an unlimited power" on the Commission, *NBC*, 319 U.S. at 216, because "the words 'public interest' in a regulatory statute … take meaning from the purposes of the regulatory legislation." *NAACP v. FPC*, 425 U.S. 662, 669 (1976). This remains the controlling law, and this Court has applied it well into recent years. *See Brown*, 364 F.3d at 1272 (citing *NBC*, 319 U.S. at 216–17).

Petitioners suggest (at 44) that the "public interest" cannot supply a limiting principle here because the challenged delegation does not involve "complex, technical determinations." Tellingly, however, Petitioners cannot muster a single case limiting *NBC* in that way. That is unsurprising, as the Supreme Court has applied *NBC* when upholding delegations on pure policy judgments, including those like criminal sentencing that affect personal liberty. *See Mistretta*, 488 U.S. at 378–79. And given the technological and economic complexities inherent in setting universal service policy, the public interest criterion "is as concrete as the complicated factors for judgment in such a field of delegated authority permit." *NBC*, 319 U.S. at 216 (quoting *FCC v. Pottsville Broad. Co.*, 309 U.S. 134, 138 (1940)).

## 2.    Section 254(c)'s Eligibility Limiting Principles

Beyond the general principles that the FCC must take into account in implementing universal service programs, Section 254(c) provides another meaningful limit on the scope of federal universal service support.

The FCC's rules implementing Section 254 must "include a definition of the services that are supported by Federal universal service support mechanisms," 47 U.S.C. § 254(a)(2), and Section 254(c)(1) limits the FCC's discretion in defining those services.  For one, eligible services must be "telecommunications services" as defined by the Act.  *See id.* § 254(c)(1); *id.* § 153(53).  And when defining which telecommunications services receive support, Section 254(c)(1) requires the Commission to "consider the extent to which" (1) the services "are essential to education, public health, or public safety," *id.* § 254(c)(1)(A); (2) "a substantial majority of residential customers" subscribe to the services, *id.* § 254(c)(1)(B); (3) carriers have "deployed" the services, *id.* § 254(c)(1)(C); and (4) the services "are consistent with the public interest, convenience, and necessity," *id.* § 254(c)(1)(D).

The four factors that the FCC must consider when defining supported services under Section 254(c)(1) are not "vague," as Petitioners

contend (at 48). The first three require the Commission to examine specific factual issues: whether the services are "essential" to education, health, or public safety; how many persons have subscribed to the services; and how extensively the services have been deployed. *See* 47 U.S.C. § 254(c)(1)(A)-(C). That guidance is much like what the Supreme Court upheld in *Touby v. United States*, 500 U.S. 160, 166 (1991), in which a statute required the Attorney General to consider three factors about drugs when scheduling them under the Controlled Substances Act.

The fourth factor requires the FCC to assess "the public interest" in addition to the other three factors. In doing so, it does not allow the agency to dispense with the other statutory considerations. 47 U.S.C. § 254(c)(1)(D). And in assessing the public interest, the FCC must consider "the purpose" of Section 254, "its factual background, and the statutory context." *See Am. Power & Light*, 329 U.S. at 104. The fourth factor therefore operates in concert with the other three factors and with Section 254 as a whole.

The statute also does not permit the FCC to redefine universal service "as often as it chooses," as Petitioners claim (at 48). Instead, the Commission is authorized to revise its definition of supported services to account for "advances in telecommunications and information

technologies and services," 47 U.S.C. § 254(c)(1), and in accordance with the factors set forth in the statute, *id.* That makes sense: "the telecommunications market" is "dynamic" and subject to "dramatic changes." *TOPUC II*, 265 F.3d at 322. Mindful of the need "to keep pace with technological advancements," Congress decided that "the universal service guarantee must be dynamic." *AT&T*, 886 F.3d at 1241. But flexibility to react to changes is not unbridled discretion.

Section 254(c)(3) provides another constraint; it authorizes the Commission to "designate additional services for [the] support mechanisms for schools, libraries, and health care providers for the purposes of" Section 254(h). 47 U.S.C. § 254(c)(3). This "restricts the FCC's authority" by specifying that services may be designated for support under Section 254(c)(3) only if they serve "'the purposes of [Section 254(h)].'" *TOPUC I*, 183 F.3d at 441 (quoting 47 U.S.C. § 254(c)(3)). As with the statute's other intelligible principles, courts can enforce this restriction when reviewing challenges to the FCC's designation of particular services. For example, the Fifth Circuit carefully considered—and ultimately rejected—a claim that the FCC exceeded its authority under Section 254(c)(3) by designating Internet access and internal connections provided to schools and libraries as

"additional services" eligible for universal service support.  *See id.* at 440–43.

### 3. Section 254(d)'s Equitable and Nondiscriminatory Contribution Principles

Section 254 also limits how the Commission can pay for universal service.  Section 254(d) requires "[e]very telecommunications carrier that provides interstate telecommunications services" to "contribute, on an equitable and nondiscriminatory basis," to the FCC's universal service support mechanisms.  47 U.S.C. § 254(d).  The carriers' legal obligation to pay thus comes directly from Congress; the Commission's role is merely to enforce that statutory command, a quintessential executive power.  *Cf. Hillcrest Prop., LLP v. Pasco Cnty.*, 915 F.3d 1292, 1302 (11th Cir. 2019) ("the role of the executive is to *apply*, or to enforce, statutes" (emphasis in original)).  So yet again, the statute differs materially from those that the Court has held unlawful, both of which purported to allow the President to impose his own legal obligations.  *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 541–42 (1935) (statute conferred "unfettered" power to "enact[] laws for the government of trade and industry"); *Panama Refining*, 293 U.S. at 414 (statute "purport[ed] to authorize the President to pass a prohibitory law").

In any event, Section 254(d) requires that collections must be "equitable and nondiscriminatory." 47 U.S.C. § 254(d). The Supreme Court has "upheld as providing sufficient guidance" a statute imposing a "fair and equitable" standard, *Touby*, 500 U.S. at 165 (citing *Yakus v. United States*, 321 U.S. 414, 426–27 (1944)), and Section 254(d)'s equitable and nondiscriminatory limitation is not materially different. *See also Nelson Bros.*, 289 U.S. at 285 (Federal Radio Commission's public interest standard for licensing informed by need to make a "fair and equitable allocation").

