[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13315

_____

CONSUMERS' RESEARCH,
CAUSE BASED COMMERCE, INC.,
EDWARD J. BLUM,
KERSTEN CONWAY,
SUZANNE BETTAC, et al.,

Petitioners,

*versus*

FEDERAL COMMUNICATIONS COMMISSION,
UNITED STATES OF AMERICA,

Respondents,

BENTON INSTITUTE FOR BROADBAND & SOCIETY, et al.,

Intervenors.

———————————

Petition for Review of a Decision of the
Federal Communications Commission
Agency No. 96-45

———————————

Before WILSON, NEWSOM, and LAGOA, Circuit Judges.

WILSON, Circuit Judge:

In this petition for review of final agency action, the Petitioners ask us to declare 47 U.S.C. § 254—the Telecommunications Act of 1996's universal service requirements—unconstitutional as a violation of the nondelegation doctrine. Additionally, they argue that the Federal Communications Commission (FCC), the agency Congress put in charge of § 254, has impermissibly delegated authority over the universal service fund to a private entity in violation of the private nondelegation doctrine.

Because § 254 provides an intelligible principle and the FCC maintains control and oversight of all actions by the private entity, we hold that there are no unconstitutional delegations and therefore **DENY** the petition.

## I.     Background

The FCC was created in 1934 "[f]or the purpose of regulating interstate . . . commerce in communication . . . so as to make

available, so far as possible, to all the people of the United States, without discrimination . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151.  In 1996, Congress instructed the FCC to establish and maintain a universal service fund in furtherance of this purpose.  *Id.* § 254.  Congress enacted § 254 to provide equitable universal services.  *Id.*  The Act instructs the FCC to determine the requisite level of universal service based on an "evolving" evaluation of four statutory factors.  *Id.* § 254(c).  The FCC requires contributors to submit a specified amount of money to the Fund per quarter.  *Id.* § 254(d).

The FCC depends on the Universal Service Administrative Company (USAC), a private entity, to carry out Congress' instruction.  The USAC assists the FCC in determining the amount each contributor must provide to the fund.  *See* 47 C.F.R. §§ 54.701, 54.709.  The USAC uses the FCC's detailed formulas to determine projections and demand for the universal service fund per quarter. *See id.* §§ 54.303, 54.901, 54.1301, 54.711(a).  The USAC must submit its "projections of demand for the federal universal service support mechanisms" to the FCC 60 days before the start of the quarter, and then submit the total contribution base (i.e., the percentage of revenues that each carrier will have to pay) to the agency at least 30 days before the start of the quarter.  *Id.* § 54.709(a)(3).  Only after the FCC approves the USAC's proposal is the USAC's valuation used to calculate that quarter's contribution factor.  *Id.*  Then, the contribution factor is used to determine the amount of individual contributions.  *Id.*

On appeal, the Petitioners—a nonprofit organization that aims to increase consumer knowledge of issues, a corporation that resells telecommunications services, and various individuals who pay into the universal service fund through monthly phone bills—challenge the FCC's and USAC's roles in creating the 4th Quarter 2022 Contribution Factor. They argue that the actions taken by both entities are unconstitutional under nondelegation doctrine jurisprudence.

## II.    Jurisdiction

Because we have "an independent obligation to ensure that subject-matter jurisdiction exists before reaching the merits of a dispute," we begin with a jurisdictional analysis before addressing the Petitioners' claims. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020).

The FCC challenges our jurisdiction to hear this appeal under the Hobbs Act. A "proceeding to enjoin, set aside, annul, or suspend any order of the Commission . . . shall be brought as provided by and in the manner prescribed in [the Hobbs Act]." 47 U.S.C. § 402(a).[1] The Hobbs Act gives Courts of Appeal exclusive jurisdiction to "determine the validity of . . . all final orders of the Federal Communications Commission." 28 U.S.C. § 2342(1); *see also FCC v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 468 (1984) ("Exclusive jurisdiction for review of final FCC orders . . . lies in the

---

[1] This direction is subject to exclusions not applicable in the case before us. *See* 47 U.S.C. § 402(b).

Court of Appeals."). However, the aggrieved party has only 60 days after the order's entry to file a petition for review. 28 U.S.C. § 2344.

The FCC argues that the Hobbs Act bars us from exercising jurisdiction for two reasons. First, because the Petitioners' true challenge is to the constitutionality of the entire statutory delegation scheme, and not the 4th Quarter Contribution Factor specifically. The FCC asserts that analyzing jurisdiction under the Hobbs Act requires looking at the impact of a proceeding rather than the reason a plaintiff brought a suit. Thus, because the statute was last amended in 2011, the Petitioners are far beyond their 60-day jurisdictional limit to file this petition. Second, the FCC argues that a challenge to a Contribution Factor is an invalid pre-enforcement challenge because the Petitioners will not be harmed by the announcement of the Contribution Factor since it has not yet been applied to them. We disagree on both points.

First, even if Petitioners challenge the entire statutory scheme, we agree with the Sixth and D.C. Circuits that administrative regulations "are capable of continuing application." *Functional Music, Inc. v. FCC*, 274 F.2d 543, 546 (D.C. Cir. 1958); *see also Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *Rettig v. State*, 987 F.3d 518, 529 (5th Cir. 2021). When considering a challenge to FCC rules under the Hobbs Act, the D.C. Circuit reasoned that the 60-day limit does not affect review of the validity of agency action that re-applies a rule. *See Functional Music*, 274 F.2d at 546. This is true because "limiting the right of review of the underlying rule would

effectively deny many parties ultimately affected by a rule an opportunity to question its validity." *Id.* Such is the case here. The Fourth Quarter Contribution Factor re-applies the statutory delegation in § 254. Thus, "Petitioners' challenge to the FCC's constitutional authority to implement § 254, reapply its prior regulations, and issue the [4th Quarter 2022 Contribution Factor] restarts the sixty-day clock." *Consumers' Rsch. v. FCC*, 67 F.4th 773, 786 (6th Cir. 2023).

Here, the challenge is timely. The Petitioners filed their challenge to the 4th Quarter Contribution Factor twenty-one days after public notice, and seven days after the Contribution Factor was deemed approved by the FCC and therefore became effective. The Petitioners were well within their 60-day jurisdictional limit.

Second, we find that the Contribution Factor is ripe for review. The Contribution Factor itself is a final and judicially reviewable agency action—Petitioners need not wait for "harm." According to FCC regulations, "Commission action shall be deemed final, for purposes of seeking reconsideration at the Commission *or judicial review*, on the date of public notice." 47 C.F.R. § 1.103(b) (emphasis added); *see also Bennett*, 520 U.S. at 177–78; *Consumers' Rsch.*, 67 F.4th at 785 (finding the text of 47 C.F.R. § 1.103(b) to be sufficient indication that an FCC contribution factor is final and reviewable). Further, as we have explained, "[o]rders 'adopted by the Commission in the avowed exercise of its rule-making power' that 'affect or determine rights generally . . . have the force of law and are orders reviewable under the' Hobbs Act." *Mais v. Gulf Coast*

*Collection Bureau, Inc.*, 768 F.3d 1110, 1121 (11th Cir. 2014) (quoting *Columbia Broad. Sys. v. United States*, 316 U.S. 407, 417 (1942)). Here, the challenge is properly brought because the Petitioners filed their challenge after the Contribution Factor's public notice date, and the Contribution Factor affects or determines their rights.