The limitation also has teeth. The Fifth Circuit has held, for example, that the FCC violated Section 254(d) when it required all providers of interstate telecommunications services to contribute a percentage of their combined interstate and international revenues to universal service. *See TOPUC I*, 183 F.3d at 433–35. The court concluded that this requirement "forced" carriers with minimal interstate revenues and large international revenues "to pay more in universal service contributions than [they] can generate in interstate revenues," effectively requiring them "to incur a loss to participate in" the "interstate service" market. *Id.* at 434–35. Given the disparate impact on these carriers, the Fifth Circuit held that the contribution

obligations were inequitable and discriminatory, in violation of Section 254(d). *Id.*[13]

Thus, the FCC does not have unbounded discretion to assess universal service fees on carriers. To comply with Section 254(d), the Commission must ensure that carriers make universal service payments "on an equitable and nondiscriminatory basis." 47 U.S.C. § 254(d). Contrary to Petitioners' contention (at 45–48), this is yet another "meaningful limitation[]" on the Commission's power to raise revenues to support universal service.

### 4. Section 254(e)'s Sufficiency Principles

Section 254(e) states that universal service "support should be explicit and sufficient to achieve the purposes of this section." 47 U.S.C. § 254(e). The Fifth Circuit has construed Section 254(e) as a "statutory command" requiring the FCC to ensure the "sufficiency of universal service support." *TOPUC I*, 183 F.3d at 412; *see also Alenco*, 201 F.3d at

---

[13]     In response to this ruling, the FCC "adopted a bright-line percentage rule" to determine "when a carrier's international revenues would be included in the base from which the agency calculates the carrier's universal service contribution." *Comsat Corp. v. FCC*, 250 F.3d 931, 934 (5th Cir. 2001). If a carrier's interstate revenues fall below 12 percent of its combined interstate and international revenues, its international revenues are excluded from its contribution base. *See* 47 C.F.R. § 54.706(c).

614 (stating that Section 254(e) "requires" universal service support to be "'explicit and sufficient'").

The sufficiency requirement further constrains the FCC's discretion to increase the universal service program's size and funding. When the Fifth Circuit upheld the FCC's adoption of cost controls to slow the growth of universal service subsidies, it noted that "excessive funding" of universal service can "violate the sufficiency requirements" in Section 254(e). *Alenco*, 201 F.3d at 620. The FCC's authority under Section 254 to assess fees to support universal service thus is not "limitless," as Petitioners contend (at 33). Because "excessive funding" can trigger needless increases in telephone rates, it can thwart the universal service goals by "pricing some consumers out of the market." *Alenco*, 201 F.3d at 620. To avoid that counterproductive result, which would "violate the sufficiency requirements" of Section 254(e), the Commission has adopted—and the courts have upheld—measures to restrain the growth of the universal service program.[14] *See id.* at 620–

---

[14] Section 254(e)'s requirement that universal service support be "explicit" imposes a further constraint on the Commission's implementation. The Fifth Circuit applied this limitation in overturning the Commission's decision to retain some implicit subsidies in requiring

21; *Rural Cellular I*, 588 F.3d at 1101–08; *In re FCC 11-161*, 753 F.3d at 1079–83.

Although Petitioners try to spin a narrative (at 7, 18–20) about an "unaccountable state of affairs" that has resulted in "skyrocketing costs," the facts tell a different story. Universal service disbursements—and, by extension, the collections from end-user consumers—"have remained relatively stable over the past decade." *Future of the Universal Service Fund*, 2022 WL 3500217, at *34 ¶92. In fact, after adjusting for inflation, the Commission estimates that consumers on average contributed *less* in 2021 than they did a decade earlier. *See id.* at *33–34 ¶91 & tbl. 2. Although the contribution factor has increased over time, that is "due in large part to a decline in the contributions revenue base" as providers report "a declining share of telecommunications revenues and an increasing share of non-telecommunications revenues." *Id.* at *34 ¶91. A higher contribution factor, standing alone, is hardly evidence of runaway costs or spending.

---

certain local exchange carriers to recover their universal service contributions through access charges. *TOPUC I*, 183 F.3d at 425.

### 5. Section 254(h)'s Schools, Libraries, and Health Care Principles

Finally, Section 254(h) further guides and limits how the Commission provides universal service support. In addition to the FCC's historic support for "high-cost" areas and "low-income subscribers," Section 254(h) added "a new wrinkle to the concept of universal service by directing the FCC to provide support to elementary and secondary schools, libraries, and health care providers …, irrespective of whether they are high-cost [or low-income] consumers." *TOPUC I*, 183 F.3d at 406, 440.

Section 254(h)(1) contains specific directives regarding the amount of funding for the universal service mechanisms for rural health care providers, schools, and libraries. Carriers required to provide telecommunications services to rural health care providers "shall be entitled" to a subsidy in "an amount equal to the difference, if any, between the rates for services provided to health care providers for rural areas in a State and the rates for similar services provided to other customers in comparable rural areas in that State." 47 U.S.C. § 254(h)(1)(A). And carriers that are required to provide services to schools and libraries at discounted rates shall "have an amount equal to

the amount of the discount treated as an offset to [their] obligation to contribute" to universal service funding. *Id.* § 254(h)(1)(B)(i). "The discount" for such services "shall be an amount that the Commission, with respect to interstate services, and the States, with respect to intrastate services, determine is appropriate and necessary to ensure affordable access to and use of such services by" elementary schools, secondary schools, and libraries. *Id.* § 254(h)(1)(B). Section 254(h)(1) thus articulates standards that the FCC must apply when deciding how much money to raise to subsidize services to rural health care providers, schools, and libraries.

In addition, Section 254(h)(2)(A) directs the FCC to establish rules to enhance "access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms, health care providers, and libraries." *Id.* § 254(h)(2)(A). The statute requires that such rules be "competitively neutral," *id.* § 254(h)(2), as well as "technically feasible and economically reasonable," *id.* § 254(h)(2)(A). These considerations further constrain the Commission's discretion in supporting services to schools, health care provides, and libraries.

*****

Whether considered separately or in combination, numerous provisions in Section 254 intelligibly guide and limit the FCC's authority to increase the size and scope of the universal service program and the fees that carriers must pay to support universal service. In setting universal service policies, the Commission must consider (among other things) how they promote the availability of "[q]uality services … at just, reasonable, and affordable rates" and are "sufficient … to preserve and advance universal service." 47 U.S.C. § 254(b)(1), (5). In deciding which services should receive support, the Commission must consider the extent to which the services (1) are "essential" to education, public health, or public safety, (2) have been adopted "by a substantial majority of residential customers," and (3) are being "deployed" by carriers. *Id.* § 254(c)(1)(A)-(C). In financing these mechanisms, the Commission must ensure that carriers make "equitable and nondiscriminatory" contributions, *id.* §§ 254(b)(4), 254(d), and that the mechanisms provide "sufficient" support to achieve the statute's purposes, *id.* §§ 254(b)(5), 254(e). And Section 254(h)'s detailed terms guide the Commission in subsidizing services to schools, libraries, and rural health care providers. *Id.* §§ 254(h)(1)(A)-(B), 254(h)(2)(A). These principles provide ample guidance to the FCC in administering the universal service program.