Even it was not ripe for review, however, Petitioners have demonstrated that their appeal presents a proper pre-enforcement review. A threatened enforcement of a law creates an Article III injury "[w]hen an individual is subject to such a threat, an actual arrest, prosecution, or other enforcement action." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). "[I]t is not necessary that petitioner first expose himself to actual [harm] to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). The Supreme Court has "permitted pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent." *Driehaus*, 573 U.S. at 159. Here, Petitioners have met this bar. Accordingly, we possess jurisdiction and proceed to the merits.

### III.    Standard of Review

"We review questions of constitutional law *de novo*." *United States v. Brown*, 364 F.3d 1266, 1268 (11th Cir. 2004).

### IV.    Traditional Nondelegation Doctrine

Although all legislative powers granted by the Constitution "shall be vested in a Congress of the United States," U.S. Const. art. I, "the Constitution does not deny to the Congress the necessary

resources of flexibility and practicality that enable it to perform its functions." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality opinion) (alterations adopted) (internal quotation marks omitted). Consequently, Congress may "obtain the assistance of its coordinate Branches—and in particular, may confer substantial discretion on executive agencies to implement and enforce the laws." *Id.* (cleaned up). Thus, "a statutory delegation is constitutional as long as Congress lays down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform." *Id.* (alterations adopted) (internal quotation marks omitted).

The standards necessary to satisfy the nondelegation doctrine "are not demanding." *Id.* at 2129; *see also Brown*, 364 F.3d at 1271 ("The government does not bear an onerous burden in demonstrating the existence of an intelligible principle."). "[A] delegation of legislative power will be 'constitutionally sufficient if Congress clearly delineates [1] the general policy, [2] the public agency which is to apply it, and [3] the boundaries of this delegated authority.'" *Brown*, 364 F.3d at 1271 (alterations in original) (quoting *Mistretta v. United States*, 488 U.S. 361, 372–73 (1989)).

The Petitioners argue that because there is no limit on how much the FCC can raise for the Fund, the statutory grant lacks any concrete, objective guidance. The FCC responds that § 254 has multiple standards.[2] "[A] nondelegation inquiry always begins (and

---

[2] The general policy of § 254 is clear: it exists to make sure "[a]ccess to advanced telecommunications and information services [are] provided in all

often almost ends) with statutory interpretation." *Gundy*, 139 S. Ct. at 2123.  An analysis of § 254 confirms that Congress' delegation provides an intelligible principle and therefore passes constitutional muster.

Section 254(b) expressly states many of the principles the FCC must adhere to. We begin with the general principles that guide the FCC.  The FCC shall create "policies for the preservation and advancement of universal service."  47 U.S.C. § 254(b).  Those policies must be based on specifically identified principles: quality services should be made available at just and reasonable rates; advanced services should be provided to the entire United States; and "low-income consumers and those in rural, insular, and high cost areas" should have access to advanced services at reasonably comparable rates to those in urban areas.  *Id*. § 254(b)(1)–(3).

Next, § 254(b)'s limiting principles.  All policies the FCC creates relating to the fund must be "specific, predictable and sufficient . . . to preserve and advance universal service."  *Id*. § 254(b)(5).  Congress assigns the responsibility for contributions to the fund to "telecommunications carrier[s] that provide[] interstate telecommunications services."  *Id*. § 254(d).  It instructs the FCC to charge contributors in an equitable and nondiscriminatory

_____

regions of the Nation."  47 U.S.C. § 254(b)(2).  The agency to implement it is likewise clear: the FCC must act to carry out this general policy.  *See id*. § 254(a)(2).  The parties disagree only on whether Congress has properly delineated "the boundaries of th[e] delegated authority."  *Brown*, 364 F.3d at 1271.

manner.  *Id.* § 254(b)(4), (d).  The FCC must provide access to "[e]lementary and secondary schools and classrooms, health care providers, and libraries," *id.* § 254(b)(6), and the funds can only be disbursed to statutorily designated eligible telecommunications carriers to provide support for universal services, *id.* § 254(e).

The last of the § 254(b) principles is more open ended, and Petitioners take specific issue with it.  Under § 254(b)(7), the FCC "shall base policies . . . on . . . "[s]uch other principles as the . . . [FCC] determine[s] are necessary and appropriate for the protection of the public interest, convenience, and necessity, and are consistent with this chapter." *Id.* § 254(b)(7).  The Petitioners contend that paragraph (b)(7) is proof of the FCC's boundless authority.  But the grant itself comes with specific limits: the FCC may only add principles that "are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter." *Id.*  Because Congress is afforded wide latitude to delegate authority to executive agencies, these limits suffice. *Gundy*, 139 S. Ct. at 2129; *Brown*, 364 F.3d at 1271.  We agree with the Sixth Circuit that the principles in § 254 collectively

> direct the FCC on (1) what it must pursue: accessible, quality, and affordable service.  (2) How the FCC must fund these efforts: by imposing carrier contributions. (3) The method by which the FCC must effectuate the goals of accessible, sound-quality, and affordable service: by creating specific mechanisms for the Fund. And (4) to whom to direct the programs: by identifying the USF's mechanisms' beneficiaries.

*Consumers' Rsch.*, 67 F.4th at 791 (emphases omitted).  Thus, we hold that 47 U.S.C. § 254 is permissible under the nondelegation doctrine.

## V.    Private Nondelegation Doctrine

"[I]f people outside government could wield the government's power—then the government's promised accountability to the people would be an illusion. . . .  This commonsense principle has come to be known as the 'private non-delegation doctrine.'" *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022).  As the Fifth Circuit aptly explained, the application of the doctrine is derived from an 80-year-old Supreme Court analysis in *Carter v. Carter Coal Co.*, 298 U.S. 238, 311–12 (1936) and *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388, 399 (1940):

> In *Carter Coal*, the Court invalidated a federal law that authorized a majority of coal producers to fix wages and hours for all producers.  Giving regulatory power to "private persons whose interests may be and often are adverse to the interests of others in the same business" was, the Court held, an unconstitutional "legislative delegation" of a "governmental function." Congress then rewrote the law and, four years later, the Court upheld it in *Adkins*.  Under the new law, private boards only proposed prices—and those prices now had to be "approved, disapproved, or modified by the [agency]."  The private entities "operate[d] as an aid" to the agency "but [were] subject to its pervasive surveillance and authority."  The Court found the

new scheme "unquestionably valid."  The Court emphasized that the private entities "function[ed] subordinately to the [agency]," that the agency and not the private entities "determine[d] the prices," and that the agency had "authority and surveillance over the [private entities]."

*Nat'l Horsemen's Benevolent & Protective Ass'n*, 53 F.4th at 880–81 (alterations in original) (internal citations omitted).