Because Congress "clearly delineate[d] its general policy, the public agency which is to apply it, and the boundaries of this delegated authority," *Am. Power & Light*, 329 U.S. at 105, Section 254's delegation to the FCC to implement the universal service program does not violate the constitutional separation of powers.

**B.    Petitioners' Efforts To Avoid The Controlling Intelligible Principle Standard Are Unavailing.**

**1.    Section 254 Survives Under Ample Supreme Court Precedent.**

Petitioners urge the Court (at 33) to hold that Section 254 "violates the original understanding of nondelegation."    Whatever difference Petitioners perceive between the "original understanding" and the intelligible principle standard, only the latter applies.    While some Justices have shown interest in revisiting the nondelegation framework, *see Gundy*, 139 S. Ct. at 2131 (Gorsuch, J., dissenting), the Supreme Court has so far adhered to the intelligible principle standard.    *Id*. at 2116 (plurality opinion); *id*. at 2130-31 (Alito, J., concurring in the judgment).    This Court has recognized that it cannot "get ahead of the Supreme Court and beat it to the punch." *United States v. Thomas*, 242 F.3d 1028, 1035 (11th Cir. 2001).    A circuit court "cannot overrule Supreme Court decisions" and is "bound to follow" Supreme Court

doctrine "until the Supreme Court itself overrules" a decision. *Id.* The intelligible principle standard thus controls this case. *See, e.g.*, *United States v. Cole*, 823 Fed. App'x. 911, 911 (11th Cir. 2020) (per curiam); *Brown*, 364 F.3d at 1270–74.

In any event, the Supreme Court has long recognized that Congress may delegate the power to "fill up the details" of a legislative program. *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825). In *Yakus*, for example, the Court cited no less than *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 413 (1819), for the proposition that "Congress is not confined" to make "the least possible delegation … to administrative officers." 321 U.S. at 425–26.[15]

Revenue-raising statutes are no exception. Even before the so-called "modern" intelligible principle standard (Pet'r Br. 30), the Court rejected a challenge to the Secretary of Agriculture's regulations that charged for grazing sheep on a federal reserve. *See Grimaud*, 220 U.S.

---

[15]    Petitioners attempt (at 41 n.10) to distinguish *Yakus* because the statute there required consideration of prevailing prices in the market. But so does Section 254 as a whole, which requires the Commission to consider (for example) whether "rates" in different areas are "reasonably comparable" when establishing the mechanisms that carriers fund. 47 U.S.C. § 254(b)(3).

at 522. "These fees were fixed to prevent excessive grazing," and for authority the Court looked no further than Congress's general directive to maintain the reserve. *See id.* at 515, 522. Contrary to Petitioners' argument (at 42) that a "formula" or "ceiling" must govern revenue generation, the relevant statute in *Grimaud* merely provided that "all money received" would sit in "a special fund" to be spent "as the Secretary of Agriculture may direct" for the reserve. *See* Act of Feb. 1, 1905, ch. 288, § 5, 33 Stat. 628. Yet the Court upheld the Secretary's power to set his own charges, 220 U.S. at 521–22, and even Justices skeptical of the modern intelligible principle standard cite *Grimaud* with approval. *See Gundy*, 139 S. Ct. at 2136 & n.38 (Gorsuch, J., dissenting).

### 2. Petitioners' Proposed Stricter Test for Taxes Is Beside the Point and Incompatible with Precedent.

Petitioners also urge (at 63) the Court to "bar[]," or at least "subject to strict guidelines," legislative delegations of the "taxing power." That, too, cannot be squared with controlling precedent.

For one, universal service fees are not taxes. As the Supreme Court has explained, an agency does not exercise taxing power if it requires regulated entities to pay a "fee" that "bestows a benefit on the [payor], not shared by other members of society." *Nat'l Cable Television Ass'n v.*

*United States*, 415 U.S. 336, 340–41 (1974).[16] The D.C. and Fifth Circuits have concluded that universal service contributions are fees, *not* taxes, because universal service "confers special benefits" on contributing carriers by (among other things) expanding the network they can serve. *See Rural Cellular II*, 685 F.3d at 1090–91 (observing that contributing carriers "will particularly benefit" from universal service, which increases the "utility of the Internet" by providing more users with "access to broadband"); *TOPUC I*, 183 F.3d at 427 n.52, 428 (observing that contributing carriers "directly benefit[] from" the "larger network" produced by "the provision of universal service").[17]

---

[16]    In arguing that universal service contributions are not fees, Petitioners cite two cases (at 55) interpreting the Constitution's Export Clause. *See United States v. U.S. Shoe Corp.*, 523 U.S. 360, 363 (1998); *Trafigura Trading LLC v. United States*, 29 F.4th 286, 292–93 (5th Cir. 2022) (opinion of Ho, J.). That reliance is misplaced because the Export Clause "is far stricter than" other clauses of the Constitution. *See Thomson Multimedia Inc. v. United States*, 340 F.3d 1355, 1360–61 (Fed. Cir. 2003); *accord, e.g., Auto Cargo, Inc. v. Miami Dade Cnty.*, 237 F.3d 1289, 1295 (11th Cir. 2001).

[17]    The D.C. Circuit also held that the FCC did not exercise "taxing power" when it adopted cost allocation requirements to subsidize universal service. *Rural Tel. Coal.*, 838 F.2d at 1314. And several state courts have ruled that charges levied on carriers to fund state universal service programs are not taxes. *See Voicestream GSM I Operating Co. v. La. Pub. Serv. Comm'n*, 943 So.2d 349, 359–62 (La. 2006); *Schumacher v. Johanns*, 272 Neb. 346, 358–63, 722 N.W.2d 37, 47–51 (Neb. 2006);

In any event, for nondelegation purposes it makes no difference whether universal service contributions are fees or taxes. Even assuming that those payments "are a form of taxation," the Supreme Court has held that "the delegation of discretionary authority under Congress' taxing power is subject to no constitutional scrutiny greater than that … applied to other nondelegation challenges." *Skinner*, 490 U.S. at 223; *see Rural Cellular II*, 685 F.3d at 1091. Because the "Supreme Court, and only the Supreme Court, has the prerogative of overruling its own decisions," *Travelers Prop. Cas. Co.*, 996 F.3d at 1168, this Court must analyze Section 254 under the same intelligible principle standard applicable to all delegations—a standard it plainly satisfies. *See* Part II.A, *supra*.