From the Supreme Court's guidance, our sister circuits have held that there is no violation of the private nondelegation doctrine where the private entity functions subordinate to an agency, and the agency has authority and surveillance over the entity.  *See, e.g.*, *United States v. Frame*, 885 F.2d 1119, 1128–29 (3rd Cir. 1989) ("[N]o law-making authority has been entrusted to" the private entity and therefore "the [statute] does not constitute an unlawful delegation of legislative authority.  In essence, the [private entities] serve an advisory function, and in the case of collection of assessments, a ministerial one."), *abrogated on other grounds*, *Cochran v. Veneman*, 359 F.3d 263 (3rd Cir. 2004); *Pittston Co. v. United States*, 368 F.3d 385, 396 (4th Cir. 2004) (holding that the private entity merely carried out the ministerial tasks of doing calculations and collecting funds, thus the "powers given to the [private entity] are of an administrative or advisory nature, and delegation of them to the [private entity] does not, we conclude, violate the nondelegation doctrine");  *Ass'n of Am. R.R. v. U.S. Dep't of Transp.*, 721 F.3d 666, 671 (D.C. Cir. 2013) (stating that private "entities may . . . help a government agency make its regulatory decisions" and "Congress may

formalize the role of private parties in proposing regulations so long as that role is merely 'as an aid' to a government agency that retains the discretion to 'approve[], disapprove[], or modif[y]' them" (alterations in original)), *vacated and remanded on other grounds*, *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43 (2015); *Nat'l Horsemen's Benevolent & Protective Ass'n*, 53 F.4th at 881 ("If the private entity does not function subordinately to the supervising agency, the delegation of power is unconstitutional."); *Oklahoma v. United States*, 62 F.4th 221, 228–29 (6th Cir. 2023) ("*Adkins* shows that a private entity may aid a public federal entity that retains authority over the implementation of federal law. But if a private entity creates the law or retains full discretion over any regulations . . . it is an unconstitutional exercise of federal power." (internal citation omitted)).

Today we join our sister circuits in holding that a government agency may delegate statutory authority to private entities without violating the private nondelegation doctrine so long as (1) the entity "function[s] subordinately" to the agency, and (2) the agency retains "authority and surveillance over the activities" of the private entity. *Adkins*, 310 U.S. at 399 (alteration in original).

Private entities "may aid [a federal agency] that retains authority over the implementation of federal law" by serving "as advisors that propose regulations[,] . . . undertak[ing] ministerial functions, . . . gather[ing] facts for the agency, or advis[ing] on or mak[ing] policy recommendations to the agency." *Consumer's Rsch.*, 67 F.4th at 795 (internal citations omitted). Likewise, "a

statute does not violate the private nondelegation doctrine if it 'imposes a standard to guide' the private party." *Consumers' Rsch. v. FCC*, 63 F.4th 441, 451 (5th Cir. 2023) (quoting *Texas v. Rettig*, 987 F.3d 518, 532 (5th Cir. 2021),[3] *vacated & reh'g en banc granted*, 72 F.4th 107 (5th Cir. 2023) (mem.)).

The Petitioners argue that the FCC has impermissibly delegated its statutory authority under § 254 to the USAC in violation of the private nondelegation doctrine. Because the USAC functions subordinately to the FCC, and the FCC maintains authority, we disagree and hold that the USAC's role in carrying out the universal service fund does not violate the private nondelegation doctrine.

### a. The USAC's Functions

In considering an identical private nondelegation challenge to a previous FCC Contribution Factor, the Sixth Circuit found that the USAC is "subordinate to the FCC and performs ministerial and fact-gathering functions." *Consumers' Rsch.*, 67 F.4th at 795–96. We agree. The USAC cannot make policy or interpret unclear provisions or rules. 47 C.F.R. § 54.702(c). Where there is confusion about how it should act, it must seek direction from the FCC. *Id.* The USAC must act in accordance with FCC regulations, and those regulations expressly limit the USAC's functions to ministerial functions like "billing contributors, collecting contributions to the

---

[3] The Fifth Circuit mistakenly attributed the quoted portion to *Rettig*. It properly appears in *Boerschig v. Trans-Pecos Pipeline, LLC*, 872 F.3d 701, 708 (5th Cir. 2017).

universal service support mechanisms, and disbursing universal service support funds." *Id.* § 54.702(b). The USAC must file annual reports with the FCC and Congress that conform to specifications outlined by the FCC. *Id.* § 54.702(g). The reports must detail the USAC's "operations, activities, and accomplishments" from the prior year and all "administrative action intended to prevent waste, fraud, and abuse." *Id.* The report must also "include all expenses, receipts, and payments associated with the administration of the universal service support programs." *Id.* Each year, the USAC must consult with the FCC "to determine the scope and content of the annual report." *Id.*

The USAC's actions are ministerial. It gathers facts to determine the Fund's needs each quarter, then proposes a dollar amount that would ensure those needs are met. *Consumer's Rsch.*, 67 F.4th at 796. As discussed below, it collects and disburses the funds pursuant to statutory and FCC instruction. Finally, every decision concerning the fund is submitted for review to both the FCC and Congress. Therefore, the USAC is properly subordinate to the FCC.

### b. *The FCC's Authority*

The Petitioners argue that the FCC's use of the USAC violates the private nondelegation doctrine because: the USAC decides how much money to raise and how to spend it, and the FCC exercises no meaningful oversight of these decisions. We disagree. A review of the regulations governing each point in the Petitioners

argument reveals that the FCC maintains substantial authority over the USAC.

First, the USAC's projection for the 2022 Fourth Quarter Contribution Factor is only a proposal. *See id.* ("[T]he FCC is not bound by USAC's projections."). The regulations make clear that "the quarterly universal service contribution factor *shall be determined by the Commission.*" 47 C.F.R. § 54.709(a)(2) (emphasis added). Consequently, the USAC cannot "decide" how much money the fund will make per quarter. Instead, it submits quarterly projected costs that "must be approved" by the FCC. *Id.* § 54.709(a)(3). The FCC has the right to adjust the projection, set its own, or take no action (in which case the USAC's projection will be deemed approved by the FCC). *Id.* If approved, the projected expenses "are used to calculate the quarterly contribution factor." *Id.* Importantly, the USAC cannot apply the contribution factor to the fund contributors until the factor has been approved by the FCC. *Id.*

The Petitioners take issue with the FCC's option to deem a proposal approved through inaction. *See id.* ("If the Commission take no action within fourteen (14) days of the date of release of the public notice announcing the projections . . . the contribution factor shall be deemed approved by the Commission."). But "an agency exercises its policymaking discretion with equal force when it makes policy by either deciding to act or deciding *not* to act." *Consumer's Rsch.*, 67 F.4th at 796 (alterations adopted) (internal quotation marks omitted). Thus, the USAC simply acts as an advisor

that proposes regulations subject to government approval. *Adkins* 310 U.S. at 388 (explaining that private entities that aid government agencies "but [that are] subject to [the agency's] pervasive surveillance and authority" are permissible); *see also Consumer's Rsch.*, 67 F.4th at 795–96.

Second, the USAC must disburse the funds collected in the manner prescribed by statute and FCC regulation.[4] The FCC mandates that the USAC "shall account for the financial transactions of the Universal Service Fund in accordance with generally accepted accounting principles . . . and maintain the accounts of the Universal Service Fund in accordance with the United States Government Standard General Ledger." 47 C.F.R. § 54.702(n). Under the implementing statute, the funds can *only* be disbursed to an eligible telecommunications carrier. 47 U.S.C. § 254(e). The USAC must report on the disbursement of the Fund to the FCC on a quarterly basis. 47 C.F.R. § 54.702(g)–(h). If a party is aggrieved by the USAC's decision making, that party may seek review by the FCC, *id.* § 54.719(b), and any decision rendered by the FCC becomes binding on the USAC for future decisions. Thus, any discretion the USAC purports to exercise in fund distribution is ultimately

---

[4] The USAC also collects the Universal Service Fund contributions, but this action is clearly ministerial and therefore permissible. *Oklahoma*, 62 F.4th at 229 (stating that decisions from courts of appeals hold that "[p]rivate entities . . . may undertake ministerial functions, such as fee collection"); *Pittston*, 368 F.3d at 397 ("[T]he mere ability to receive governmental monies is clearly ministerial, so that the power to receive taxes (premiums) and other federal revenues . . . does not violate the nondelegation doctrine.").

reviewable by the FCC to ensure it has been used in the manner prescribed by the FCC and Congress.