## III. THE FCC DOES NOT IMPERMISSIBLY DELEGATE GOVERNMENT POWER TO USAC.

Petitioners also contend (at 64–70) that the FCC impermissibly delegated its regulatory power to USAC, the private company that administers the universal service program as the FCC's agent. That argument fails for two reasons: (1) It rests on the false premise that USAC exercises regulatory power, rather than largely providing

---

*Citizens' Util. Ratepayer Bd. v. State Corp. Comm'n*, 264 Kan. 363, 396–400, 956 P.2d 685, 708–10 (Kan. 1998).

accounting and billing assistance, and (2) any delegation would be lawful even if USAC's role were more substantial because the FCC retains final decision-making authority over collections and disbursements.

## A. USAC Largely Provides Accounting And Billing Support To The FCC.

1. At the outset, Petitioners overstate USAC's functions and role. USAC is for the most part responsible for "billing" contributors, "collecting" universal service contributions, and "disbursing" universal service funds. 47 C.F.R. § 54.702(b). In performing these accounting and billing tasks, USAC "may not make policy, interpret unclear provisions of the statute or rules, or interpret the intent of Congress." *Id.* § 54.702(c). Instead, when facing a gap or ambiguity, USAC must "seek guidance from the Commission." *Id.* Parties dissatisfied with USAC's decisions may seek review at the FCC, which can grant relief.[18] *Id.* § 54.719(b).

---

[18] This avenue for agency relief is not merely hypothetical. *See, e.g.*, *Streamlined Resolution of Requests Related to Actions by the Universal Service Administrative Company*, DA 22-1008, 2022 WL 5241209 (WCB rel. Sept. 30, 2022) (granting, dismissing, or denying numerous requests for review); *Alpaugh Unified Sch. Dist.*, 22 FCC Rcd 6035 (2007) (granting 78 appeals of USAC decisions); Part I.B, *supra* (citing additional examples).

Most important for present purposes, only the Commission has power to approve a quarterly contribution factor. USAC simply provides the agency with projections of "demand" and "administrative expenses" for the various universal service mechanisms, as well as the "total contribution base." *Id.* § 54.709(a). USAC's projections take account of FCC rules that limit or cap available support; thus, USAC is constrained by the FCC's universal service policy decisions. *See, e.g.*, *id.* § 54.303(a)(1) (high-cost support monthly per-line limit); *id.* § 54.507(a) (schools and libraries annual cap); *id.* § 54.619(a) (health care providers annual cap). Using those projections, the FCC's Office of Managing Director computes and announces the quarterly contribution factor in a Public Notice. *Id.* § 54.709(a). If, within 14 days of the announcement, the Commission does not exercise its reserved power "to set projections of demand and administrative expenses at amounts that [it] determines will serve the public interest," the contribution factor is "deemed approved by the Commission." *Id.* § 54.709(a)(3).

2. Given its limited role, USAC wields no government power at all. Any "prohibition against subdelegation to an outside entity … is applicable only if an agency actually delegated its power in the first place." *La. Forestry Ass'n Inc. v. Sec'y of U.S. Dep't of Labor*, 745 F.3d

653, 671 (3d Cir. 2014). On that score, federal courts routinely hold that no delegation occurs when an agency merely "reasonably conditions" its action "on an outside party's determination of some issue," which merely amounts "to legitimate requests for input." *State v. Rettig*, 987 F.3d 518, 531 (5th Cir. 2021) (citing *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 566–67 (D.C. Cir. 2004)) (cleaned up).[19] What matters is the relationship between Congress's charge to the agency and the outside entity's input. *See Rettig*, 987 F.3d at 531–32; *La. Forestry*, 745 F.3d at 673–75.

USAC's input is reasonably related to the Commission's statutory charge to oversee carrier contributions. *See* 47 U.S.C. § 254(d). Each contribution factor is based on the "ratio" of (1) "projected quarterly expenses" of universal service support to (2) "projected collected end-user interstate and international telecommunications revenues." 47 C.F.R. § 54.709(a)(2). Commission policy constrains the expenses by limiting

---

[19]     *See also, e.g.*, *La. Forestry*, 745 F.3d at 672 ("An agency delegates its authority when it shifts to another party almost the entire determination of whether a specific statutory requirement has been satisfied." (quoting *Funds for Animals v. Kempthorne*, 538 F.3d 124, 133 (2d Cir. 2008) (cleaned up))); *cf. Nat'l Truck Equip. Ass'n v. NHTSA*, 711 F.3d 662, 675 (6th Cir. 2013) (rejecting subdelegation challenge for "fail[ure] to specify any particular power … that the agency has turned around and actively delegated").

total available support, *e.g.*, *id.* §§ 54.303(a)(1), 54.507(a), 54.619(a), and the Commission reviews and approves USAC's projected expenses "before they are used to calculate the quarterly contribution factor and individual contributions," *id.* § 54.709(a)(3).[20] Moreover, carriers self-report their projected revenues to USAC. *Id.* § 54.711(a).

The "fact gathering" that USAC performs for the FCC is a "legitimate outside party input." *See La. Forestry*, 745 F.3d at 672; *U.S. Telecom*, 359 F.3d at 566. USAC's proposed contribution factor inputs are not a policymaking decision. Instead, they are the revenue and demand projections used to calculate the contribution factor that the agency's Office of Managing Director adopts and the Commission approves. 47 C.F.R. § 54.709(a)(3). There is no improper delegation of regulatory power when USAC performs these data-gathering functions. *Cf. Pittston Co. v. United States*, 368 F.3d 385, 397 (4th Cir. 2004) (upholding the "ministerial task of doing calculations").

---

[20]    If USAC's projections turn out to be wrong, there is no lasting injury to contributors. FCC rules provide that if "contributions for a particular quarter exceed" universal service "disbursements" plus "USAC's administrative costs for that quarter, the 'excess payments will be carried forward,' thereby reducing the contribution factor for the subsequent quarter." *Rural Cellular II*, 685 F.3d at 1086 (quoting 47 C.F.R. § 54.709(b)).

**B.    Any Delegation To USAC Is Permissible Because The FCC Provides Supervision And Retains Final Decision-making Authority.**

1.  Even if USAC's role in determining the contribution factor were more substantial, there would be no impermissible delegation.  Again, courts routinely uphold arrangements in which the agency retains "final reviewing authority." *La. Forestry*, 745 F.3d at 672 (quoting *Kempthorne*, 538 F.3d at 133); *cf. Boerschig v. Trans-Pecos Pipeline, LLC*, 872 F.3d 701, 708 (5th Cir. 2017) (no improper delegation where a private entity lacks "the final say").  Thus, an agency "may subdelegate to private entities so long as the entities 'function subordinately to' the federal agency and the federal agency 'has authority and surveillance over their activities.'" *Rettig*, 987 F.3d at 532 (quoting *Sunshine Anthracite Coal*, 310 U.S. at 399).