Last, the FCC maintains deep and meaningful control over the USAC. In addition to the ways the FCC maintains final decision-making authority regarding the universal service fund, the FCC always maintains control of the USAC as an entity. It sets requirements for selection and selects each of the USAC's nineteen directors, *id*. § 54.703(b)–(c), and the Chairman of the FCC must approve or appoint the USAC's Chief Executive Officer, *id*. § 54.704(b). A review of the USAC's involvement with calculating the contribution factor process reveals no unconstitutional delegation of legislative authority. The USAC submits proposed projections of the fund's needs, and the FCC reviews the USAC's proposal. If the FCC approves the projection, it is then used in the FCC's calculation of the contribution factor. The USAC collects and disburses the funds but must do so according to statutory and administrative directions. Parties can appeal any USAC action to the FCC, and the FCC's decisions in these cases bind USAC. In sum, under § 254, the USAC is subordinate to and remains subject to the authority of the FCC. Consequently, "[s]ince law-making is not entrusted to the [USAC], this statutory scheme is unquestionably valid." *Adkins*, 310 U.S. at 399.

## VI.   Conclusion

Today we hold that there are no unconstitutional delegations under 47 U.S.C. § 254 because Congress has laid out the principles the FCC must follow in bringing universal service to our

22-13315               Opinion of the Court                    19

Nation.  Additionally, because all USAC action is subordinate to the FCC, and the FCC retains ultimate decision-making power, we further hold that there is no violation of the private nondelegation doctrine.  For these reasons, we **DENY** the petition.

22-13315      Newsom, J., Concurring in the Judgment           1

NEWSOM, Circuit Judge, concurring in judgment:

Although I concur in the judgment denying the petition for review, I do so reluctantly. I'm deeply skeptical that today's result can be squared with constitutional first principles. And even under existing precedent, I'm not sure how the case would come out had it been framed differently. Let me explain.

## I

First, a brief tour of the statutory and regulatory landscape. Congress has tasked the FCC with administering a program designed to make telecommunications services widely available throughout the United States. *See generally* 47 U.S.C. § 254. This "universal service" program is funded through mandatory exactions on telecom companies—euphemistically called "contributions"—that are then redistributed to cash-strapped carriers that serve hard-to-reach areas, like rural and insular communities. *Id.* § 254(b), (d). The FCC determines the program's size and scope by prescribing what "universal service" should entail, guided by an "evolving" consideration of several statutory criteria. *Id.* § 254(c)(1). Having done so, the agency proceeds to decide how much carriers should have to pay into the pot in order to make "universal service" a reality. *Id.* § 254(d).

The FCC relies on a private entity called the Universal Service Administrative Company to assist it in administering the universal-service program. USAC projects universal-service funding demands, proposes contribution rates, bills and collects money from carriers, and then disburses those funds to eligible providers.

*See* 47 U.S.C. § 254(e) (describing the basic requirements for disbursement); *id.* §§ 54.701–02, 54.706, 54.708, 54.709, 54.712 (designating USAC as the administrator of the universal-service program and outlining the rules for contributions and distribution).  To calculate demand, USAC uses detailed FCC-promulgated formulas, inputting companies' self-reported operating expenses and other values.  *See* 47 C.F.R. §§ 54.303, 54.901, 54.1301.  After crunching the numbers, USAC submits "projections of demand" to the agency 60 days before the start of each quarter.  *Id.* § 54.709(a)(3).  Thirty days later, the FCC publishes USAC's proposed contribution rate for all telecommunications carriers.  *Id.*

If the FCC fails to countermand USAC's contribution rate within two weeks, the rate goes into effect for the quarter, and carriers are charged accordingly.  *Id.*  The agency apparently exercises its oversight authority sparingly; so far as I can tell, it has disapproved or modified USAC's rate only three times in the last 25 years.  *See First Quarter 1998 Universal Service Contribution Factors Revised and Approved*, CC Docket No. 96-45, Public Notice, 12 FCC Rcd. 21881, 21886 (1997); *Revised Second Quarter 2003 Universal Service Contribution Factor*, CC Docket No. 96-45, Public Notice, 18 FCC Rcd. 5097 (2003); *Proposed Third Quarter 2023 Universal Service Contribution Factor*, DA 23-507, 2023 WL 4012359 (June 14, 2023).  In one instance, the FCC rounded the rate up fifty-six one-thousandths of a percentage point, from 9.044% to 9.1%.  *See Revised Second Quarter 2003*, 18 FCC Rcd. 5097.  Another occurred (serendipitously or otherwise) during the pendency of this litigation and, in fact, involved nothing more than a minor front-end adjustment

carrying unspent funds forward to a new quarter. *See Proposed Third Quarter 2023,* 2023 WL 4012359; *see also Proposed Fourth Quarter 2023¸*CC Docket No. 96-45, Public Notice, DA 23-843 (Sept. 13, 2023) (also noting the carryover funds for the fourth quarter).

USAC's collections activity brings in real money. The record indicates that USAC was projected to collect nearly $2 billion from carriers *in the final quarter of 2022 alone*, a figure that dwarfs the FCC's entire annual budget. *Compare* FCC, *Proposed Fourth Quarter 2022 Universal Service Contribution Factor*, Public Notice, 2022 WL 424497 (Sept. 13, 2022) (projecting $1.914 billion in universal-service program collection for the quarter), *with* FCC, *2022 Budget Estimates to Congress*, DA 22-946, 2021 WL 2190014 (May 1, 2021) (requesting approximately $500 million for the year).

## II

Petitioners principally contend that in 47 U.S.C. § 254 Congress has unconstitutionally delegated its "legislative Powers" to the FCC. *See* U.S. Const. art. I, § 1, cl. 1. As an original matter, I suspect they may well be right. Their challenge fails, as I see it, only because non-delegation doctrine has become a punchline.

First off, what exactly is "legislative Power[]"? In short, it's the authority "to adopt generally applicable rules of conduct governing future actions by private persons." *Gundy v. United States*, 139 S. Ct. 2116, 2133 (2019) (Gorsuch, J., joined by Roberts, C.J., and Thomas, J., dissenting); *accord Department of Transp. v. Association of Am. R.Rs.*, 575 U.S. 43, 70 (2015) (Thomas, J., concurring) (similar). By that measure, the FCC is almost *certainly* exercising

legislative power when it decides, among other things, how big the universal-service program should be, what it should entail, and how much carriers should have to chip in to bring it to fruition.