Here, USAC simply applies the FCC's detailed regulations and calculates the projected demand, expenses, and the contribution base for each quarter.  47 C.F.R. § 54.709(a)(3).  The Commission approves the contribution factor, which USAC then applies.  *Id*.  And any "party aggrieved" by USAC action may "seek review" from the FCC.  *Id*. § 54.719(b).  The governing standard and opportunity for review defeat Petitioners' claim that a subdelegation to USAC is unlawful.

This is consistent with longstanding Supreme Court precedent allowing private entities to "propose" policy if the proposal is "approved, disapproved, or modified" by a government authority. *See Sunshine Anthracite Coal*, 310 U.S. at 388, 399. So long as the agency retains "final reviewing authority" and "review[s] and accept[s]" the outside entity's input, there is no unlawful delegation of government power. *Rettig,* 987 F.3d at 533. Because USAC's work is "closely superintended" by the Commission, there is no unlawful private delegation merely because USAC proposes a policy that the Commission ultimately adopts. *Id.* (cleaned up).[21]

2. Petitioners contend (at 66–67) that the Commission is a mere "rubber stamp" that has "never meaningfully exercised" its retained supervisory authority. Not so. The FCC has revised USAC's calculations

---

[21]    In a single sentence near the end of their brief, Petitioners contend (at 69–70) that the appointment of USAC's board members by the FCC Chair "fails to comply with" the Constitution's requirements for the appointment of "Officers" of the United States. That issue is "abandoned" because it received only "a single reference" unsupported by "legal or factual argument." *Denney v. City of Albany*, 247 F.3d 1172, 1182 (11th Cir. 2001). In any event, given the FCC's review and approval power, USAC's board members are not officers of the United States under the Constitution because they do not "exercis[e] significant authority pursuant to the laws of the United States." *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1980 (2021).

to account for changes in Commission policy. *See Revised Second Quarter 2003 Universal Service Contribution Factor*, 18 FCC Rcd 5097 (WCB 2003) (adjusting rate from 9.0044% to 9.1%); *First Quarter 1998 Universal Service Contribution Factors Revised and Approved*, 12 FCC Rcd 21881, 21886 (CCB 1997) (setting "the approved contribution factors"). Thus, Petitioners are wrong when they claim (at 67–68) that the "narrow window" for completing review leaves the Commission with "no option but to accept USAC's quarterly numbers." Indeed, the FCC has "extended the review period" when necessary. *See* 12 FCC Rcd at 21882–83 (recounting three extensions).

In any event, it is unsurprising that the Commission's revisions are relatively infrequent, given USAC's limited role and the Commission's additional oversight in advance of contribution factor announcements. For example, the Commission has acted preemptively "to avoid dramatic shifts in the contribution factor" by directing USAC to make certain collections "regardless of the projected quarterly demand."[22] And the FCC has "direct[ed]" USAC to retain certain funds "and not to take that

---

[22] *See* Notice of Proposed Rulemaking, *Universal Service Contribution Methodology*, 34 FCC Rcd 4143, 4144–45 ¶5 (2019) (citing *Connect America Fund*, 26 FCC Rcd at 17847 ¶561).

amount into consideration when determining the contribution factor for the first quarter of 2018."[23]  These examples further reflect the Commission's active oversight of the contribution factor process.  And because USAC's calculations are guided by the FCC's detailed regulations, the FCC ordinarily would have little occasion to override those calculations.

3.  USAC's role in collection and disbursement is similarly limited.  The collection of assessments is a "ministerial" function, and courts have consistently upheld its delegation.  *See Pittston*, 368 F.3d at 397 (a private entity may perform "the ministerial task" of "collecting funds" to support a federal program); *United States v. Frame*, 885 F.2d 1119, 1129 (3d Cir. 1989) (upholding the private Cattleman's Board's collection of assessments).  Petitioners try to distinguish these cases (at 69) by noting that the FCC's approval is passive and USAC's collections are large.  But *Pittston* upheld private assessments based only on statutory "guidance" with *no* pre-collection government review, 368 F.3d at 397, and *Frame* upheld private collection of "$1.00 per head of cattle," 885 F.2d at 1128,

---

[23]     *See Wireline Competition Bureau Provides Guidance to the Universal Service Administrative Company Regarding the High-Cost Service Mechanism Budget*, 32 FCC Rcd 9243 (WCB 2017).

which in 2021 totaled over \$42.6 million.[24]  The Commission's quarterly

review and approval of the universal service figures entails far more

agency involvement than either of those cases.

Petitioners' contrary claim (at 65) that "the Ninth Circuit has held"

that the FCC "has essentially no power" over the collection and

disbursement process misstates the Ninth Circuit's holding in *Incomnet*

and ignores its rationale.  That case addressed a narrow bankruptcy law

issue:  whether USAC was a "transferee" from which a bankruptcy estate

could recover a preferential transfer.  *In re Incomnet, Inc.*, 463 F.3d 1064,

1068 (9th Cir. 2006).  Under the Ninth Circuit's "dominion" test, USAC

was a transferee because it "holds legal title to the funds in the [universal

service] account."  *Id.* at 1073, 1076.

*Incomnet*'s bankruptcy holding is irrelevant here.   Far from

suggesting "no meaningful oversight" (Pet'r Br. 64), the Ninth Circuit

recounted how USAC exists "to collect, pool, and disburse" funds with its

"operations [all] carried out pursuant to regulations promulgated by the

FCC."  463 F.3d at 1067.  Although USAC held legal title to the funds,

the FCC had "substantial authority to determine USAC's budget and

---

[24]      https://www.beefboard.org/2021-annual-report/financials-2021/.

approve its disbursements" as part of its responsibility for "overseeing USAC." *Id.* at 1074.

In any event, USAC no longer holds legal title to the universal service funds. That money is now maintained at the U.S. Treasury, *see* FCC-USAC MOU, at 2, § III.B, and Congress treats the funds as permanent indefinite appropriations (*i.e.*, unlimited in duration or amount). *See* Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49, tit. V, § 510; Universal Service Antideficiency Temporary Suspension Act, 2004, Pub. L. No. 108-494, 118 Stat. 3986, 3998, tit. III, § 302 (exempting universal service contributions and distributions from the Antideficiency Act, 31 U.S.C. § 1341); *see also* Statement of Patricia A. Dalton, GAO, Before the Senate Committee on Commerce, Science, and Transportation, April 11, 2005, GAO-05-546T, at 26–28, *available at* https://www.gao.gov/assets/gao-05-546t.pdf (like numerous other "permanent appropriation" statutes, Section 254 "authorized collection of fees" by a federal agency to fund "expenditures for a specified purpose").