The contribution scheme, in particular, seems suspect. In practical effect, the universal-service "contributions" are probably taxes, in that they are exacted from all telecom carriers but are redistributed only to the subclass of those that are "eligible" on the ground that they serve high-cost and underserved areas. *See* 47 U.S.C. § 254(d)–(e); 47 C.F.R. § 54.701(c)(1); *see also National Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 341–42 (1974) (distinguishing a tax from a fee on the ground that the latter "bestows a benefit on the applicant, not shared by other members of society").[1] Setting tax rates sure seems like a legislative power to me. *See* The Federalist No. 56 at 1 (James Madison or Alexander Hamilton) (Clinton Rossiter ed., 1961) ("What are to be the objects of federal legislation? Those which are of most importance, and which seem most to require local knowledge, are commerce, taxation, and the militia."); *National Cable*, 415 U.S. at 341–42 ("Taxation is a legislative function and Congress . . . is the sole organ for levying taxes.").[2]  Likewise, prescribing the universal-service

---

[1] It also seems to me relevant to the contributions' "tax" status that the statute itself designates the American public—writ large, rather than the payor carriers—as the universal-service program's principal beneficiary. *See* 47 U.S.C. § 254(b)(2).

[2] I recognize that two other circuits have concluded that the universal-service contributions constitute fees rather than taxes. *See Rural Cellular Ass'n v. FCC*, 685 F.3d 1083, 1091 (D.C. Cir. 2012); *Texas Off. Pub. Util. Couns. v. FCC* (*TOPUC*

program's sweep and scope—determining what it should accomplish, to what extent, and where—strikes me as the sort of "policy judgment[]" that "Congress, and not the Executive Branch, [should] make." *Gundy*, 139 S. Ct. at 2141 (Gorsuch, J., joined by Roberts, C.J., and Thomas, J., dissenting).

Section 254 gives the FCC only the faintest, most vacuous guidance about how to exercise its authority. For instance, in crafting "policies for the preservation and advancement of universal service," the statute directs the agency to consider a handful of "principles." 47 U.S.C. § 254(b). Among them, the agency shall—

- aim to make "[q]uality services" available at "just, reasonable, and affordable rates," *id.* § 254(b)(1);

- endeavor to make telecom services available to "[c]onsumers in all regions of the Nation" at rates that are "reasonably comparable to rates charged for similar services in urban areas," *id.* § 254(b)(3);

_____

*I*), 183 F.3d 393, 440 (5th Cir. 1999). Respectfully, I'm not so sure. Notably, one of those courts deemed the contributions fees in order to avoid the constitutional difficulties that would arise were they instead deemed taxes. *See TOPUC I*, 183 F.3d at 440 (stating that the "FCC's decision to extend universal service support to internet access and internal connections raises grave doubts as to whether § 254(h) creates an unconstitutional tax" and accordingly "constru[ing] the statute narrowly to avoid raising these constitutional problems"). In any event, the Supreme Court's decision in *Skinner v. Mid-America Pipeline Co.* indicates that the tax-fee distinction shouldn't affect the nondelegation analysis. 490 U.S. 212, 222–23 (1989) (rejecting "the application of a different and stricter nondelegation doctrine in cases where Congress delegates discretionary authority to the Executive under its taxing power").

- require all telecom carriers to make *"an equitable and nondiscriminatory* contribution to the preservation and advancement of universal service," *id.* § 254(b)(4); and

- ensure that there are "specific, predictable and sufficient Federal and State mechanisms" to preserve and advance universal service, *id.* § 254(b)(5).

Those hazy "principles"—grounded in terms like "just," "reasonable," "affordable," "reasonably comparable," "equitable," "predictable," and "sufficient"—cannot possibly constrain the FCC's policymaking discretion in any meaningful way. They leave the agency all the room it needs to do essentially whatever it wants. And to make matters even worse—even more open-ended— § 254(b) adds a catch-all clause, which authorizes the FCC to consider "[s]uch other principles" as it "determine[s] are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter." *Id.* § 254(b)(7).

Further diminishing the likelihood of any real guidance, the term "universal service"—the very object of the entire program— is defined only in the most ambiguous way. "Universal service," the statute says, is an "evolving" concept that should "tak[e] into account advances in telecommunications and information technologies and services." *Id.* § 254(c)(1). In specifying the content of that concept, the statute vaguely directs the FCC to "consider the extent to which such telecommunications services" (a) are "essential to education, public health, or public safety," (b) "have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers," (c) are "being

deployed in public telecommunications networks by telecommunications carriers," and—the kicker—(d) are "consistent with the public interest, convenience, and necessity." *Id*.

Finally, § 254 provides similarly squishy (which is to say essentially no) direction about how much telecom companies should actually be charged: "Every telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service." *Id*. § 254(d). Candidly, I have *no* idea what that means.

As a matter of first principles—as in real life—such empty, mealymouthed shibboleths provide no meaningful constraint; to the contrary, they confer front-line law- and policymaking power on unelected, unaccountable agency bureaucrats. *See* Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327, 369 (2002) (suggesting that a statute that allows a "ratemaking agency" to "choose its own standard for the rate base" would be "invalid[]").[3]

---

[3] I'm aware of Founding-era evidence indicating that agency boards sometimes set real-estate valuations that served as the baselines for the imposition of taxes. But I see that as a fact-finding exercise appropriate to Executive Branch determination, not as the articulation of any generally applicable policy. *Cf.* Nicholas Parrillo, *A Critical Assessment of the Originalist Case Against Administrative Regulatory Power: New Evidence from the Federal Tax on Private Real Estate in the 1790s*, 130 Yale L.J. 1288, 1313 & n.102 (2021) (presenting "skeptics'" argument that setting valuations is a fact-finding exercise). In the cited

But—and herein lies the problem—I don't think I can say that the so-called "principles" that § 254 articulates are any less "intelligible" than those that the Supreme Court has explicitly sanctioned as sufficiently clear to forestall a non-delegation challenge. *See Gundy*, 139 S. Ct. at 2123 (2019) ("[W]e have held, time and again, that a statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).  To take just one example, the Court has upheld a statute directing the FCC to act in the "public interest, convenience, or necessity" on the ground that it wasn't "so indefinite as to confer an unlimited power" and didn't leave the agency wholly "at large in performing this duty."  *National Broad. Co. v. United States*, 319 U.S. 190, 216 (1943); *see also*, *e.g.*, *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 475–76 (2001) ("requisite" "to protect the public health"); *Yakus v. United States*, 321 U.S. 414, 421, 427 (1944) ("so far as practicable," "fair and equitable").  In light of the decidedly "not demanding" standards that the Court has tolerated to date, *Gundy*, 139 S. Ct. at 2129, I think the majority here is correct to conclude that, under existing precedent, § 254 probably passes constitutional muster.

To be clear, I'm not at all "convinced that the intelligible principle doctrine serves to prevent all cessions of legislative

---

example, Congress set the tax rates via statute; the assessors merely determined the taxed property's value.  *See id.* at 2020–21.

power." *Whitman*, 531 U.S. at 487 (Thomas, J., concurring). But taking the intelligible-principle standard as I find it, I feel constrained to conclude that § 254 satisfies it.