## CONCLUSION

The Court should dismiss the petition for lack of jurisdiction or deny it on the merits.

Dated:  December 22, 2022

Respectfully submitted,

/s/  *Adam G. Crews*

Brian M. Boynton
  *Principal Deputy Assistant
    Attorney General*

Sarah E. Harrington
  *Deputy Assistant
    Attorney General*

Mark B. Stern
Gerard J. Sinzdak
  *Attorneys*

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, APPELLATE STAFF
950 Pennsylvania Ave. NW
Washington, DC 20530

P. Michele Ellison
  *General Counsel*

Jacob M. Lewis
  *Deputy General Counsel*

James M. Carr
Adam G. Crews
  *Counsel*

FEDERAL COMMUNICATIONS
  COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    ☒ this document contains <u>13,000</u> words, *or*

    ☐ this document uses a monospaced typeface and contains ____ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒ this document has been prepared in a proportionally spaced typeface using <u>Microsoft Word for Office 365</u> in <u>14-point Century Schoolbook</u>, *or*

    ☐ this document has been prepared in a monospaced spaced typeface using _____ with _____.


*/s/ Adam G. Crews*
Adam G. Crews
Federal Communications Commission
Washington, DC 20554
(202) 418-1740

*Counsel for Respondent*

## CERTIFICATE OF FILING AND SERVICE

I, Adam G. Crews, hereby certify that on December 22, 2022, I caused the foregoing Brief for Respondents to be filed with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit using the Court's electronic CM/ECF system, which caused a true and correct copy of the same to be served on all participants in the case registered to receive such notices.

/s/ *Adam G. Crews*

Adam G. Crews
Federal Communications Commission
Washington, DC 20554
(202) 418-1740

*Counsel for Respondent*

Statutory Addendum

# CONTENTS

47 U.S.C. § 151 ................................................................................................. 1

47 U.S.C. § 254 ................................................................................................. 2

47 C.F.R. § 54.702 ............................................................................................ 7

47 C.F.R. § 54.703 .......................................................................................... 10

47 C.F.R. § 54.709 .......................................................................................... 13

# 47 U.S.C. § 151
## § 151. Purposes of chapter; Federal Communications Commission created

For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communications, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is created a commission to be known as the "Federal Communications Commission", which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this chapter.

# 47 U.S.C. § 254
## § 254. Universal service
### (Excerpts)

## (a) Procedures to review universal service requirements

### (1) Federal-State Joint Board on universal service

Within one month after February 8, 1996, the Commission shall institute and refer to a Federal-State Joint Board under section 410(c) of this title a proceeding to recommend changes to any of its regulations in order to implement sections 214(e) of this title and this section, including the definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for completion of such recommendations. In addition to the members of the Joint Board required under section 410(c) of this title, one member of such Joint Board shall be a State-appointed utility consumer advocate nominated by a national organization of State utility consumer advocates. The Joint Board shall, after notice and opportunity for public comment, make its recommendations to the Commission 9 months after February 8, 1996.

### (2) Commission action

The Commission shall initiate a single proceeding to implement the recommendations from the Joint Board required by paragraph (1) and shall complete such proceeding within 15 months after February 8, 1996. The rules established by such proceeding shall include a definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for implementation. Thereafter, the Commission shall complete any proceeding to implement subsequent recommendations from any Joint Board on universal service within one year after receiving such recommendations.

## (b) Universal service principles

The Joint Board and the Commission shall base policies for the preservation and advancement of universal service on the following principles:

### (1) Quality and rates

Quality services should be available at just, reasonable, and affordable rates.

**(2) Access to advanced services**
Access to advanced telecommunications and information services should be provided in all regions of the Nation.

**(3) Access in rural and high cost areas**
Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas.

**(4) Equitable and nondiscriminatory contributions**
All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.

**(5) Specific and predictable support mechanisms**
There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.

**(6) Access to advanced telecommunications services for schools, health care, and libraries**
Elementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services as described in subsection (h).

**(7) Additional principles**
Such other principles as the Joint Board and the Commission determine are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter.

**(c) Definition**

**(1) In general**
Universal service is an evolving level of telecommunications services that the Commission shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services. The Joint Board in recommending, and the Commission in

establishing, the definition of the services that are supported by Federal universal service support mechanisms shall consider the extent to which such telecommunications services--

> **(A)** are essential to education, public health, or public safety;

> **(B)** have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers;

> **(C)** are being deployed in public telecommunications networks by telecommunications carriers; and

> **(D)** are consistent with the public interest, convenience, and necessity.

**(2) Alterations and modifications**
The Joint Board may, from time to time, recommend to the Commission modifications in the definition of the services that are supported by Federal universal service support mechanisms.

**(3) Special services**
In addition to the services included in the definition of universal service under paragraph (1), the Commission may designate additional services for such support mechanisms for schools, libraries, and health care providers for the purposes of subsection (h).

**(d) Telecommunications carrier contribution**
Every telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service. The Commission may exempt a carrier or class of carriers from this requirement if the carrier's telecommunications activities are limited to such an extent that the level of such carrier's contribution to the preservation and advancement of universal service would be de minimis. Any other provider of interstate telecommunications may be required to contribute to the preservation and advancement of universal service if the public interest so requires.

**(e) Universal service support**
After the date on which Commission regulations implementing this section take effect, only an eligible telecommunications carrier designated under section

214(e) of this title shall be eligible to receive specific Federal universal service support. A carrier that receives such support shall use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended. Any such support should be explicit and sufficient to achieve the purposes of this section.

* * *

## (h) Telecommunications services for certain providers

### (1) In general

#### (A) Health care providers for rural areas

A telecommunications carrier shall, upon receiving a bona fide request, provide telecommunications services which are necessary for the provision of health care services in a State, including instruction relating to such services, to any public or nonprofit health care provider that serves persons who reside in rural areas in that State at rates that are reasonably comparable to rates charged for similar services in urban areas in that State. A telecommunications carrier providing service under this paragraph shall be entitled to have an amount equal to the difference, if any, between the rates for services provided to health care providers for rural areas in a State and the rates for similar services provided to other customers in comparable rural areas in that State treated as a service obligation as a part of its obligation to participate in the mechanisms to preserve and advance universal service.