### III

Petitioners separately raise a "private nondelegation" challenge. *See* Br. of Petrs. at 64–70; Reply Br. of Petrs. at 43–49. I'll have to say, though, that it's hard to discern precisely what they mean by that. Clearly, they object to USAC's participation in the universal-service program. What's less clear to me is on exactly what ground. As I understand their position, petitioners contend that USAC—the private entity that the FCC has tapped to help it run the program—is impermissibly exercising *legislative* power. Thus, for instance, petitioners conclude their brief by arguing that USAC's involvement "violates the private nondelegation doctrine, *contrary to Article I of the U.S. Constitution.*" Br. of Petrs. at 70 (emphasis added); *see also id.* at 64 ("But that is exactly what has happened here—'[w]hat [i]s essentially a *legislative* determination' is now 'made not by Congress or even by the Executive Branch but by a private group.'" (emphasis added) (alterations in original).

To the extent that's the gist of petitioners' private-delegation challenge, I disagree with it. I don't think that USAC is exercising legislative power. So far as I can tell, the majority is right that the FCC establishes the formulas from which USAC derives the contribution rate. *See* Maj. Op. at 3; 47 C.F.R. §§ 54.303, 54.901, 54.1301. Accordingly, to the extent that rate-setting is a legislative function—and I think it is, *see supra* at 3–5—it's the FCC that's exercising

legislative power. As I've said, as a first-principles matter, I think that the agency is violating the Constitution in doing so. *See supra* at 3–7. But if under existing precedent I'm stuck with the fiction that the FCC isn't acting legislatively when it sets the rates, then I think it follows *a fortiori* that USAC isn't doing so either. *Cf*. 47 C.F.R. § 54.702(c) ("[USAC] may not make policy . . . .").

Even so, it might yet be the case that USAC is operating ultra vires—for either of at least two reasons. Because petitioners haven't teed up either objection, I offer only a few preliminary observations.

## A

First, it may be that USAC is operating in contravention of the governing statute, 47 U.S.C. § 254, which conspicuously never even *mentions* USAC, let alone authorizes its involvement in the universal-service program. As already explained, the statute charges the FCC with establishing "mechanisms" to "preserve and advance universal service" such that "[e]very telecommunications carrier" will "contribute" to the program. 47 U.S.C. § 254(d). But it says nary a word about USAC. That alone seems a pretty good reason to think that USAC shouldn't be exercising governmental power. *Cf. Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (deeming delegation of governmental power to a private entity "obnoxious" even where Congress *had* explicitly authorized it).[4] For

---

[4] At oral argument, the FCC asserted that § 254(j) contains what is, in effect, a veiled acknowledgement of USAC's role. *See* Oral Arg. at 23:08–24:25. I'm not convinced. All subsection (j) says is that "[n]othing in this section shall

22-13315      Newsom, J., Concurring in the Judgment      11

whatever reason, though, petitioners haven't framed their challenge in statutory terms, so I won't pursue the matter further.[5]

---

affect the contribution, distribution, or administration of the Lifeline Assistance Program . . . ."  47 U.S.C. § 254(j).  That program was originally run by the National Exchange Carrier Association, another private organization that preceded USAC.  *See Allnet Comm. Serv., Inc. v. National Exch. Carrier Ass'n, Inc.*, 965 F.2d 1118, 1119 (D.C. Cir. 1992) (observing that NECA collected access charges for the Lifeline Assistance Program).  Conspicuously, though, § 254(j) never mentions NECA, much less sanctions a private entity's involvement in the program's administration.  I think it strains credulity to read subsection (j) as authorizing USAC's participation in the universal-service scheme.

[5] I realize that some of my colleagues have found the lack of statutory authorization relevant to the question whether a private-delegation arrangement violates the Constitution.  *See Texas v. Rettig*, 993 F.3d 408, 413–15 (5th Cir. 2021) (Ho, J., dissenting from denial of rehearing en banc).  To be sure, when the operative statute requires an agency to act, as ours does, *see* 47 U.S.C. § 254(d), and yet doesn't authorize further subdelegation to a private entity, that subdelegation violates the statute.  *See, e.g., U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565–66 (D.C. Cir. 2004).  I'm less convinced, though, that congressional authorization (or the lack thereof) has any real bearing on the *constitutional* question, if only because we generally don't take Congress's word for whether a scheme is constitutional.  For the same essential reason, I think that *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974), is largely inapposite—to the constitutional question, I mean.  That case merely holds, as a statutory matter, that when a provision says that the "applicable federal agency must bear the responsibility for the ultimate work product," the agency "must independently perform its reviewing, analytical and judgmental functions and participate actively and significantly in the preparation and drafting process."  *Id.* (internal quotation omitted).  I don't think it bears on the constitutionality of the agency's subdelegation to a private party.

**B**

Second, and separately, even if USAC isn't impermissibly exercising legislative power, its involvement in the universal-service program may yet violate the Constitution. "[B]ound to apply [the] 'intelligible principle' test," and thus to conclude that there's been no unlawful delegation of *legislative* power, *Association of Am. R.Rs.*, 575 U.S. at 90 (Thomas, J., concurring), I'm left to ask two follow-on questions, neither of which the parties here have squarely teed up: Is USAC exercising *executive* power, and if so, is it "constitutionally eligible" to do so? *Id.*

The answer to the first of those two follow-ons is clear. The majority opinion accurately describes USAC's role in the universal-service program: "The FCC depends on [USAC], a private entity, to carry out Congress's instruction[s]." Maj. Op. at 3; *see also id.* at 14 (referring to "USAC's role in carrying out the universal service fund"). And that description perfectly describes the "executive" function. The term "execute" has long meant—and means today—"to carry out or into complete effect." *Webster's New International Dictionary* (2d ed. 1944); *accord* Noah Webster, *An American Dictionary of the English Language* (1828) ("to carry into complete effect"); 1 Samuel Johnson, *Dictionary of the English Language* (6th ed. 1785) ("[t]o put in act; to do what is planned or determined"). So yes, it seems obvious to me that in collecting de facto taxes and distributing benefits USAC is exercising "executive" power.

The critical question, then, is whether the Constitution permits it to do so.[6] Let's start with what we know for sure. First, "[u]nder our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take care that the Laws be

---

[6] So far as I can tell, none of the pertinent Supreme Court decisions have tackled the question whether a private party was impermissibly exercising executive power; rather, all have addressed the allegedly unlawful exercise of *legislative* authority. In 1936, the Court in *Carter Coal* invalidated a statute that authorized a group of private business owners to set maximum work hours. 298 U.S. at 311. In so doing, the Court called the scheme "*legislative* delegation in its most obnoxious form." *Id.* (emphasis added). Several years later, after the infamous "switch in time" the Court twice upheld statutes that conferred authority on private entities against challenges that they "involve[d] any delegation of *legislative* authority." *Currin v. Wallace*, 306 U.S. 1, 15 (1939) (emphasis added); *accord Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 398 (1940) ("Nor has Congress delegated its *legislative* authority to the industry. . . . Since *law-making* is not entrusted to the industry, this statutory scheme is unquestionably valid." (emphasis added)).