#### (B) Educational providers and libraries

All telecommunications carriers serving a geographic area shall, upon a bona fide request for any of its services that are within the definition of universal service under subsection (c)(3), provide such services to elementary schools, secondary schools, and libraries for educational purposes at rates less than the amounts charged for similar services to other parties. The discount shall be an amount that the Commission, with respect to interstate services, and the States, with respect to intrastate services, determine is appropriate and necessary to ensure affordable access to and use of such services by such entities. A telecommunications carrier providing service under this paragraph shall--

**(i)** have an amount equal to the amount of the discount treated as an offset to its obligation to contribute to the mechanisms to preserve and advance universal service, or

**(ii)** notwithstanding the provisions of subsection (e) of this section, receive reimbursement utilizing the support mechanisms to preserve and advance universal service.

**(2) Advanced services**
The Commission shall establish competitively neutral rules--

**(A)** to enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms, health care providers, and libraries; and

**(B)** to define the circumstances under which a telecommunications carrier may be required to connect its network to such public institutional telecommunications users.

\* \* \*

**(i) Consumer protection**
The Commission and the States should ensure that universal service is available at rates that are just, reasonable, and affordable.

**(j) Lifeline assistance**
Nothing in this section shall affect the collection, distribution, or administration of the Lifeline Assistance Program provided for by the Commission under regulations set forth in section 69.117 of title 47, Code of Federal Regulations, and other related sections of such title.

# 47 C.F.R. § 54.702
## § 54.702 Administrator's functions and responsibilities.

(a) The Administrator, and the divisions therein, shall be responsible for administering the schools and libraries support mechanism, the rural health care support mechanism, the high-cost support mechanism, and the low income support mechanism.

(b) The Administrator shall be responsible for billing contributors, collecting contributions to the universal service support mechanisms, and disbursing universal service support funds.

(c) The Administrator may not make policy, interpret unclear provisions of the statute or rules, or interpret the intent of Congress. Where the Act or the Commission's rules are unclear, or do not address a particular situation, the Administrator shall seek guidance from the Commission.

(d) The Administrator may advocate positions before the Commission and its staff only on administrative matters relating to the universal service support mechanisms.

(e) The Administrator shall maintain books of account separate from those of the National Exchange Carrier Association, of which the Administrator is an independent subsidiary. The Administrator's books of account shall be maintained in accordance with generally accepted accounting principles. The Administrator may borrow start up funds from the National Exchange Carrier Association. Such funds may not be drawn from the Telecommunications Relay Services (TRS) fund or TRS administrative expense accounts.

(f) The Administrator shall create and maintain a website, as defined in § 54.5, on which applications for services will be posted on behalf of schools, libraries and rural health care providers.

(g) The Administrator shall file with the Commission and Congress an annual report by March 31 of each year. The report shall detail the Administrator's operations, activities, and accomplishments for the prior year, including information about participation in each of the universal service support mechanisms and administrative action intended to prevent waste, fraud, and abuse. The report also shall include an assessment of subcontractors' performance, and an itemization of monthly administrative costs that shall include all expenses,

receipts, and payments associated with the administration of the universal service support programs. The Administrator shall consult each year with Commission staff to determine the scope and content of the annual report.

(h) The Administrator shall report quarterly to the Commission on the disbursement of universal service support program funds. The Administrator shall keep separate accounts for the amounts of money collected and disbursed for eligible schools and libraries, rural health care providers, low-income consumers, and high-cost and insular areas.

(i) Information based on the Administrator's reports will be made public by the Commission at least once a year as part of a Monitoring Report.

(j) The Administrator shall provide the Commission full access to the data collected pursuant to the administration of the universal service support programs.

(k) Pursuant to § 64.903 of this chapter, the Administrator shall file with the Commission a cost allocation manual (CAM) that describes the accounts and procedures the Administrator will use to allocate the shared costs of administering the universal service support mechanisms and its other operations.

(l) The Administrator shall make available to whomever the Commission directs, free of charge, any and all intellectual property, including, but not limited to, all records and information generated by or resulting from its role in administering the support mechanisms, if its participation in administering the universal service support mechanisms ends.

(m) If its participation in administering the universal service support mechanisms ends, the Administrator shall be subject to close-out audits at the end of its term.

(n) The Administrator shall account for the financial transactions of the Universal Service Fund in accordance with generally accepted accounting principles for federal agencies and maintain the accounts of the Universal Service Fund in accordance with the United States Government Standard General Ledger. When the Administrator, or any independent auditor hired by the Administrator, conducts audits of the beneficiaries of the Universal Service Fund, contributors to the Universal Service Fund, or any other providers of services under the universal service support mechanisms, such audits shall be conducted in accordance with generally accepted government auditing standards. In administering the Universal

Service Fund, the Administrator shall also comply with all relevant and applicable federal financial management and reporting statutes.

(o) The Administrator shall provide performance measurements pertaining to the universal service support mechanisms as requested by the Commission by order or otherwise.

# 47 C.F.R. § 54.703
## § 54.703 The Administrator's Board of Directors.

(a) The Administrator shall have a Board of Directors separate from the Board of Directors of the National Exchange Carrier Association. The National Exchange Carrier Association's Board of Directors shall be prohibited from participating in the functions of the Administrator.

(b) Board composition. The independent subsidiary's Board of Directors shall consist of nineteen (19) directors:

(1) Three directors shall represent incumbent local exchange carriers, with one director representing the Bell Operating Companies and GTE, one director representing ILECs (other than the Bell Operating Companies) with annual operating revenues in excess of $40 million, and one director representing ILECs (other than the Bell Operating Companies) with annual operating revenues of $40 million or less;

(2) Two directors shall represent interexchange carriers, with one director representing interexchange carriers with more than $3 billion in annual operating revenues and one director representing interexchange carriers with annual operating revenues of $3 billion or less;

(3) One director shall represent commercial mobile radio service (CMRS) providers;

(4) One director shall represent competitive local exchange carriers;

(5) One director shall represent cable operators;

(6) One director shall represent information service providers;

(7) Three directors shall represent schools that are eligible to receive discounts pursuant to § 54.501;

(8) One director shall represent libraries that are eligible to receive discounts pursuant to § 54.501;

(9) Two directors shall represent rural health care providers that are eligible to receive supported services pursuant to § 54.601;

(10) One director shall represent low-income consumers;

(11) One director shall represent state telecommunications regulators;

(12) One director shall represent state consumer advocates; and

(13) The Chief Executive Officer of the Administrator.

(c) Selection process for board of directors.