Our sister circuits' decisions have likewise focused on the question whether private entities were unconstitutionally exercising legislative (rather than executive) authority. *See, e.g., Frame v. United States*, 885 F.2d 1119, 1128–29 (3d Cir. 1989) (observing that because "no law-making authority ha[d] been entrusted to" the private entity, the statute in question did "not constitute an unlawful delegation of legislative authority"); *National Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880–83 (5th Cir. 2022) (criticizing a scheme that gave "rulemaking power" to a private entity); *cf. Pittston Co. v. United States*, 368 F.3d 385, 397 (4th Cir. 2004) (stating, without citation, that "the mere ability to receive governmental monies is clearly ministerial"). Only the Sixth Circuit in *Oklahoma v. United States* acknowledged the "[d]ifficult and fundamental questions" that may "arise when private entities enforce federal law." 62 F.4th 221, 233 (6th Cir. 2023) (internal quotation omitted). Notably, though, because the parties there (like those here) hadn't "engaged with this feature of the Act," the court declined to do so. *Id.*

faithfully executed.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2191 (2020) (quoting U.S. Const. art. II, § 1, cls. 1; *id.* § 3); *see also id.* at 2197 ("The entire 'executive Power' belongs to the President alone."). Second, "[b]ecause no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance"—provided, at least, that he maintains sufficient supervisory authority over them. *Id.* at 2191; *see also, e.g.*, Saikrishna Prakash, *The Essential Meaning of Executive Power*, 2003 U. Ill. L. Rev. 701, 795 (2003); Tara Leigh Grove, *Standing as an Article II Nondelegation Doctrine*, 11 J. Const. L. 781, 790 (2009).

Beyond that, things get hazier. In particular, the question whether (and to what extent) a private party or entity may share in the Executive Branch's implementation of federal policy is, to use a buzzphrase du jour, undertheorized. There is, I think it's fair to say, evidence pointing in both directions.

On the one hand, the Constitution's text and structure indicate—admittedly without saying so explicitly—that private parties may not be tasked with exercising governmental power *of any sort*. Justice Thomas has explained the point well: "Although no provision of the Constitution expressly forbids private entities from exercising government authority," the "so-called 'private nondelegation doctrine' flows logically from the three Vesting Clauses":

> Because a private entity is neither Congress, nor the President or one of his agents, nor the Supreme Court or an inferior court established by Congress, the Vesting Clauses would categorically preclude it

from exercising the legislative, executive, or judicial powers of the Federal Government. In short, the "private nondelegation doctrine" is merely one application of the provisions of the Constitution that forbid Congress to allocate power to an ineligible entity, whether governmental or private.

*Association of Am. R.Rs.*, 575 U.S. at 87–88 (Thomas, J., concurring); *see also Gundy*, 139 S. Ct. at 2133 (Gorsuch, J., joined by Roberts, C.J., and Thomas, J., dissenting) (emphasizing that the three parallel Vesting Clauses lodge "the authority to exercise different aspects of the people's sovereign power in distinct entities"). Put simply, "when it comes to private entities" exercising governmental power, "there is not even a fig leaf of constitutional justification." *Association of Am. R.Rs.*, 575 U.S. at 62 (Alito, J., concurring).

And to be clear, it's not all form and structure. Delegation of government power to private entities also raises practical and fairness concerns. As the Supreme Court said almost a century ago, delegation of official power to a private party is "delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business." *Carter Coal*, 298 U.S. at 311. Emphasizing the Court's rationale there, at least one commentator has described *Carter Coal* as turning, fundamentally, on the due process concerns that attend allowing one private, self-interested party to harness the coercive power of the state to regulate others. *See* Alexander Volokh, *New Private-Regulation Skepticism: Due Process, Non-*

*Delegation, and Antitrust Challenges*, 37 Harv. J. L. & Pub. Pol'y 931, 980–81 (2014); *see also* Alexander Volokh*, The Myth of the Federal Private Nondelegation Doctrine*, 99 Notre Dame L. Rev. 203, 257 (2023).

All of this squares with what I've said before about the prospect of private parties exercising *executive* power, in particular—namely, that they can't. That is so, I've said, for both "formal, structural reasons—in particular, Article II's explicit vesting of federal 'executive Power' in the President"—and "instrumental ones"—specifically, the risks inherent in giving enforcement power to those not "subject to political and legal constraints." *Laufer v. Arpan LLC*, 29 F.4th 1268, 1294–95 (11th Cir. 2022) (Newsom, J., concurring), *vacated*, 77 F.4th 1366, 2023 (11th Cir. 2023); *accord Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1133 (11th Cir. 2021) (Newsom, J., concurring) ("From [Article II's] explicit vesting, it follows that the 'executive Power' can't be exercised by private parties.").

Now, in the interest of completeness, I should acknowledge some historical counterevidence—areas and instances in which private parties and entities seemingly *have* been allowed to exercise what would certainly seem to be executive authority. One obvious example: The Constitution itself contemplates that private individuals—in essence, mercenaries—might play a role in international law enforcement. *See* U.S. Const. art. 1 § 8, cl. 11 (allowing Congress to "grant Letters of Marque and Reprisal"). There's also a fairly long history in this country of private entities managing prisons. *See, e.g.*, Gillian Metzger, *Privatization as Delegation*, 103

22-13315    Newsom, J., Concurring in the Judgment    17

Colum. L. Rev. 1367, 1392–93 (2003) (noting that "[e]xtensive privatization characterized incarceration in the nineteenth century," waned during the early twentieth century, and has since come back into vogue). The nation's early years saw private parties bringing criminal prosecutions—a practice that, needless to say, has died out—and qui tam actions—a practice that has persisted. *See, e.g.*, Zachary Price, *Enforcement Discretion and Executive Duty*, 67 Vand. L. Rev. 671, 720–22 (2014); *but see United States ex rel. Polansky v. Executive Health Res., Inc.*, 599 U.S. 419, 449 (Thomas, J., dissenting) ("There are substantial arguments that the qui tam device is inconsistent with Article II . . . ."). And most recently, the Supreme Court recognized that "[f]or as long as the eminent domain power has been exercised by the United States, it has also been delegated to private parties." *PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244, 2255 (2021).

As best I can tell, the history of private-party involvement in tax collection—a role roughly analogous to one that USAC seems to play in § 254's universal-service scheme—is mixed. In the Founding era, private parties seem not to have been involved. The First Congress created the Treasury Department in 1789 to, among other things, collect federal taxes, and it has been doing so ever since. *See* U.S. Dep't of the Treasury, *History Overview*, https://home.treasury.gov/about/history/history-overview (last visited Sept. 22, 2023) (listing "collecting income and excise taxes" as one of the Treasury's "activities," "formally established as an executive department by the First Session of Congress in 1789"); Prakash, *Essential Meaning*, at 747 (citing Montesquieu for the

proposition that tax collection is a quintessential government task); *see also, e.g.*, Act of July 11, 1798, ch. 71, §§ 1–16, 1 Stat. 591, 591–94 (repealed) (setting compensation for tax collectors during the Fifth Congress); *id.*, ch. 70, §§ 2–9, 28–30, 1 Stat. 580, 583, 590–91 (1798) (setting compensation and requiring oaths for federal real-estate assessors); Act of July 14, 1798, ch. 75, § 2, 1 Stat. 597, 598 (1798) ("That the said tax shall be collected by the supervisors, inspectors, and collectors of the internal revenues of the United States . . . ."); Act of Mar. 3, 1804, ch. 20, §§ 1–7, 2 Stat. 262, 262–64 (1804) (using tax collectors for the direct tax); Oliver Wolcott, Compensation of Officers of the Revenue (Apr. 17, 1798), *in* 1 American State Papers, Finance 576, 576–79 (1832) (encouraging Congress to accept a proposed "augmentation of compensation" for tax collectors to "prevent the greatest embarrassments").