(1) Sixty (60) days prior to the expiration of a director's term, the industry or non-industry group that is represented by such director on the Administrator's Board of Directors, as specified in paragraph (b) of this section, shall nominate by consensus a new director. The industry or non-industry group shall submit the name of its nominee for a seat on the Administrator's Board of Directors, along with relevant professional and biographical information about the nominee, to the Chairman of the Federal Communications Commission. Only members of the industry or non-industry group that a Board member will represent may submit a nomination for that position.

(2) The name of an industry or non-industry group's nominee shall be filed with the Office of the Secretary of the Federal Communications Commission in accordance with part 1 of this chapter. The document nominating a candidate shall be captioned "In the matter of: Nomination for Universal Service Administrator's Board of Directors" and shall reference FCC Docket Nos. 97–21 and 96–45. Each nomination shall specify the position on the Board of Directors for which such nomination is submitted. Two copies of the document nominating a candidate shall be submitted to the Wireline Competition Bureau's Telecommunications Access Policy Division.

(3) The Chairman of the Federal Communications Commission shall review the nominations submitted by industry and non-industry groups and select each director of the Administrator's Board of Directors, as each director's term expires pursuant to paragraph (d) of this section. If an industry or non-industry group does not reach consensus on a nominee or fails to submit a nomination for a position on the Administrator's Board of Directors, the Chairman of the Federal Communications Commission shall select an individual to represent such group on the Administrator's Board of Directors.

(d) Board member terms. The directors of the Administrator's Board shall be appointed for three-year terms, except that the Chief Executive Officer shall be a permanent member of the Board. Board member terms shall run from January 1 of the first year of the term to December 31 of the third year of the term, except that, for purposes of the term beginning on January 1, 1999, the terms of the six directors shall expire on December 31, 2000, the terms of another six directors on December 31, 2001, and the terms of the remaining six directors on December 31, 2002. Directors may be reappointed for subsequent terms pursuant to the initial nomination and appointment process described in paragraph (c) of this section. If a Board member vacates his or her seat prior to the completion of his or her term, the Administrator will notify the Wireline Competition Bureau of such vacancy, and a successor will be chosen pursuant to the nomination and appointment process described in paragraph (c) of this section.

(e) All meetings of the Administrator's Board of Directors shall be open to the public and held in Washington, D.C.

(f) Each member of the Administrator's Board of Directors shall be entitled to receive reimbursement for expenses directly incurred as a result of his or her participation on the Administrator's Board of Directors.

# 47 C.F.R. § 54.709

## § 54.709 Computations of required contributions to universal service support mechanisms.

(a) Prior to April 1, 2003, contributions to the universal service support mechanisms shall be based on contributors' end-user telecommunications revenues and on a contribution factor determined quarterly by the Commission. Contributions to the mechanisms beginning April 1, 2003 shall be based on contributors' projected collected end-user telecommunications revenues, and on a contribution factor determined quarterly by the Commission.

(1) For funding the federal universal service support mechanisms prior to April 1, 2003, the subject revenues will be contributors' interstate and international revenues derived from domestic end users for telecommunications or telecommunications services, net of prior period actual contributions. Beginning April 1, 2003, the subject revenues will be contributors' projected collected interstate and international revenues derived from domestic end users for telecommunications or telecommunications services, net of projected contributions.

(2) Prior to April 1, 2003, the quarterly universal service contribution factor shall be determined by the Commission based on the ratio of total projected quarterly expenses of the universal service support mechanisms to the total end-user interstate and international telecommunications revenues, net of prior period actual contributions. Beginning April 1, 2003, the quarterly universal service contribution factor shall be determined by the Commission based on the ratio of total projected quarterly expenses of the universal service support mechanisms to the total projected collected end-user interstate and international telecommunications revenues, net of projected contributions. The Commission shall approve the Administrator's quarterly projected costs of the universal service support mechanisms, taking into account demand for support and administrative expenses. The total subject revenues shall be compiled by the Administrator based on information contained in the Telecommunications Reporting Worksheets described in § 54.711(a).

(3) Total projected expenses for the federal universal service support mechanisms for each quarter must be approved by the Commission before they are used to calculate the quarterly contribution factor and individual contributions. For each quarter, the Administrator must submit its

projections of demand for the federal universal service support mechanisms for high-cost areas, low-income consumers, schools and libraries, and rural health care providers, respectively, and the basis for those projections, to the Commission and the Office of the Managing Director at least sixty (60) calendar days prior to the start of that quarter. For each quarter, the Administrator must submit its projections of administrative expenses for the high-cost mechanism, the low-income mechanism, the schools and libraries mechanism and the rural health care mechanism and the basis for those projections to the Commission and the Office of the Managing Director at least sixty (60) calendar days prior to the start of that quarter. Based on data submitted to the Administrator on the Telecommunications Reporting Worksheets, the Administrator must submit the total contribution base to the Office of the Managing Director at least thirty (30) days before the start of each quarter. The projections of demand and administrative expenses and the contribution factor shall be announced by the Commission in a public notice and shall be made available on the Commission's website. The Commission reserves the right to set projections of demand and administrative expenses at amounts that the Commission determines will serve the public interest at any time within the fourteen-day period following release of the Commission's public notice. If the Commission take no action within fourteen (14) days of the date of release of the public notice announcing the projections of demand and administrative expenses, the projections of demand and administrative expenses, and the contribution factor shall be deemed approved by the Commission. Except as provided in § 54.706(c), the Administrator shall apply the quarterly contribution factor, once approved by the Commission, to contributor's interstate and international end-user telecommunications revenues to calculate the amount of individual contributions.

(b) If the contributions received by the Administrator in a quarter exceed the amount of universal service support program contributions and administrative costs for that quarter, the excess payments will be carried forward to the following quarter. The contribution factors for the following quarter will take into consideration the projected costs of the support mechanisms for that quarter and the excess contributions carried over from the previous quarter. The Commission may instruct the Administrator to treat excess contributions in a manner other than as prescribed in this paragraph (b). Such instructions may be made in the form of a Commission Order or a public notice released by the Wireline Competition Bureau. Any such public notice will become effective fourteen days after release of the public notice, absent further Commission action.

(c) If the contributions received by the Administrator in a quarter are inadequate to meet the amount of universal service support program payments and administrative costs for that quarter, the Administrator shall request authority from the Commission to borrow funds commercially, with such debt secured by future contributions. Subsequent contribution factors will take into consideration the projected costs of the support mechanisms and the additional costs associated with borrowing funds.

(d) If a contributor fails to file a Telecommunications Reporting Worksheet by the date on which it is due, the Administrator shall bill that contributor based on whatever relevant data the Administrator has available, including, but not limited to, the number of lines presubscribed to the contributor and data from previous years, taking into consideration any estimated changes in such data.