For a brief period in the 1870s, and again more recently, the federal government experimented with privatized tax collection. The 19th-century effort failed spectacularly—and very publicly—and was scrapped after just two years. *See, e.g.*, H.R. Rep. No. 559 at 9 (1874) ("The committee are of [the] opinion that any system of farming the collection of any portion of the revenues of the Government is fundamentally wrong; that no necessity for such laws exist[s], for the reason that the Secretary of the Treasury and the head of the Internal-Revenue Bureau are fully empowered by law to make all collections of taxes . . . ."); 2 Cong. Rec. 2121 (1874) (statement of Sen. Hale) ("[I]n [this law's] inception it was, in my view, wholly, radically, violently, wickedly wrong."); *The President and the Sanborn Business*, N.Y. Times, May 5, 1874 (describing one

of the private tax collectors as a "superlative rogue who has swindled the Government from one month's end to another with amazing impunity"). The more modern experiment began about 20 years ago and remains ongoing. IRS, *Private Debt Collection* (July 5, 2023), https://www.irs.gov/businesses/small-businesses-self-employed/private-debt-collection; Emily Rockwood, *Privatizing Tax Collection: A Case Study in the Outsourcing Debate*, 36 Pub. Cont. L.J. 423, 427 (2007).

Candidly, I'm not quite sure what to make of all this—the textual, structural, and historical indicators seem to point in different (or multiple) directions. But of this much I'm confident: To the extent that delegation of executive power to a private entity outside the government is permissible at all, it is permissible *only* if that entity "is adequately subject to Presidential control." *Assoc. of Am. R.Rs.*, 575 U.S. at 91 (Thomas, J., concurring). So if I'm right that USAC is exercising executive power, *see supra* at 12, then the question becomes, at the very least, whether USAC is subject to the sort of control that Article II demands. *See generally* Alexander Volokh, *supra*, at 248, 254.

That, to my mind, is far from clear. To be sure, USAC operates under *some* supervision. For example, it has to file annual reports detailing its activities. *See* 47 C.F.R. 54.702(g). The FCC retains the formal authority to reject USAC determinations, and a party wishing to challenge one of those determinations is entitled to a hearing before the agency. *See id.* §§ 54.709(a)(3); 54.719; 54.722. Critically, though, with respect to the proposed universal-

service "contribution factor," in particular—the primary and most direct way that USAC executes congressional directives—the FCC needn't (and overwhelmingly doesn't) do anything at all. *See supra* 2–3. Unless and until the agency steps in to affirmatively countermand USAC's proposed exaction within 14 days, it goes into effect by sheer force of inertia. *Id.* Accordingly, while the FCC maintains a patina of control over USAC's most important function, the fact that agency approval can be entirely passive—and in fact, is effectively presumed—calls into question how meaningful its control really is.

In any event, the key isn't the degree of the FCC's control, but the *President's*. And in that connection, the Supreme Court's decisions "treat appointment and removal powers as the primary devices of executive control." *Assoc. of Am. R.Rs.,* 575 U.S. at 91 (Thomas, J., concurring) (citing *Free Enter. Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477, 492 (2010)). The removal issues vis-à-vis USAC, it seems to me, are doubly fraught. First, the only word regarding USAC's removal comes from its own bylaws, which authorize the entity's board to remove one of its members by a majority vote and with the approval of the FCC's chairman. *See* By-Laws of Univ. Serv. Admin. Co., art. 2 § 7 https://www.usac.org/wp-content/uploads/about/documents/leadership/usacbylaws.pdf. So far as the bylaws are concerned, then, USAC is essentially in charge of its own continuance in office. Second, and to compound matters, because the FCC is an independent agency, whose commissioners may be removed only for cause, *see Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,* 537

F.3d 667, 695–96 (D.C. Cir. 2008) (Kavanaugh, J., dissenting), *aff'd in part, rev'd in part and remanded*, 561 U.S. 477 (2010), USAC's board members enjoy something akin to the double-for-cause-removal protection that the Supreme Court has recently held to be unconstitutional. *See Seila Law*, 140 S. Ct. at 2197; *Free Enter. Fund*, 561 U.S. 477 at 484 (2010). And, it seems to me, the removal-and-control-related considerations that attend delegation of executive power to a private entity are at least as acute as—if not demonstrably more acute than—those that attend delegation to an administrative agency. Delegation to a private entity breaks the ordinary chain of accountability that our "carefully calibrated" system of government is designed to uphold. *Seila Law*, 140 S. Ct. at 2203.[7]

\* \* \*

Because petitioners didn't squarely present either a statutory or an executive-delegation challenge, I won't go any further. Suffice it to say, though, that nondelegation issues do not necessarily

---

[7] I suppose the FCC (although *not* the President) retains some modicum of authority over the appointment of USAC's directors. *See* 47 C.F.R. § 54.703. Even there, though, the agency's oversight is minimal and is filtered through private groups' preferences: The FCC Chairman's initial selection comes from the "nominations submitted by industry and non-industry groups"; he can make his own selection in the event they can't "reach consensus on a nominee or fail[] to submit a nomination." *Id.* § 54.703(c)(3). USAC's Chief Executive Officer is selected in much the same way: first, the board forwards names for the FCC Chairman's review; then, if no consensus is reached, the Chairman makes the selection. *Id.* § 54.704(b).

end with Article I.  Article II provides important limits, as well, however uncertain under current doctrine.

### III

Bound by precedent and the parties' framing of the issues, I concur in the majority's judgment.  But this case illuminates deeper problems in nondelegation precedent.  After all, "[l]iberty requires accountability." *Ass'n of Am. R.Rs.*, 575 U.S. at 57 (Alito, J., concurring).  But with each successive delegation—from Congress to agencies, and then from agencies to private parties—we drift further and further from the locus of democratic accountability.  The Constitution imposes important limits on how the government goes about doing its job.  If it can't do everything it wants to do—such that it has to outsource responsibilities to private parties—that may indicate it's trying to do too much.

22-13315                LAGOA, J., Concurring                1

LAGOA, Circuit Judge, concurring:

I concur in the majority opinion. But I share much of the same concerns expressed by Judge Newsom in his concurring opinion about how the current nondelegation doctrine, which requires courts to look to "whether Congress has supplied an intelligible principle to guide the delegee's use of discretion," *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality opinion), has strayed from constitutional first principles, *see* Newsom Conc. at 3–9; *see also Gundy*, 139 S. Ct. at 2133–42 (Gorsuch, J., joined by Roberts, C.J., and Thomas, J., dissenting). However, we are bound to apply the intelligible principle test as set forth by Supreme Court precedent. And given how both the Supreme Court and this Court have applied the intelligible principle test in rejecting nondelegation challenges to other statutes, *see, e.g.*, *Nat'l Broad. Co. v. United States*, 319 U.S. 190 (1943); *Yakus v. United States*, 321 U.S. 414 (1944); *Am. Power & Light Co. v. SEC*, 329 U.S. 90 (1946); *Lichter v. United States*, 334 U.S. 742 (1948); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001); *United States v. Brown*, 364 F.3d 1266 (11th Cir. 2004), I believe that those cases require us to find that 47 U.S.C. § 254's statutory language likewise satisfies the intelligible principle test, as the majority opinion concludes.

With this understanding, I concur.